**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| Afren plc, | ) Case No. 15-11452 (KG) |
| | ) |
| | ) Proposed Hearing Date and Time:  July __, 2015 at [___]m. (EDT) |
| | ) Proposed Objection Deadline:  July __, 2015 at 4:00 p.m. (EDT) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

**VERIFIED PETITION FOR RECOGNITION
OF FOREIGN MAIN PROCEEDING
SUPPLEMENTING "VOLUNTARY PETITION" [DOCKET NO. 1]
AND MOTION FOR RELATED RELIEF**

Anne Vallely (the "**Petitioner**"), duly appointed by a resolution dated June 5, 2015 (the "**Resolution of Appointment**") of the board of directors of Afren plc ("**Afren**," or the "**Debtor**," and such board, the "**Board of Directors**," or the "**Directors**"), a public limited company incorporated under the laws of England, and declared as authorized to act by a June 30, 2015 order (the "**Convening Court Order**") of the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "**UK Court**") as the foreign representative in respect of a voluntary restructuring proceeding (the "**UK Proceeding**") concerning the Debtor currently pending before the UK Court, acting in such capacity and by and through her undersigned counsel, respectfully submits this verified petition in furtherance of the Form of Voluntary Petition filed concurrently herewith [Docket No. 1] (collectively herewith, the "**Petition**"), for entry of an order, substantially in the form of the proposed order annexed hereto as **Exhibit "A,"** (i) recognizing the UK Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code (the "**Bankruptcy Code**"),[1] (ii) granting related relief

---

[1] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

pursuant to section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief

pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a), and 1525(a) of the Bankruptcy

Code in support of the restructuring of the Debtor and certain of its affiliates under English law

(the "**Restructuring**," or if the Restructuring does not obtain the necessary consent of

shareholders of Afren, an alternate financial restructuring, the "**Alternative Restructuring**"),

through, among other things, a scheme of arrangement (the "**Scheme**"), if such Scheme is duly

approved by a requisite majority of affected creditors and sanctioned by the UK Court, all in

accordance with applicable English law.  In support of the Petition, the Petitioner has filed

concurrently herewith and incorporated herein by reference (a) the Declaration of Anne Vallely

pursuant to 28 U.S.C. § 1746 (the "**Vallely Declaration**")[2] [Docket No. 3] and (b) the

Declaration of Christian Pilkington pursuant to 28 U.S.C. § 1746 (the "**Pilkington Declaration**")

[Docket No. 4], and respectfully represents as follows:

**BACKGROUND**

**A.**    **The Debtor, the Debtor's Group, and the Foreign Representative**

1.    Afren is a public limited company incorporated under the Companies Act 1985, a

statute of England and Wales (which are constituent parts of the United Kingdom), and was

registered on December 3, 2004 by the Registrar of Companies for England and Wales (the agent

responsible for registering English companies) under number 05304498.  Its registered office and

corporate headquarters is at Kinnaird House, 1 Pall Mall East, London, United Kingdom SW1Y

5AU.  It was listed on AIM (the London Stock Exchange's international market for smaller

growing companies) in March 2005 and moved to the premium section of the main market of the

---

[2] True and correct copies of each of the Resolution of Appointment and the Convening Court Order are attached to the Vallely Declaration as **Exhibits "A"** and **"B,"** respectively.

2

London Stock Exchange in December 2009.  Afren's market capitalization was approximately £20.7 million, based on a share price of 1.87 pence at the close of business on June 18, 2015.

2.      Afren conducts the administration of its interests on a regular basis from its corporate offices in London, England, where it maintains the entirety of its statutory books, records, corporate documents and tangible assets.  Its primary deposit accounts are in London, and it is also a resident of the United Kingdom for tax purposes.  Since it was formed, all meetings of Afren's Board of Directors and shareholders have been held in London.  Key members of its management, its advisors and auditors are located in London, and its key management decisions are made in the United Kingdom, where all key negotiations in respect of the present liquidity crisis and restructuring have occurred.  All of Afren's correspondence to third parties is sent from London.  Afren's press releases similarly refer to its London address. Its administrative expenses consist primarily of employee expenses related to staff in its corporate head office in London, where all its employees work and a sign stating its name is displayed.

3.      Afren is a holding company and the ultimate parent of 52 direct and indirect subsidiaries (together with Afren, the "**Group**").  Its most important assets are equity interests in English companies, especially Afren Nigeria Holdings Ltd., and claims arising from intercompany to members of the Group.  Annexed to the Vallely Declaration as **Exhibit "C"** is a chart illustrating the corporate structure of the Group.

4.      The Group is focused on the exploration, development, and production of oil assets.  Through various operating subsidiaries, it maintains a portfolio of producing assets, appraisal and development opportunities and exploration prospects, with its core producing assets located in Nigeria.  As of December 31, 2014, it had 86 millions of barrels of

3

independently certified proved oil and gas reserves and 162 millions of barrels of independently certified proved plus probable oil and gas reserves. Daily gross and net oil production averaged approximately 47,560 barrels of oil per day and 31,819 barrels of oil per day, respectively, for the year ended December 31, 2014.

5.    The Group's portfolio of 20 assets predominantly consists of oil production, development, and exploration opportunities. Its three core producing assets – Ebok, Okoro, and OML 26 – are located in Nigeria. The Ebok field and the Okoro field offshore Nigeria are the Group's two primary producing assets. It has further development or exploration interests in Nigeria and in East, West, and South Africa, including in Kenya, Tanzania, Ethiopia, Seychelles, Madagascar, Côte d'Ivoire, Ghana, Congo Brazzaville, and South Africa.

6.    The Group's main operating companies are:

a.    Afren Resources Limited ("**Afren Resources**"), a wholly-owned indirect subsidiary of Afren, which has entered into a joint operating agreement with Oriental Energy Resources Limited, an unaffiliated Nigerian-based company, to develop the Ebok field, under which agreement Afren Resources is responsible for funding fifty percent (50%) of all capital and operating costs for the development of the Ebok field;

b.    Afren Energy Resources Limited ("**AERL**"), a wholly-owned subsidiary of Afren, which has contracted to develop and exploit the Okoro field pursuant to a production sharing and technical services agreement with AMNI International Petrolium Development Company, Limited, an unaffiliated Nigerian-based company;

c.      First Hydrocarbon Nigeria Company Limited ("**FHN**"), a subsidiary set up with two leading Nigerian financial institutions, of which Afren currently holds (directly and indirectly) seventy-eight percent (78%) of the issued share capital and has entered into binding terms with the two minority shareholders for the acquisition of the remaining twenty-two percent (22%);

d.      FHN 26 Limited ("**FHN 26**"), a wholly owned subsidiary of FHN, which has been contracted to develop and exploit the OML 26 field pursuant to a joint operating agreement with Nigerian Petroleum Development Company, an unaffiliated Nigerian-based company; and

e.      Afren Exploration & Production Nigeria Alpha Limited ("**Afren E&P**"), a wholly owned subsidiary of Afren, which is party to a joint operating agreement with Oriental Energy Resources Limited in order to develop the Okwok field.

7.      The Petitioner is Acting General Counsel of Afren and, as such, is fully aware of, and closely involved in, all of the legal affairs of the Debtor and the Group and the proposed financial restructuring.  As noted above, the Petitioner was duly appointed foreign representative pursuant to the Resolution of Appointment.  (See id., § 14.5.)  Pursuant to the Convening Court Order, the UK Court declared that the Petitioner has been specifically authorized in the UK Proceeding to act as a foreign representative in respect of the UK Proceeding in restructuring-related proceedings concerning the Debtor in the United States, including in this chapter 15 case, and regarding the relief requested by this Petition.  (See id., ¶ 18.)

**B.      The Group's Capital Structure**

8.      The Group has raised debt finance by way of the bank facilities described below, the Existing Notes (as hereinafter defined), and equity finance by listing Afren's shares on the

5

London Stock Exchange.  The Group has net current liabilities of approximately $458.5 million as of December 31, 2014 and total gross debt in the amount of $1.304 billion as of December 31, 2014, reflecting a $175 million increase over total gross debt as of December 31, 2013.  As of June 26, 2015, the Group's outstanding debt under the Existing Notes (including accrued interest) was approximately $920 million, and interest on such debt continues to accrue.

9.    <u>Bank Facilities</u>.  The Group has a number of bank facilities in place, the most significant of which are:

a.    A $300 million senior secured loan and letter of credit facility under an agreement dated March 24, 2010 (as amended and restated from time to time, the "**Ebok Facility**"), between, among others, Afren Resources, as borrower, Afren, as guarantor, BNP Paribas, as facility agent, and the lenders (the "**Ebok Lenders**") named therein and secured by (i) a fixed and floating charge and security over substantially all of the assets and undertakings of Afren Resources, (ii) a pledge by Afren Nigeria Holdings Limited of the shares in Afren Resources, (iii) account pledges over Afren Resources' onshore and offshore bank accounts and (iv) assignment of insurances, reinsurance rights and major contracts. Currently, the full $300 million is drawn under the senior secured loan and $6 million is outstanding under various letters of credit.

b.    A $100 million loan under an agreement dated February 27, 2014 (as amended from time to time, the "**OML 26 Facility**"), between FHN 26, as borrower, and Zenith Bank plc, as lender, which is fully drawn.  The OML 26 Facility is secured by (i) a deed creating a charge over FHN 26's interest in OML

6

26 in favor of Zenith Bank; (ii) a deed of pledge over FHN 26's account receivables and cash flows on OML 26; and (iii) a letter of awareness from Afren.

c.       A $550 million facility under an agreement dated September 30, 2014 (as amended from time to time, the "**Okwok/OML 113 Facility**," and together with the Ebok Facility and the OML 26 Facility, the "**Existing Bank Facilities**"), between Afren E&P, as borrower, Afren and FHN 113 Limited, as guarantors, and Access Bank plc, as lender, which is fully drawn.  The Okwok/OML 113 Facility is secured by:  (i) a Nigerian law all assets debenture granted by Afren E&P, including, but not limited to (a) a fixed and floating charge over all its shares in its subsidiaries and the secured bank accounts held with Access Bank and (b) an assignment over insurances and material contracts (subject to obtaining any relevant consents of the counterparties); (ii) a Nigerian law all assets debenture granted by FHN 113 Limited, including, but not limited to (a) a fixed and floating charge over all its shares in its subsidiaries and (b) an assignment over insurances and material contracts (subject to obtaining any relevant consents of the counterparties); (iii) a Nigerian law governed share charge over the shares in Afren E&P and FHN 113 Limited; and (iv) an irrevocable undertaking to domicile free and unencumbered cashflows into Afren's account.

10.       Other than the OML 26 Facility, which will remain in place without being restructured, the Existing Bank Facilities will be restructured on a fully consensual basis as part of the wider financial restructuring of the Group.

11.       <u>Existing Notes</u>.  The Debtor's creditors subject to the Scheme have beneficial interests in the following notes:  (i) 11.5% senior secured notes due February 1, 2016 with an

7

aggregated principal amount outstanding of approximately $253 million (the "**2016 Notes**"), (ii) 10.25% senior secured notes due April 8, 2019 with an aggregate principal amount outstanding of approximately $250 million (the "**2019 Notes**"), and 6.625% senior secured notes due December 9, 2020 with an aggregate principal amount outstanding of approximately $360 million (the "**2020 Notes**," and together with the 2016 Notes and the 2019 Notes, the "**Existing Notes**").

    a.    The 2016 Notes were issued by Afren pursuant to an indenture between, among others, Afren and Deutsche Bank Trust Company, Americas (subsequently replaced by UMB Bank, N.A.), as trustee (the "**Existing Notes Trustee**"), dated February 3, 2011 (as amended from time to time, the "**2016 Indenture**"). The principal amount of the 2016 Notes is payable on their maturity on February 1, 2016, and the 2016 Notes bear interest at the rate of 11.5% payable twice annually (on February 1 and August 1), until maturity.

    b.    The 2019 Notes were issued by Afren pursuant to an indenture between, among others, Afren and the Existing Notes Trustee, dated March 8, 2012 (as amended from time to time, the "**2019 Indenture**"). The principal amount of the 2019 Notes is payable on their maturity on April 8, 2019, and the 2019 Notes bear interest at the rate of 10.25% payable twice annually (on April 8 and October 8) until maturity.

    c.    The 2020 Notes were issued by Afren pursuant to an indenture between, among others, Afren and the Existing Notes Trustee, dated December 9, 2013 (as amended from time to time, the "**2020 Indenture**," and together with the 2016 Indenture and the 2019 Indenture, the "**Existing Indentures**"). The principal

8

amount of the 2020 Notes is payable on their maturity on December 9, 2020, and the 2020 Notes bear interest at the rate of 6.625% payable twice annually (on June 9 and December 9) until maturity.

All of the Existing Notes are listed on the Official List of the Luxembourg Stock Exchange and traded on the Euro MTF Market, and all of the Existing Indentures are governed by New York law.

12.     Each of the Existing Indentures contains covenants typical for high yield notes, including restrictions on liens, the making of certain payments, incurrence of debt, and changes of control.

13.     On April 30, 2015, Afren issued $211.6 million of private placement notes (the "**Bridge Securities**") under a note purchase and private shelf agreement.  The Bridge Securities were issued for a term of 360 days at an original issue discount of 5.5% and have an annual interest rate, payable in kind, of 15%.  This interim funding has provided the Group with immediate liquidity and necessary time to implement the required steps to complete the Restructuring (or the Alternative Restructuring).  Without the provision of such interim funding, the Directors considered that Afren would have been unable to continue as a going concern and would have commenced insolvency proceedings prior to the publication of its accounts on April 30, 2015 for the year ended December 31, 2014.

14.     The Existing Notes are secured by assets connected to the Ebok field (the "**Ebok Collateral**") and the Okoro field (the "**Okoro Collateral**").

15.     With respect to the Ebok Collateral, the relative rights of the holders of the Existing Notes (the "**Existing Noteholders**") and other creditors of the Group are governed by:

9

a.      An intercreditor agreement between, among others, the trustee for the 2016 Notes and BNP Paribas (in its capacities as agent and security agent for the Ebok Lenders and also in its capacity as collateral agent for the Existing Noteholders), dated February 3, 2011 (the "**Ebok Intercreditor Agreement**");

b.      An intercreditor agreement, dated April 30, 2015 entered into in connection with the implementation of the Bridge Securities, which provides, among other things, that the claims of holders of the Bridge Securities (the "**Bridge Noteholders**") rank ahead of the claims of the Existing Noteholders; and

c.       An intercreditor agreement, dated April 30, 2015 entered into in connection with the implementation of the Bridge Securities, which provides, among other things, that the claims of the Bridge Noteholders rank ahead of the claims of the Ebok Lenders.

16.     As a result of the foregoing, (i) the claims of the Bridge Noteholders in respect of the Ebok Collateral rank ahead of the claims of the lenders under the Ebok Facility, (ii) the claims of the Ebok Lenders rank ahead of the claims of the Existing Noteholders, and (iii) the claims of the Existing Noteholders rank pari passu among each other.

17.     With respect to the Okoro Collateral, the relationship among the Bridge Noteholders, the holders of the 2016 Notes, the holders of the 2019 Notes, and the holders of the 2020 Notes is governed by an amended and restated intercreditor agreement entered into on December 9, 2013 between Afren and Deutsche Bank Trust Company Americas (subsequently replaced by UMB Bank, N.A.), and to which UMB Bank, N.A. acceded on April 30, 2015 as Okoro Security Trustee, pursuant to which, among other things, the parties have agreed that they share the Okoro Collateral on a pari passu basis.

10

18.     The Existing Notes will be restructured by way of the Scheme and will be the only debt subject to the Scheme.

**C.     Recent Financial Difficulties**

19.     A number of factors have caused Afren and its subsidiaries to underperform substantially against expectations and put pressure on the Group's short-term liquidity position. Chief among these is that the price of oil fell significantly in 2014 and the resulting depressed price is still in place in 2015.

20.     Afren's liquidity requirements arise principally from its capital expenditure, debt service and working capital requirements.  Afren has traditionally met its working capital requirements primarily from the proceeds of debt financings and oil and gas sales.  Historically, Afren has utilized a combination of short and long term financial instruments to supplement cash flow from operations to finance its cash needs.  Events following the dismissal of the Group's former chief executive officer and chief operating officer, including Afren's inability to continue the planned refinancing of debt obligations in 2014, as well as the sharp decline in oil prices, have placed significant pressure on the Group's liquidity position, resulting in the Group having net current liabilities of $458.5 million as of December 31, 2014.  As of March 31, 2015, the Group had net current liabilities of $1,068 million and cash and cash equivalents of $100 million. The net current liabilities have increased by $609 million from $458.5 million as of December 31, 2014 to $1,068 million as of March 31, 2015 principally due to the following:

a.     a decline in the cash and cash equivalents position that led to current liabilities of $136 million;

b.     an increase in trade and other payables due to the delay of supplier payments that led to current liabilities of $102 million;

11

      c.      a recognition of the 2016 Notes and $50 million of the Ebok Facility as current borrowings that led to current liabilities of $307 million; and

      d.      a decrease in trade receivables and inventory and an increase in tax liabilities that led to current liabilities of $523 million.

21.      In light of the significant uncertainty in the industry and related financing markets resulting from the rapid decline in oil prices, and the material funding constraints faced by the business from January 2015, the Directors initiated a series of actions to stabilize the Group's capital structure and a review of the Group's liquidity requirements and funding sources. The actions and review were intended to address the immediate funding requirements of the business and manage the overall high leverage of the Group. This process ultimately resulted in the Directors' approval of the Bridge Securities to enable the Group to continue to operate while the Restructuring (and the Alternative Restructuring) were developed so as to be capable of implementation, in part, by the Scheme.

22.      As of December 31, 2014, the Group had a consolidated cash position of approximately $237 million. Available liquidity, however, was significantly lower as a result of restricted or segregated cash balances in place to address operational requirements. These balances are held in project accounts and ring-fenced for expenditure on specific assets and therefore cannot be freely used to meet other liabilities of the Group. Afren's near term cash flow was also impacted by ongoing development programs on the Group's producing assets and capital expenditures incurred in late 2014 before operational changes had been implemented to adapt to the new lower oil price environment.

23.      Furthermore, Afren faced, and continues to face, significant debt service obligations in 2015 and 2016. As a first step in managing those obligations, the Group entered

into discussions with the lenders under the Ebok Facility in the second half of 2014. Unfortunately, having fully documented the terms of an amended facility, the week the amendment agreement was due to be signed, the former chief executive officer and chief operating officer were suspended, which derailed the process.

24.     Overall, the Board of Directors concluded in its results for the year ended December 31, 2014 that there was material uncertainty as to whether the Group could continue as a going concern.

25.     As a result of the need to preserve cash in light of insufficient liquidity to fund working capital requirements, committed capex requirements and forthcoming interest and principal payments, the Group took a number of significant steps in early 2015 as a means to avoid potential insolvency proceedings.  These included significant reductions in expenditures, including cutting capex by suspending major developments on key oil fields, stopping all discretionary exploration activity and curtailing all non-essential expenses.

26.     On January 12, 2015, Afren announced its intention to review its strategic options in respect of the Barda Rash oil field, located in the Kurdistan region of Iraq, reflecting both disappointing operational results at the field and a significant reserves and resources downgrade. This, combined with the impact of lower oil prices on producing assets, resulted in a material impairment charge in 2014 in respect of the reserves relating to production and development assets (including goodwill) with Barda Rash fully written off.  In addition, material impairment charges were recorded in relation to the Group's exploration and evaluation assets as future capital expenditure, which have since been curtailed due to the materially lower oil price environment and Afren's current financing constraints.  As a result, the Group incurred pre-tax impairment charges of approximately $2.2 billion in 2014.

**D.**    **Steps Taken Toward Financial Restructuring**

27.    The Group has also taken a number of significant steps in order to address its short term liquidity position and to avoid potential insolvency proceedings, including (but not limited to):

a.    in December 2014, Afren sold its 2015 hedges of 2.85 million of barrels of crude oil, realizing a cash benefit of $80 million;

b.    on February 2, 2015, Afren, Afren Resources and Afren Nigerian Holdings Limited agreed with the Ebok Lenders to a deferral of a $50 million amortization payment due on January 31, 2015 until February 27, 2015.  On April 30, 2015, Afren, Afren Resources and Afren Nigerian Holdings Limited agreed with the Ebok Lenders to a further deferral of this amount, together with a deferral of a $50 million amortization payment due on April 30, 2015 and a $50 million amortization payment due on July 31, 2015, until the completion of the Restructuring (or the Alternative Restructuring), subject to a long-stop date of September 7, 2015.  The Ebok Facility is being restructured on a fully consensual basis;

c.    on February 1, 2015, Afren took advantage of a 30-day grace period on an interest payment which became due under the 2016 Notes.  On March 3, 2015, it determined not to make the approximately $15 million interest payment that was due and owing.  Certain 2016 Noteholders have agreed to refrain from accelerating amounts owing under the 2016 Notes following the missed coupon payment.  In return for this forbearance, Afren has agreed to pay a forbearance fee.  Afren considered that the payment of the forbearance fee was a necessary part of the restructuring process.  It provided comfort to the Debtor that the 2016 Noteholders were not going to accelerate,

14

which would have triggered cross-acceleration provisions in the 2019 Notes and the 2020 Notes and almost certainly left the Directors with little choice but to commence an insolvency proceeding (which, given the Debtor's severe liquidity issue, would likely have been a compulsory liquidation).  Afren also considered that the quantum of the forbearance fee was commercially justifiable;

      d.     on April 9, 2015, the Group announced that it would not make the approximately $12.8 million interest payment that had been due on April 8, 2015 under the 2019 Notes.  The 30-day grace period expired on May 6, 2015, and accordingly, an amount equivalent to approximately $12.8 million of interest (excluding default interest) is now due and payable.  However, in contrast to the position above, the Debtor decided not to enter into a forbearance arrangement with the 2019 Noteholders.  This was principally because discussions in relation to the Restructuring and the Alternative Restructuring were more advanced and, in the Debtor's opinion, the risk of the 2019 Noteholders accelerating the outstanding indebtedness under the 2019 Notes was remote; and

      e.     on June 9, 2015, Afren failed to make the approximately $11.9 million interest payment due under the 2020 Notes.  The Debtor has a 30-day period, after which time, if the interest payment is not made, there will be an event of default under the 2020 Indenture.

28.     Afren engaged Alvarez & Marsal on January 12, 2015 to provide services as chief restructuring officer and cash management support.  In addition, Afren has been working with legal counsel White & Case LLP and financial advisors Morgan Stanley & Co. International plc ("**Morgan Stanley**") to develop plans and contingencies to work through its financial difficulties

and find and implement a restructuring solution.  In March 2015, the Group engaged Lucid

Issuer Services Limited (the "**Information Agent**"), a specialist bondholder communications

firm, to contact Existing Noteholders in relation to the Group's restructuring and to engage with

them in relation to it.

29.    The Group has taken, and continues to take, steps to grow its revenues and reduce

its costs.  However, despite the changes being implemented across the Group and the

streamlining of its businesses, it became apparent that the Group's liquidity position places it in

severe risk of being forced to commence some form of insolvency proceedings in the event that

the Restructuring (or the Alternative Restructuring) is not implemented.

30.    In parallel with the above, Afren commenced detailed discussions with its key

creditors in January 2015, including the Ebok Lenders and an ad hoc committee of Existing

Noteholders (the "**Ad Hoc Committee**"), which, at the time, represented approximately 54.1%

in aggregate principal value of the 2016 Notes, 41.4% in aggregate principal value of the 2019

Notes, and 31.4% in aggregate principal value of the 2020 Notes.

31.    These discussions were with a view to determining whether such creditors would

be prepared to provide additional funding or otherwise amend the terms of their existing credit

facilities.  Afren also indicated that it was in discussions with the advisers to the Ad Hoc

Committee regarding the immediate liquidity and funding needs of the business.

32.    Following discussions with third parties, the Debtor was of the view that, given

the terms offered and the significant uncertainty that any of the offers were capable of being

implemented, no third party alternative additional funding was either available or could be

completed within the relevant time frame available to avoid insolvency proceedings.  The only

offer that was available, capable of execution within the timeframe of the Group's liquidity

16

requirements, and capable of garnering the support of the creditors necessary to receive such

funding within the structure and terms of the Group's existing debt was from the Ad Hoc

Committee in the form of the Bridge Securities.  This offer addressed the short-term funding

requirements of the business and was structured in a manner that was capable of being

implemented.  The offer required the agreement of the Ebok Lenders and the lenders under the

Okwok/OML 113 Facility, however, as it required that the proposed interim funding be made on

a senior secured basis to the Group's existing secured facilities.

33.    <u>Agreement on the terms of the Restructuring and Alternative Restructuring</u>.  On

March 13, 2015, the Debtor announced it had agreed in principle on the terms of a financial

restructuring with the Ad Hoc Committee and certain lenders under the Ebok Facility.  Those

terms were documented under a restructuring agreement on March 12, 2015 (as amended from

time to time, the "**Restructuring Agreement**"[3]) and which included:

      a.    a proposal from the Ad Hoc Committee to provide $200 million in net

cash proceeds to Afren as an interim funding measure.  Without the provision of

such interim funding, the Directors considered that the Debtor would have been

unable to continue as a going concern and would have commenced insolvency

proceedings prior to the publication of its accounts on April 30, 2015 for the year

ended December 31, 2014; and

      b.    an agreement from the parties thereto to support the Restructuring (and the

Alternative Restructuring) and refrain from taking certain actions, including

accelerating sums owing by the Group or taking enforcement action over any

---

[3] A copy of the Restructuring Agreement is annexed to the Vallely Declaration as **Exhibit "D."**

security, which may frustrate the implementation of the Restructuring or the Alternative Restructuring.[4]

34.     On April 30, 2015, in connection with the provision of the interim funding, which was provided in the form of the Bridge Securities, as described further below, the Restructuring Agreement was amended and restated to provide for, among other things, the final negotiated position between Afren and the parties thereto in respect of the terms of the Restructuring and the Alternative Restructuring.  Holders of approximately 42% of the aggregate principal amount of the Existing Notes and holders of 100% of the aggregate principal amount of the Ebok Facility were parties to or acceded to the Restructuring Agreement, as amended and restated.  The Scheme that is being proposed is in line with the terms of the Restructuring Agreement.

35.     The Existing Noteholders' interests have been represented throughout the discussions over the Restructuring (and the Alternative Restructuring) by the Ad hoc Committee, which has itself been advised by a legal adviser – Akin Gump Strauss Hauer & Feld LLP ("**Akin**") – and Blackstone Advisory Partners as financial adviser.  Akin, in particular, have negotiated the Restructuring Documents and the Alternative Restructuring Documents (each as hereafter defined).

36.     <u>Alternatives to the Restructuring</u>.  Prior to considering the Restructuring and the Alternative Restructuring, the Board of Directors of Afren, and Afren's financial and legal advisers, considered a number of alternatives to deal with the Group's debt burden, none of which proved viable.

37.     An exchange-solicitation was considered, whereby Afren would have requested that the Existing Noteholders exchange the Existing Notes for new securities.  This would have

---

[4] The Restructuring Agreement terminates on September 12, 2015, though it may be extended by agreement of certain applicable majorities of Existing Noteholders.

required the terms of the Existing Notes to be amended, and under the Existing Indentures, the consent threshold that would have been needed was ninety percent (90%) of the aggregate principal amount of the Existing Notes then outstanding. Given that the Existing Notes are widely held and the short time frame Afren has to implement the Restructuring or the Alternative Restructuring, an exchange-solicitation was considered unworkable.

38. Afren also explored whether additional equity could have been raised by way of a capital injection or equity offering from its existing shareholders (the "**Existing Shareholders**"). Unfortunately, by mid-January 2015, Afren's share price had significantly fallen, leaving its market capitalization (i.e. share price multiplied by total number of shares on issue) at approximately $200 million (down from approximately $700 million in October 2014). It was not commercially feasible for the existing shareholders to provide the amount of capital which was required by the Group given the value of their equity investment (and, more specifically, the reduction in value thereof) at that time, particularly given Afren's urgent need for additional funds and the disparate nature of the shareholder base.

39. Afren also had tried to attract new financing and/or refinance its outstanding indebtedness. Unfortunately, its attempts to refinance the Ebok Facility were derailed by the sudden dismissal of its former Chief Executive Officer and former Chief Operating Officer in the middle of 2014. The Debtor also did not receive any third party offers which were capable of implementation.

40. Afren also explored with Morgan Stanley whether a merger could be a potential solution to its financial difficulties. It was approached by several potential strategic partners, the most significant being Seplat Petroleum Development Company plc, a Nigerian oil producer. However, after two months of due diligence, Afren terminated discussions on the basis that the

19

proposal put forward by Seplat was not capable of being implemented within the time frame

available and, therefore, was not in the best interests of Afren's shareholders.

41.    Afren also considered pursuing a restructuring under chapter 11 of the

Bankruptcy Code given that the Existing Notes are all governed by New York law.  However, it

was determined, among other things, that the costs of such a restructuring likely would be

considerably higher than the estimated cost of the Restructuring (or the Alternative

Restructuring) implemented through the Scheme.

42.    <u>Interim Funding</u>.  On April 30, 2015, Afren entered into a note purchase

agreement with the Bridge Noteholders for the provision of interim funding of $200 million in

net cash proceeds, through the issuance of the Bridge Securities.  The Bridge Securities were

issued for a term of 360 days at an original issue discount of 5.5% and have an annual interest

rate, payable in kind, of 15%.  This interim funding has provided the Group with immediate

liquidity and necessary time to implement the required steps to complete the Restructuring (or

the Alternative Restructuring).

43.    The Bridge Noteholders comprise those Existing Noteholders who are (or were at

the time) on the Ad Hoc Committee.  The Group's financial crisis meant that securing new

sources of funding from external sources was extremely difficult, and the only third party

financing that could be obtained on acceptable terms was from the Ad Hoc Committee.

44.    Given the financial condition of the Group, the Bridge Noteholders were willing

to fund the Bridge Securities only if they received security that ranked ahead of the Existing

Notes.  As a result, in connection with the provision of the interim funding, Afren entered into

additional intercreditor agreements which, among other things, provide that the Bridge Securities

and the security in respect thereof rank ahead of the Existing Notes.

20

45.     The interim funding was, and continues to be, needed to address the immediate operational requirements of the Group.  The money is kept in an escrow account in the name of the agent under the Bridge Securities, and Afren is allowed to draw down on the money in tranches based on its projected cash flow needs.  The aggregate amount of interim funding which was provided under the Bridge Securities was based on the amount of money which the Debtor forecasted it would need until the end of June.  The new money is committed but can be withdrawn at any time in the event of certain limited circumstances.

46.     The proceeds of the Bridge Securities have been applied towards the payment of essential services and key suppliers.  Without making these payments, the Group would not have been able to have continued as a going concern, and the Directors would have commenced insolvency proceedings prior to the publication of its accounts on April 30, 2015 for the year ended December 31, 2014.

47.     Under the terms of the Bridge Securities, Afren has the option to issue another $50 million of private placement notes.  If the Restructuring (or the Alternative Restructuring) does not complete by the end of the third week in July and Afren therefore does not receive the cash injection from the proceeds of the New Senior Notes (or the Alternative New Senior Notes), Afren expects that it will be very close to running out of the liquidity it needs in order to continue to operate as a going concern.  In anticipation of this, Afren has recently approached the Bridge Noteholders with a view to increasing the amount borrowed under the Bridge Securities by an additional $30 million in net cash proceeds to provide additional working capital, but there is no assurance that they will agree to more funding.

48.     It is intended that the Bridge Securities will be repaid:

a.      under the Restructuring, through a combination of the proceeds raised by the issuance of New Senior Notes (described below) and the issue to the holders of the Bridge Securities (or their nominees) of new ordinary shares in Afren representing 5% of the fully diluted share capital of Afren (in return for the conversion of $5 million of the Bridge Securities) following the Debt-for-Equity Swap, the New Senior Notes Share Issue and the Open Offer (as defined below), each as further described below; and

b.      under the Alternative Restructuring, out of the proceeds from the issuance of the Alternative New Senior Notes and the issue of $5 million of Alternative New Senior Notes to the Bridge Noteholders.

49.    Long term prospects.  Despite the challenging operational and macro-economic conditions during 2014, the Group delivered full year 2014 gross and net production of approximately 47.6 thousand barrels of oil per day and 31.8 thousand barrels of oil per day, respectively.  Afren is confident that it can build on this output, and by executing its new business plan (aligned around core producing assets to operate in a lower oil price environment), it expects year-on-year growth in the underlying net production base through to 2017.

50.    Over the long-term, Afren is confident that, following the implementation of the Restructuring (or the Alternative Restructuring) and by responding to the lower oil price environment, the Group's financial position will be sustainable.

E.    **The Restructuring**

51.    The primary objectives of the Restructuring (and of the Alternative Restructuring, as applicable) are to (i) mitigate the risk of any member of the Group having to commence a formal insolvency process, which would result in materially lower recoveries for persons with a

22

beneficial interest in the Existing Notes (the "**Scheme Creditors**," and the claims based on such interests, the "**Scheme Claims**") than if the Restructuring or the Alternative Restructuring were successfully completed, (ii) implement a new capital structure so that the Group will have a strengthened balance sheet and a debt service and maturity profile more appropriately adapted to the ongoing difficult market conditions in the global oil and gas market, and (iii) ensure that the Group can service its general corporate and working capital obligations, thereby allowing the Group to continue trading.

52.    Under the Restructuring, the Scheme provides that:

a.    Scheme Creditors will release in full the existing financial indebtedness of Afren and other Group entities under the Existing Notes (including any guarantees and security granted in connection with the Existing Notes), and

b.    Scheme Creditors (or their nominated recipients) shall receive, in aggregate, in consideration for the compromises and arrangements under the Scheme:

i.    on a pro rata basis by reference to the Scheme Claims of Scheme Creditors:

(a)    new high yield notes due 2019 in principal amount of approximately $350 million (the "**New 2019 Notes**") and high yield notes due 2020 in principal amount of approximately $350 million (the "**New 2020 Notes**," and together with the New 2019 Notes, the "**Reinstated Notes**"), issued by Afren Finance plc (the "**Notes Issuer**"), a newly incorporated subsidiary sitting directly underneath Afren; and

23

(b)    new ordinary shares representing eighty percent (80%) of the existing issued ordinary share capital in Afren immediately following issuance of such shares (the "**Debt for Equity Swap**"); and

ii.    the ability to participate in the issuance by the Notes Issuer of new high yield notes due 2017 in principal amount of approximately $369 million (the "**New Senior Notes**");

iii.    the ability to participate in the issuance of new ordinary shares in Afren to the holders of the New Senior Notes in a total aggregate amount representing fifty percent (50%) of the share capital of Afren (the "**New Senior Notes Share Issue**") following the Debt for Equity Swap.

53.    Under the Restructuring, but outside of the terms of the Scheme, Afren will:

a.    undertake the Open Offer

b.    following the Open Offer, allocate the Early Subscriber Issue (as defined below);

c.    repay the Bridge Securities; and

d.    amend the terms of the Ebok Facility and the Okwok/OML 113 Facility.

54.    The effect of the Restructuring on share capital and ownership of Afren:

|  | **Equity Ownership*** |
|---|---|
| Existing Shareholders | 15% |
| Scheme Creditors | 31% |
| New Senior Noteholders (through the New Senior Notes Issue) | 39% |

24

| Recipients of the Early Subscriber Issue | 10% |
|---|---|
| Recipients of the Bridge Securities Share Issue | 5% |

*Assumes 100% take-up from the Existing Shareholders only under the Open Offer.  Amount held by Existing Shareholders, Scheme Creditors and Scheme Creditors participating in the issue of the New Senior Notes is capped at 85% in aggregate.

55.    Structure charts, illustrating the Group's position before the Restructuring and after the Restructuring are attached to the Vallely Declaration as **Exhibit "C."**

56.    <u>Issue of the Reinstated Notes</u>.  As part of the Scheme, the Notes Issuer will issue the New 2019 Notes and the New 2020 Notes (each as further described in the Explanatory Statement (as hereinafter defined)) to each Scheme Creditor.  The New 2019 Notes and the New 2020 Notes will have an annual interest rate of 9.1%, payable in kind until the New Senior Notes are fully repaid and then payable in cash.

57.    <u>Debt for Equity Swap</u>.  As part of the Scheme, the Scheme Creditors collectively will be entitled to receive 80% of the share capital of Afren in consideration for the cancellation of the Existing Notes held by each Scheme Creditor.  This entitlement will be satisfied by the issue of new ordinary shares in Afren to the Scheme Creditors. The collective 80% shareholding of the Scheme Creditors will then be diluted in accordance with the steps described below.

58.    <u>Issue of the New Senior Notes and Repayment of the Bridge Securities</u>.  As part of the Scheme, each Scheme Creditor will be entitled to participate in the issuance of the New Senior Notes in a principal amount of approximately $369 million.  The New Senior Notes will carry an annual interest rate of 15% (7.5% payable in cash and 7.5% payable in kind). An event of default under any of the Ebok Facility (as amended and restated as part of the Restructuring),

the OML 26 Facility and the Okwok/OML 113 Facility (as amended and restated as part of the Restructuring) is likely to give rise to a cross-default under the New Senior Notes and vice versa.

59.     The New Senior Notes will be used to refinance and repay substantially all of the Bridge Securities and provide an additional $148 million in net cash proceeds to the Group (as compared to the funding position under the Bridge Securities).  The issue of the New Senior Notes has been fully subscribed by certain Existing Noteholders pursuant a conditional subscription agreement dated April 30, 2015 (as amended, the "**Conditional Subscription Agreement**"), giving the Debtor certainty that the New Senior Notes issue will be fully subscribed. However, all Scheme Creditors will be entitled to participate in the issuance of the New Senior Notes.

60.     New Senior Notes Share Issue.  Afren shall issue new ordinary shares for cash at nominal value to those Existing Noteholders who subscribe for New Senior Notes.  Afren has agreed to issue a total aggregate amount of new ordinary shares (representing 50% of the share capital of Afren) following the completion of the Debt-for-Equity Swap.  The collective shareholding of those Scheme Creditors will then be diluted in accordance with the steps described below.

61.     Open Offer.  Outside of the terms of the Scheme, Afren will subsequently commence a pre-emptive open offer (the "**Open Offer**") of up to £49.2 million (approximately $75 million) of the ordinary shares in Afren to all shareholders, including those Existing Noteholders who acquire shares pursuant to the Debt-for-Equity Swap and the New Senior Notes Share Issue.  The Open Offer will not be underwritten.

62.     Bridge Securities Share Issue.  Under the terms of the Restructuring, $5 million of the Bridge Securities will not be repaid by the proceeds raised by the issue of the New Senior

Notes but instead will be released and converted into equity pursuant to the issue of new ordinary shares in Afren to holders of Bridge Securities (or their nominees) following the completion of the Debt for Equity Swap, the New Senior Notes Share Issue, the Open Offer, and the Early Subscriber Issue (and, if applicable, the Additional Commitment Issue (described below)).

63.    <u>Early Subscriber Issue</u>.  Under the terms of the Restructuring, the new financing will be raised by the issuance of the New Senior Notes.  Given the importance of this new financing to the Group's ability to continue to operate, Afren requires certainty that the new liquidity will be provided and that creditors will elect to participate in the issuance of the New Senior Notes.  It is normal practice in the debt markets to achieve this by having one or more persons underwrite or subscribe early for the new debt in return for which a fee is paid.

64.    With respect to the Restructuring, members of the Ad Hoc Committee were initially given the opportunity to subscribe early for the New Senior Notes (the "**Initial Providers**") pursuant to the terms of the Conditional Subscription Agreement.  This was to give Afren the required certainty that these new funds will be secured for the Group's operations.  Following the initial commitment, the other Existing Noteholders were offered the opportunity to subscribe early for the New Senior Notes (the "**Consenting Noteholders**," and together with the Initial Providers, the "**Restructuring Backstop Providers**") by adhering to the Conditional Subscription Agreement.  The Debtor has agreed to issue, for cash at nominal value to the Restructuring Backstop Providers, additional new shares in the ordinary share capital of Afren representing 10% in aggregate of the fully diluted share capital of Afren (the "**Early Subscriber Issue**"), following the Debt-for-Equity Swap, the New Senior Notes Share Issue and the Open Offer and assuming the completion of the Bridge Securities Share Issue.  This is as an "early bird" incentive payment, in order of priority of the Restructuring Backstop Providers' agreement

27

to subscribe for New Senior Notes.  If the New Senior Notes are issued after August 7, 2015, the amount of the Early Subscriber Issue will increase by 0.1205% of the fully diluted share capital of Afren for each day after August 7, 2015 until the date of issue of the New Senior Notes (the "**Additional Commitment Issue**").

65.     Afren has agreed to issue ordinary shares in Afren in respect of the Early Subscriber Issue to the Initial Providers and Consenting Noteholders on the following basis:

a.     20% of the Early Subscriber Issue shall be allocated to the Initial Providers *pro rata* to their subscriptions for Bridge Securities (the "**Initial Provider Fee**");

b.     80% of the Early Subscriber Issue shall be allocated to the Consenting Noteholders *pro rata* to their subscriptions for New Senior Notes and adjusted for the date on which they agreed to subscribe for New Senior Notes and the amount of Existing Notes held at such time.

66.     Afren has agreed to pay the Early Subscriber Issue because it believes that the fee is a necessary part of the overall restructuring.  The Restructuring Backstop Providers have insisted, understandably, on payment of a commercial fee in return for their agreement to subscribe early, and Afren could not take the risk that they would not subscribe for the new debt instruments and support the Restructuring.  The Petitioner submits that the payment of the Initial Provider Fee is merely reflective of the commercial fee payable in return for those members' commitment to subscribe early for the New Senior Notes before the other Existing Noteholders. Although the Initial Provider Fee is not being made available to all Existing Noteholders, the Petitioner does not believe that this would cause an Initial Provider who considered any substantive aspect of the Scheme to be against its interest to vote in favor of the Scheme by reason of the Initial Provider Fee.

67.     The Early Subscriber Issue, which is merely reflective of the commercial fee that is payable in return for a commitment to subscribe early for the New Senior Notes, is unlikely to cause a Restructuring Backstop Provider who considered any substantive aspect of the Scheme to be against its interests to vote in favor of the Scheme by reason of the Early Subscriber Issue. The Early Subscriber Issue is *de minimis* when compared with the aggregate claims of the Scheme Creditors, and it is unlikely that a Scheme Creditor would be persuaded to vote in favor of the Scheme by reason of the Early Subscriber Issue.

68.     <u>Conditionality of the Restructuring</u>.  Afren's ability to implement the Restructuring is, in part, subject to its Existing Shareholders approving various matters in connection with the steps outlined above.  It is intended that the Debtor will call an extraordinary general meeting of shareholders (the "**EGM**") to try to obtain all of the necessary approvals.  It is intended that the EGM will be held on July 24, 2015, but in any event before the Scheme Meeting, so that prior to voting on the Scheme, it will be known if the Restructuring can be implemented (subject to the requisite majorities of Scheme Creditors approving the terms of the Scheme at the Scheme Meeting).  If the requisite shareholder approval is not obtained, Afren will seek to implement the Alternative Restructuring (subject to the requisite majorities of Scheme Creditors approving the terms of the Scheme at the Scheme Meeting).  Given the Group's urgent need for relief, both alternatives are being simultaneously presented until it becomes clear whether such conditions have been met, which will occur before the Scheme Creditors vote on the Scheme at the Scheme Meeting and before this Court holds a hearing to consider the relief requested herein.

**F.**    **The Alternative Restructuring**

69.    Under the Alternative Restructuring, the Scheme provides:

a.    Scheme Creditors will release in full the existing financial indebtedness of Afren and other Group entities under the Existing Notes (including any guarantees and security granted in connection with the Existing Notes); and

b.    Scheme Creditors shall receive, in aggregate, in consideration for the compromises and arrangements under the Scheme, on a *pro rata* basis by reference to the Scheme Claims of the Scheme Creditors:

i.    from the Notes Issuer, new high yield notes due 2019 in principal amount of approximately $350 million (the "**Alternative New 2019 Notes**"), high yield notes due 2020 in principal amount of approximately $350 million (the "**Alternative New 2020 Notes**"), and $233 million new high yield notes which have an annual interest rate of 20.2%, payable in kind (the "**Alternative New 2021 Notes**," and together with the Alternative New 2019 Notes and the Alternative New 2020 Notes, the "**Alternative Reinstated Notes**"); and

ii.    the ability to participate in the issuance of approximately $401 million new high yield notes (the "**Alternative New Senior Notes**"),[5] which will mature in 2017 and have an annual interest

---

[5] The increase from $369 million, which would have been issued under the New Senior Notes had the Restructuring been effected, is due to (i) an increased discount of 5% to the issue price of the Alternative New Senior Notes (as opposed to a discount of 2% under the New Senior Notes), (ii) $14 million additional Alternative New Senior Notes being required to effect the Alternative Early Subscriber Issue (as described below) as opposed to shares being issued pursuant to the Early Subscriber Issue had the Restructuring been effected, and  (iii) $5 million of the Bridge Securities being payable by the issue of Alternative New Senior Notes (as opposed to the issue of shares had the Restructuring been effected).

rate of (a) 7.1% payable in cash on the principal amount of the Alternative New Senior Notes, (b) 2.5% payable in kind on the principal amount of the Alternative New Senior Notes being capitalized under new senior PIK notes (which will mature in 2017 and will be issued on the same terms as the Alternative New Senior Notes) and (c) interest of 26.9% per annum payable in kind on the principal amount of the Alternative New Senior Notes being capitalized under new junior PIK notes (which will mature 6 months after the date of maturity of the Ebok Facility (as amended and restated as part of the restructuring process)).

70. It will be an event of default under the Alternative New Senior Notes if, among other things:

    i. Afren does not take certain steps to initiate a sale of all or substantially all of the Group's business by the end of 2015;

    ii. Afren has not entered into a binding agreement or agreements (each a "**sale agreement**") for the sale of all or substantially all of the Group's business by the end of December 2016;

    iii. Shareholders do not approve the terms of any sale agreement when put to them for approval;

    iv. any sale agreement is terminated as a result of a failure to satisfy conditions of such agreement (other than shareholder approval), provided that such termination shall not in any event be an event of default before March 31, 2017; and/or

ACTIVE 30676937v1 07/02/2015

v.    Afren and/or the Notes Issuer breaches the terms of the Investor Rights Agreement (as described below).

71.    <u>Investor Rights Agreement</u>.  Pursuant to the terms of an investor rights agreement (the "**Investor Rights Agreement**"), attached as Appendix S to the Explanatory Statement (as defined below), the holders of 50% or more of the Alternative New Senior Notes will have the right to appoint a majority of Afren's board of directors and the board of directors of the Notes Issuer and Afren International Limited (each such member, a "**Director Nominee**"), with control over the process for the sale of the Group's business, under the terms of the Investor Rights Agreement.  Under the Investor Rights Agreement, the obligations of Afren and the Notes Issuer are to ensure that such Director Nominees are appointed to the relevant board of directors.  It will be an event of default under the Alternative New Senior Notes if Afren or the Notes Issuer breaches the terms of the Investor Rights Agreement.

72.    <u>Early Subscriber Issue</u>.  Under the terms of the Alternative Restructuring, the new financing will be raised by the issuance of the Alternative New Senior Notes.  As was the case under the Restructuring, given the importance of this new financing to the Group's ability to continue to operate, Afren requires certainty that the new liquidity will be provided and that creditors will elect to participate in the issuance of the Alternative New Senior Notes.  It is normal practice in the debt markets to achieve this by having one or more persons underwrite or subscribe early for the new debt in return for which a fee is paid.

73.    Similar to the position under the Restructuring, members of the Ad Hoc Committee were initially given the opportunity to subscribe early for the Alternative New Senior Notes as Initial Providers.  This was to give the Debtor the required certainty that these new funds will be secured for the Group's operations.  Following the initial commitment, the other

32

Existing Noteholders were offered the opportunity to subscribe early for the Alternative New Senior Notes (the "**Alternative New Senior Notes Backstop Providers**," and together with the Initial Providers, the "**Alternative Backstop Providers**") by adhering to the Conditional Subscription Agreement.  The Debtor has agreed to issue the Alternative Backstop Providers approximately $14 million in aggregate of Alternative New Senior Notes (the "**Alternative Early Subscriber Issue**").  The Alternative Early Subscriber Issue will be satisfied in the form of the issue of additional Alternative New Senior Notes as the Debtor will not have the requisite shareholder approval to issue the ordinary shares representing the Early Subscriber Issue.

74.    Afren has agreed to the Alternative Early Subscriber Issue because it believes that it is a necessary part of the overall restructuring.  The Alternative Backstop Providers have insisted, understandably, on commercially reasonable consideration in return for their agreement to subscribe early, and the Debtor could not take the risk that they would not subscribe for the new debt instruments and support the Alternative Restructuring.

75.    In relation to the Alternative Restructuring, as described above, a certain portion of the Alternative Early Subscriber Issue will be available only to those members of the Ad Hoc Committee that participated in the early subscription.  This will be paid through the allocation of $2.8 million Alternative New Senior Notes (being 20% of the Alternative Early Subscriber Issue) to the Initial Providers (the "**Alternative Initial Provider Fee**").  The Petitioner submits that the payment of the Alternative Initial Provider Fee is merely reflective of the commercial fee payable in return for those members' commitment to subscribe early for the Alternative New Senior Notes before the other Existing Noteholders.  Although the Alternative Initial Provider Fee is not being made available to all Existing Noteholders, the Petitioner does not believe that this would cause an Initial Provider who considered any substantive aspect of the Scheme to be

33

against its interest to vote in favor of the Scheme by reason of the Alternative Initial Provider Fee.

76.     The Alternative Early Subscriber Issue, which is merely reflective of the commercial fee that is payable in return for a commitment to subscribe early for the Alternative New Senior Notes would not cause an Alternative Backstop Provider who considered any substantive aspect of the Scheme to be against its interests to vote in favor of the Scheme by reason of the Alternative Early Subscriber Issue.  The Alternative Early Subscriber Issue is *de minimis* when compared with the aggregate claims of the Scheme Creditors, and it is unlikely that a Scheme Creditor would be persuaded to vote in favor of the Scheme by reason of the Alternative Early Subscriber Issue.

77.     If the Alternative Restructuring is implemented, the Scheme Creditors will not receive distributions of any ordinary shares in Afren as part of the Scheme.

## G.     Consequences of a Failure to Implement the Restructuring or the Alternative Restructuring

78.     Afren has outstanding debt of $1,587 million, of which approximately $920 million constitutes the Existing Notes, including principal and accrued interest.  Following the Restructuring, the Group's total external debt will decrease to approximately $1,534 million. However, the Group's capital structure will have a more appropriate debt service and maturity profile, and Scheme Creditors will benefit from a substantially reduced risk of default and the potential to receive substantial returns if Afren performs well.

79.     In the event of the Alternative Restructuring, the Group's total external debt (excluding debt-like commitments) will be increased to approximately $1,799 million. Additionally, the Alternative New Senior Notes will contain a covenant requiring Afren to sell all or substantially all of the Group's assets by the end of 2016.  However, the Alternative

34

Restructuring will provide the Group with a more advantageous debt service profile (particularly given the current cash flow position of the Group) in the short term to allow it the opportunity to realize its assets in an orderly manner and return increased value to its creditors from such disposals.

80.     If neither the Restructuring nor the Alternative Restructuring can be consummated, the Directors believe that the Group would face an immediate risk of being unable to meet its contractual obligations when they fall due.  The Group has deferred or not paid a number of payments when they fell due, including:

a.      the deferral, as part of the negotiation of the terms of the Restructuring (and the Alternative Restructuring), of two amortization payments of approximately $50 million each under the Ebok Facility, which were due on January 31, 2015 and April 30, 2015, and which, if the Restructuring (or the Alternative Restructuring) is not implemented, will become immediately due and payable;

b.      approximately $15 million of accrued and unpaid interest under the 2016 Notes, which was due on February 1, 2015; and

c.      approximately $12.8 million of accrued and unpaid interest under the 2019 Notes, which was due on April 8, 2015.

81.     In the medium- to long-term, the Group will also be liable to pay:

a.      approximately $11.9 million of accrued and unpaid interest under the 2020 Notes, which was due on June 9, 2015, but is subject to a 30-day grace period;

b.      further amortization payments of approximately $50 million each under

the Ebok Facility, which are due on July 31, 2015, October 31, 2015 and January 31, 2016;

c.      the Okwok/OML 113 Facility in full (in the amount of approximately $50 million plus accrued interest) on September 30, 2015;

d.      a further interest payment of approximately $15 million under the 2016 Notes, which will become due and payable in August 2015;

e.      the 2016 Notes (in the amount of approximately $253 million plus accrued interest) in full on February 1, 2016;

f.      further interest payments of approximately $12 million under the 2019 Notes and 2020 Notes, which will be due twice yearly until maturity; and

g.      the Bridge Securities, which will be due and payable in full (in the amount of $211.6 million plus accrued interest) on April 25, 2016 (save that the non-approval of the Restructuring or the Alternative Restructuring shall be an event of default).

82.      Taking into account the interest payments that are or shortly will be outstanding under the Existing Notes, the amortization payments that are or shortly will be outstanding under the Existing Bank Facilities, and the medium- and long-term debt burden of Afren, the Board of Directors likely would have no alternative but to place Afren into some form of insolvency process if neither the Restructuring nor the Alternative Restructuring could be implemented. Additionally, the guarantee obligations of the Guarantors (as defined in the Existing Indentures) likely would be called, compelling the directors of each of those companies to commence insolvency proceedings in the relevant jurisdictions.

36

83.     As discussed above, the Group's key operating subsidiaries have entered into joint operating agreements with local strategic partners, and the key assets of the Group, the Ebok oil field, the Okwok oil field and the OML 26 oil field, are all jointly owned. The joint operating agreements contain change of control and/or termination provisions that would be triggered upon an insolvency of the respective operating subsidiaries.  Assuming that the change of control and/or termination provisions were not waived, the Group would lose control of its key operating assets, a highly value destructive outcome that would lead to a Group insolvency and likely to liquidation proceedings with returns to Scheme Creditors likely be materially worse than those available under the Restructuring or the Alternative Restructuring.

84.     In addition, Afren's Directors believe that it is highly likely that if the lenders under the Existing Bank Facilities thought that the Restructuring (or the Alternative Restructuring) was not capable of implementation, they would be highly likely to accelerate the Group's borrowings given the existing events of default under the Group's facilities.  In such circumstances:

a.     the lenders under the Ebok Facility would be able to enforce their security interest in the shares in Afren Resources and thereby acquire the Group's interest in the Ebok field, which is one of the Group's key assets; and/or

b.     the lender under the OML 26 Facility would be able to enforce its security interest in the shares in First Hydrocarbon Nigeria Company Limited and thereby acquire the Group's interest in the OML 26 field, which is one of the Group's key assets; and/or

ACTIVE 30676937v1 07/02/2015

  c.  the lender under the Okwok/OML 113 Facility would be able to enforce its security interest and thereby acquire the Group's interest in the Okwok field, which is one of the Group's key assets.

85.  If the lenders under the Existing Bank Facilities enforce, the Group will lose control over their key assets.  Given the Debtor is a holding company, the loss of the Group's key assets would be highly value destructive, and this, combined with the amounts due and payable under the Existing Bank Facilities and the Existing Notes, would result in the directors of Afren and of the other Group entities having to commence insolvency proceedings.  As discussed, returns to Scheme Creditors in such insolvency proceeding(s) would likely be materially worse than those available under the Restructuring or the Alternative Restructuring, in particular because of the loss of key assets which could not be realized upon such insolvency proceedings.

86.  Accordingly, the Board of Directors considers that the Restructuring or the Alternative Restructuring is in the best interest of the Group and its stakeholders.

## H. Legal Framework for Schemes of Arrangement Under the Law of England and Wales

87.  A scheme of arrangement is a proceeding under the laws of England and Wales[6] that allows companies to effect compromises or arrangements, including restructuring their liabilities, with their members and/or creditors (or any class of them).  Schemes are available in the situation where a company is insolvent, but also where no grounds for insolvency exist. They are particularly useful in cases in which holdout creditors seek unfair advantage as against similarly ranked creditors in workout negotiations, as they enable companies and their creditors in certain instances to obtain a court sanction to effect restructuring measures without having to

---

[6] The legal basis for schemes of arrangement is set out in Part 26 of the Companies Act 2006 of England and Wales.

obtain approval from 100% of affected creditors.  Creditors generally benefit from the fact that a scheme can afford the certainty that they will receive at least certain consideration in partial satisfaction of their claims relatively quickly in accordance with the terms of the scheme, although they may lose some of their rights, including the right to full satisfaction of their claims, pursuant to the "compromise" or "arrangement" proposed in the Scheme.

88.    The scheme process begins when a company proposes the scheme and then submits it to the UK Court, seeking its permission to convene a creditors' meeting (or meetings) to vote on the scheme proposal, i.e., the "compromise" or "arrangement" being put to the creditors and/or members.  After a hearing, at which creditors are entitled to raise objections (primarily at this stage as to the composition of creditor classes and jurisdiction issues), the UK Court decides whether to order that a creditors' meeting (or meetings) be convened to discuss and vote on the proposed scheme.

89.    Any such convening order must rest on a finding of requisite jurisdiction.  To have jurisdiction under English law to sanction a scheme, the UK Court must be satisfied that Afren is a "company" for the purposes of the Insolvency Act 1986.  The Insolvency Act 1986 grants such jurisdiction in respect of all companies registered in England and Wales or Scotland under the Companies Act 2006.  This includes those companies incorporated under the Companies Act 1985 and the Companies (Northern Ireland) Order 1986, which, as noted above, includes Afren.

90.    If the UK Court finds it has jurisdiction and decides to allow a creditors' meeting (or meetings) to be convened, notice of the meeting must be delivered to creditors directly affected by the scheme before the meeting.  Such notice must set forth the time and place of the creditors' meeting, and an explanatory statement must be distributed to such creditors that

contains sufficient information for a typical creditor whose claim is being affected by the terms of the scheme to make a reasonable decision about whether to support the scheme. The explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of acceptances of a chapter 11 plan. Affected creditors are entitled to attend (in person or by proxy) and ask questions regarding the proposed scheme at the creditors' meeting.

91.    The scheme is considered approved by the creditors' meeting only if it is supported by a simple majority (by number) of the creditors present and voting (in person or by proxy) and representing at least seventy-five percent (75%) by value of each class of creditors involved. All creditors whose claims would be affected by the scheme are entitled to vote. The voting majorities will normally be scrutinized and confirmed by an independent third party (in this case, the Information Agent). In those cases where the creditors have been divided into a number of classes with different rights, each class of creditors must approve the scheme by the same majorities. In this connection it should be noted that nonconsenting creditors can be bound into the terms of the scheme only if they are within an approving class. Thus, unlike a confirmed chapter 11 plan, a scheme cannot "cram down" entire classes of dissenting creditors.

92.    As noted above, in order for the scheme to become binding on creditors following the creditors' meeting or meetings (assuming the requisite majority votes in favor have been obtained) it also must be sanctioned by the UK Court at a fairness hearing, which is comparable to a confirmation hearing under section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3020(b)(2). All affected creditors have an opportunity to raise questions and objections to the scheme and present evidence at the fairness hearing.

93.     The UK Court has full discretion to grant or withhold its sanction of the scheme at the fairness hearing.  In particular, it will examine whether the applicable statutory requirements are met, e.g., whether the requisite majorities of voting creditors have approved the scheme (the Information Agent providing a sworn statement as evidence thereof), and whether the scheme overall is fair, taking into account the interests of the creditors and the nature of the scheme's impact upon dissenting creditors.

94.     If the UK Court sanctions a scheme, it will take effect once a certified copy of the UK Court's order sanctioning the scheme[7] has been delivered to the Registrar of Companies for England and Wales for registration.  It will then apply to, and be effective upon, all creditors in the relevant class or classes, irrespective of whether or not they took part in the creditors' meeting or meetings and whether or not they voted in favor of the scheme.

95.     It is now well established that a company through an English scheme may cause the release of its creditors' claims under guarantees provided by third parties where the guarantees are of the debt being compromised under the scheme.  In accordance with the applicable case law, the UK Court will consider the release only of claims which:

      a.      are closely connected with the scheme creditors' rights as creditors against the scheme company;

      b.      are personal and not proprietary rights; and

      c.      if exercised and leading to a payment by the third party guarantor, would result in a reduction of the scheme creditors' claims against the company.

96.     These stringent tests ensure that the ability to release third party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the

---

[7] The order may be appealed to the Court of Appeal, and appeal may be had from the Court of Appeal to the Supreme Court.

jurisdiction of the UK Court.  In this case, these tests are met.  The Scheme contemplates certain non-consensual third party releases of obligations and liabilities of Guarantors of the Existing Notes.  The releases are essential, because without them, any amounts the Guarantors paid on the debt to the holders of Existing Notes would merely be transformed into contribution or subrogation claims of each Guarantor against the Debtor and/or the other Guarantors.  For the same reason, the "close connection" and "reduction in claims against the company" requirements are met.  The released rights are for satisfaction of a debt and are thus personal rather than proprietary in nature – any release of a proprietary security right being the direct result of a release of such debt.  Without the releases, demands for payment would mean that the Guarantors would have to undergo uncertain and expensive restructuring alternatives or liquidate, risks and expenses that the vast majority of holders of Existing Notes are unwilling to take on given the possibility of compromise under the Scheme.  In the present circumstances, a requisite "give and take" between Guarantors and the holders of Existing Notes will be present to allow for a release of third party guarantee claims given that they relate to such holders' claims against the Debtor, and the overall Scheme inures to the benefit of both the holders of Existing Notes and the Guarantors as the financial position of the Debtor and its affiliates will be improved and value preserved in comparison to the alternatives.  Furthermore, the Guarantors will guarantee the new notes issued to the Existing Noteholders, which will also be supported by pledges over the shares in the Guarantors' share capital.

97.    Non-UK creditors have the same rights to participate in and vote at the creditors' meetings, participate at and raise questions and issues at both UK Court hearings in relation to the scheme, and appeal the UK Court's orders, if any, as creditors from the UK.

I.    **The UK Proceeding**

98.    In this case, after negotiating the terms of the Scheme and other aspects of the

Restructuring and the Alternative Restructuring, the Debtor applied to the UK Court on June 30,

2015 for an order directing it to convene a single meeting of the Scheme Creditors (the "**Scheme**

**Meeting**") for them to consider and, if thought fit, approve the Scheme.  The Scheme has only

one class, which consists of persons with a beneficial interest in the Existing Notes (the "**Scheme**

**Creditors**").  The Existing Notes are each held in global form through the Depository Trust

Company ("**DTC**"), Euroclear, and Clearstream.  A person is deemed to be a Scheme Creditor if

the person holds a beneficial interest in the Existing Notes as of July 27, 2015 at 10:00 p.m.

(London Time) (the "**Record Time**").[8]

99.    Notice of the Scheme and the Scheme Meeting was distributed to all Scheme

Creditors pursuant to a practice statement letter (the "**Practice Statement Letter**") dated June 8,

2015 and addressed to UMB Bank, N.A., in its capacities as trustee for the Existing Notes, and to

the Scheme Creditors.[9]

---

[8] In relation to the Existing Notes, the Debtor has considered who satisfies the legal definition of a "creditor" of Afren for purposes of the Scheme.  While one might argue that the "formal" creditor may be the Existing Notes Trustee or DTC as Common Depositary for the Existing Notes, the parties recognize that such a narrow interpretation of the term "creditor" is inappropriate in this instance because those creditors with the actual economic interest in the Existing Notes, i.e., the "real" creditors, are the underlying Existing Noteholders, or Scheme Creditors.  Moreover, the Existing Indentures each expressly prevents the Existing Notes Trustee from exercising any discretion to vote on a matter such as this.  Indeed, the Existing Notes Trustee has undertaken not to vote at the Scheme Meeting.

It also should be noted that, because the Existing Notes are held in global form through DTC, all of the beneficial interests in the Existing Notes are held by the Existing Noteholders through account holders (the "**Account Holders**"), who are registered as having a direct interest in the Existing Notes with DTC.  The Existing Notes could be definitized (i.e., individual bond certificates could be issued to each beneficial holder) in certain circumstances so that each beneficial holder becomes a legal owner of the Existing Notes.  Each of the Existing Indentures provide for the circumstances in which the interests of beneficial owners may be exchanged for definitive notes.  However, this process would add administrative complexity and have a significant impact on the Debtor's resources.  The more practical alternative, which is now relatively well established in England, is to treat ultimate beneficial holders of the Existing Notes as contingent creditors and permit them to vote on the Scheme on that basis.  This process was adopted in bringing the Practice Statement Letter (as hereinafter defined) to the attention of the Existing Noteholders.

[9] A copy of the Practice Statement Letter is attached to the Vallely Declaration as **Exhibit** "**E**."

ACTIVE 30676937v1 07/02/2015

100.    Afren sent out an update notice (the "**Update Notice**") to the Practice Statement Letter on June 19, 2015, informing the Scheme Creditors of a revised court date.

101.    The Practice Statement Letter notified the Scheme Creditors of, among other things:

      a.      the fact that the Scheme was being promoted;

      b.      the purpose that the Scheme is designed to achieve;

      c.      the meeting of Scheme Creditors that Afren believes is required for the purposes of voting on the Scheme; and

      d.      the composition of the Scheme Meeting.

102.    Further, the Practice Statement Letter (as updated by the Update Notice) gave notice to Scheme Creditors that Afren was intending to apply to the UK Court, at a hearing (the "**Scheme Directions Hearing**") to be held no earlier than June 30, 2015, for an order (i.e, the Convening Court Order) granting Afren certain directions in relation to the Scheme, including permission to convene the Scheme Meeting for the purpose of considering and, if thought fit, approving the Scheme.

103.    The Information Agent reports that the Practice Statement Letter was made available to the Scheme Creditors June 8, 2015 (and the Update Notice was made available to the Scheme Creditors June 19, 2015) by:

      a.      publication on the Information Agent's website[10];

      b.      notification through DTC, Euroclear, and Clearstream; and

      c.      the Luxembourg Stock Exchange.

They were also published on Afren's website.

---

[10] The Information Agent has agreed to provide a website (www.lucid-is.com/afren) to make Scheme documentation available to Scheme Creditors and to transmit any relevant document to any Scheme Creditor who requests the same.

104.    Formal notice of the Scheme was given to the Scheme Creditors by means of the Practice Statement Letter of June 8, 2015 (as updated June 19, 2015).  Given the Scheme Creditors' representation in the prior negotiations over the Restructuring, the liquidity position of the Group, and the impending expiry of the Restructuring Agreement, the Petitioner believed that such notice would not prejudice the Scheme Creditors and was sufficient and justified by the urgency of the situation and the need to achieve a restructuring.

105.    On June 30, 2015, the UK Court held the Scheme Directions Hearing and issued the Convening Court Order.  The UK Court found that it could exercise jurisdiction and that the center of the Debtor's main interests is situated in England.  Among other things, the Convening Court Order also (i) set the Scheme Meeting for July 29, 2015 at 8:30 a.m. (London Time) at the offices of White & Case LLP, 5 Old Broad Street, London EC2N 1DW, UK, (ii) ordered that Scheme Creditors be notified of the Scheme Meeting and the Scheme by having notices placed at least twenty-one (21) days before the Scheme Meeting, on or with the Information Agent's website, which notice will be accompanied by instructions on how to access the Explanatory Statement (as hereinafter defined), (iii) ordered that, at least twenty-one (21) days before the Scheme Meeting, a package of documents be published on the Information Agent's website and be sent to the Existing Notes Trustee and the depositaries, and e-mailed to known Existing Noteholders, which package should include, among other things (a) an explanatory statement required to be provided under section 897 of the Companies Act 2006 (the "**Explanatory Statement**"), describing, among other things, the Scheme, the effect and risks of the Scheme, any material interests of the managing directors of Afren and the effect that the Scheme has on such interests, the Scheme voting and approval process, the other steps of the Restructuring and the Alternative Restructuring (including a summary of the order sought by this Petition) and

45

information about the Debtor, its business and that of the Group,[11] (b) the document incorporating the Scheme,[12] (c) a form of notice of the Scheme Meeting (the "**Notice of the Scheme Meeting**")[13] and (d) a form of letter (the "**Account Holder Letter**") to be sent to depositary account holders, which allows the Existing Noteholders to register details of their holdings and certain elections with respect to voting the Existing Notes in respect of the Scheme[14] (the documents comprising (a)-(d) collectively, the "**Notification Documents**"). Notice of the Scheme and Scheme Meeting was accompanied by instructions on how to access the Explanatory Statement.  A copy of the Explanatory Statement is available on request to each Scheme Creditor, free of charge.

106.    The Convening Court Order also declared that the Petitioner is authorized to act, as foreign representative in respect of the UK Proceeding in any chapter 15 cases under the Bankruptcy Code.

107.    The Notification Documents, including a voting and proxy form, have been provided to the Existing Noteholders on the Information Agent's website.

108.    In addition, on June 30, 2015, the Notification Documents, including the notice of the Scheme Meeting, were sent to the depositories, which, according to their usual procedures, have forwarded or will forward a notice confirming their receipt of such materials directly to their participants and clients, being the Account Holders for whom they hold details, and informing the Account Holders of the means by which they can download or otherwise obtain copies of the materials.

---

[11] The Explanatory Statement is attached to the Vallely Declaration as **Exhibit** "**F**."
[12] The Scheme is set forth in Part G of the Explanatory Statement.
[13] The Notice of the Scheme Meeting is set forth in Appendix B of the Explanatory Statement.
[14] The Account Holder Letter is set forth in Appendix C of the Explanatory Statement.

ACTIVE 30676937v1 07/02/2015

109.    It is understood that the Account Holders have been liaising with the beneficial owners of the Existing Notes and/or any intermediaries who themselves hold an interest in the Existing Notes on behalf of Scheme Creditors, and will collate, through the procedures established by DTC, Euroclear, and Clearstream for purposes of the Scheme, individual voting instructions on behalf of the Scheme Creditors.  The votes can then be lodged by the Account Holder with the relevant depositary, together with certification of the individual Scheme Creditor's holding (as of the Record Time), and, in turn, lodged with Afren via the Information Agent.

110.    On July 1, 2015, Afren also notified Scheme Creditors of the Scheme and Scheme Meeting by advertising in the press, including the Luxemburger Wort in Luxembourg.[15]

111.    It is anticipated that a hearing to consider sanctioning the Scheme, if it obtains requisite approval at the Scheme Meeting, will occur on or after July 30, 2015 (the "**Fairness Hearing**").  After the Fairness Hearing, the Debtor anticipates that the UK Court will enter an order sanctioning the Scheme (the "**Sanction Order**").

**J.    The Scheme**

112.    The Scheme has been promulgated as part of the process to implement the Restructuring of the Group (or if the Restructuring does not obtain the necessary consent of Existing Shareholders of Afren, the Alternative Restructuring).  Afren proposes to implement the Restructuring in part through the Scheme to provide a solution to the immediate and long-term liquidity and debt problems that the Group faces, which the Petitioner submits is in the interests of all of the Group's stakeholders.  The Restructuring will allow all of the Scheme Creditors to benefit from any recovery in the performance of the Group.  If Afren is not able to implement the Restructuring, given its liquidity position it will not be possible for it to return to creditors a

---

[15] Copies of these press advertisements are attached to the Vallely Declaration as **Exhibit** "**G**."

ACTIVE 30676937v1 07/02/2015

second time with a different restructuring proposal, and therefore, Afren would seek to

implement the Alternative Restructuring.  Obtaining an order from this Court giving full force

and effect to the Scheme in the United States is a condition to implementing the Scheme.

113.    A detailed description of the Scheme is set forth in Part C of the Explanatory

Statement.  In short, the Scheme seeks

a.    to bind all of the Scheme Creditors to certain aspects of the Restructuring,

which will affect their rights (including in respect of the release and then

cancellation of the Existing Notes), and to grant Afren the authority, for itself and

on behalf of the Scheme Creditors, to enter into certain documents required to

effect the Restructuring (as set forth in Part D of the Explanatory Statement, the

"**Restructuring Documents**") and any other documents necessary to effect the

Restructuring, but only if the Scheme receives the support of the requisite

majority of the Scheme Creditors and the other applicable conditions to the

effectiveness of the Scheme are satisfied; or

b.    to bind the Scheme Creditors to certain aspects of the Alternative

Restructuring, which will affect their rights, and to grant Afren the authority, for

itself and on behalf of the Scheme Creditors, to enter into certain documents

required to effect the Alternative Restructuring (as set forth in Part E of the

Explanatory Statement, the "**Alternative Restructuring Documents**") and any

other documents necessary to effect the Alternative Restructuring, but only if the

Restructuring cannot be implemented because the necessary shareholder

approvals are not obtained.

48

114.    Pursuant to the Scheme, Afren will be authorized to execute the Restructuring Documents or the Alternative Restructuring Documents, as applicable, to which the Scheme Creditors are party, or under which they assume their rights, on behalf of the Scheme Creditors, together with other documents necessary to give effect to the Restructuring or the Alternative Restructuring, as applicable, subject to the conditions set out therein.  The Guarantors will not be bound directly by the Scheme, which relates solely to Afren.  However, each of these entities, together with Afren and the Scheme Creditors, intends to enter into the Restructuring Documents or the Alternative Restructuring Documents, as applicable, where necessary to implement the Restructuring or the Alternative Restructuring, respectively, which will take effect if the Scheme is sanctioned.

## K.    The Debtor's Connections to the United States

115.    Afren's assets in the United States include Afren's wholly owned subsidiary, Afren USA Inc. ("**Afren USA**"), a corporation organized, existing and registered under the laws of Delaware, that provides technical staff and support and is based in Texas.

116.    Afren also holds a reversionary interest in a $25,000 retainer advanced to the Petitioner's Delaware counsel, Fox Rothschild LLP, in Wilmington, Delaware.

117.    Other connections to the United States include that the Existing Indentures, under which Afren issued the Existing Notes, are governed by New York law.  However, the Existing Notes are not qualified or required to be qualified under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb, because the offer and sale of the Existing Notes was not registered or required to be registered under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, as the Existing Notes were not sold in a public offering in the United States.  Rather, the Existing Notes are listed on the Official List of the Luxembourg Stock Exchange and are traded on the

Euro MTF Market.  Pursuant to Section 14.9 of the Existing Indentures, Afren has expressly

consented to the jurisdiction of any federal or state court located in the borough of Manhattan,

New York, New York and any appellate court from any thereof.

118.    Afren has appointed Corporation Service Company, a privately held corporation,

incorporated in Delaware and with its registered office in Wilmington, Delaware, as its agent for

service of process for any such court for actions arising out of the Existing Indentures or

transactions contemplated thereby.

119.    Finally, some of the Existing Noteholders and other financial creditors of Afren

may be based in the United States.

120.    Afren is not involved in any litigation in the United States.

## JURISDICTION AND VENUE

121.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)

and 1334 and the Amended Standing Order of Reference of the United States District Court for

the District of Delaware, dated February 29, 2012 (Sleet, C.J.).  This is a core proceeding

pursuant to 28 U.S.C. §§ 157(b)(1) and (2)(P).

122.    This case has been properly commenced in accordance with section 1504 of the

Bankruptcy Code by the filing of the Petition for recognition of the UK Proceeding under section

1515 of the Bankruptcy Code.

123.    Venue is proper in this District.  Section 1410 of title 28 of the United States

Code provides:

A case under chapter 15 of title 11 may be commenced in the district court of the
United States for the district —

(1)    in which the debtor has its principal place of business or principal assets in
the United States;

50

(2)      if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or

(3)      in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410.

124.    As stated above, Afren's primary assets in the United States consist of Afren's shares in its wholly owned subsidiary, Afren USA, a Delaware corporation,[16] and its reversionary interest in a $25,000 retainer advanced to the Petitioner's Delaware counsel, Fox Rothschild LLP, in Wilmington, Delaware.

## **RELIEF REQUESTED**

125.    The Petitioner requests that this Court enter an order, substantially in the form of the proposed order annexed hereto as **Exhibit "A,"** pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1515, 1517, 1520, 1521(a), and 1525(a) of the Bankruptcy Code that:

a.      recognizes the UK Proceeding as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) and grants the Debtor all of the relief afforded to a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code;

b.      recognizes the Petitioner as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceeding;

c.      grants the Petitioner authority to examine witnesses, take evidence, and deliver information concerning the Debtor and its business, and entrusts the

---

[16] Prior to the implementation of the Scheme, the Group will undertake an internal reorganization, and each of the Notes Issuer and Afren International Limited will become an intermediate holding company of the Group. The Notes Issuer (together with Afren International Limited) will subsequently hold all of Afren's investments in its operating subsidiaries, including Afren USA, and will also acquire all (or substantially all) of Afren's assets, though the contractual liabilities of Afren (including guarantees) will remain with Afren. Afren will keep its reversionary interest in the Fox Rothschild retainer.

administration, realization and distribution of any and all of the Debtor's assets within the territorial jurisdiction of the United States to the Petitioner;

d.        provides that, as of the Effective Date (as defined in the Explanatory Statement), the Scheme Sanction Order, the Scheme, and the Restructuring Documents (or in the event that the Alternative Restructuring is implemented in lieu of the Restructuring, the Alternative Restructuring Documents) are recognized, granted comity, and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and that such terms shall be binding and fully enforceable in the United States on all of the Scheme Creditors, as well as their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians, and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, the "**Related Parties**"), whether or not they actually agreed to be bound by the Scheme or the Restructuring Documents or the Alternative Restructuring Documents, as applicable, or participated in the UK Proceeding;

e.        provides that, as of the Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of the Debtor or any of the "**Protected Parties**" (as defined in the Deed of Covenant[17] entered into between Afren and the Scheme Creditors) with respect

---

[17] As therein defined, "Protected Parties" means each of: (i) any or all of the Directors; (ii) the Advisers; (iii) the members of the Ad hoc Committee set out in Schedule 1; (iv) the Existing Notes Collateral Agent; (v) the Okoro Security Trustee; (vi) the Existing Notes Trustee; (vii) the Collateral Agent; (viii) New Notes Trustee (ix) the New Senior Notes Trustee; (x) each member of the Group; and (xi) each and any of such parties' partners, members, employees, consultants and other representatives. Such Protected Parties are protected by a covenant not to sue in respect of claims arising out of the Scheme Claims, the Restructuring or the Alternative Restructuring (as applicable), but the covenant excludes Liability arising from fraud and any Liability of any Adviser to any Scheme

to any debt cancelled, discharged, or restructured under the Scheme or other Restructuring Documents or Alternative Restructuring Documents, as applicable, and/or as a result of English law relating to the Restructuring or the Alternative Restructuring, is unenforceable in the United States;

f.        as of the Effective Date, permanently enjoins the Scheme Creditors and the Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit, or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding, or process in any judicial, arbitral, administrative, or other forum), employing any process, or performing any act to collect, recover, or offset (except as expressly provided in the Scheme and the Restructuring Documents or the Alternative Restructuring Documents, as applicable) within the territorial jurisdiction of the United States any debt cancelled, discharged, or restructured under the Scheme or the Restructuring Documents or the Alternative Restructuring Documents, as applicable, and/or as a result of English law relating to the Restructuring or the Alternative Restructuring, as applicable, or seeking any discovery related thereto;

g.        as of the Effective Date, permanently enjoins the Scheme Creditors and the Related Parties from commencing or continuing any action (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action or proceeding or process in any judicial, arbitral,

---

Creditor arising under a duty of care which has been specifically accepted or acknowledged in writing by the relevant Adviser or which can only be excluded in accordance with applicable law and has not been so excluded, or which cannot be released, waived or excluded under applicable law.  (All capitalized terms herein as defined in the Deed of Covenant, which is as set out in Appendix 7 to the Scheme.)

administrative, or other forum and including by way of counterclaim), employing

any process, or performing any act, to collect, recover, or offset (except as

expressly provided in the Scheme and the Restructuring Documents or the

Alternative Restructuring Documents, as applicable) any debt cancelled,

discharged, or restructured under the Scheme, the Restructuring Documents or the

Alternative Restructuring Documents, as applicable, and/or as a result of English

law relating to the Restructuring or the Alternative Restructuring, as applicable,

against property of the Debtor or of the Protected Parties within the territorial

jurisdiction of the United States, including without limitation (i) enforcing,

levying, attaching (including any prejudgment attachment), collecting, or

otherwise recovering by any manner or means, whether directly or indirectly, any

judicial, quasi-judicial, or administrative judgment, award, determination, decree,

assessment, garnishment, order, or arbitration award, against the Debtor or the

Protected Parties or their respective property, or any direct or indirect transferee

of or successor to any property of the Debtor or of the Protected Parties, or any

property of such transferee or successor, or (ii) creating, perfecting, or otherwise

enforcing in any manner, directly or indirectly, any lien or encumbrance of any

kind against such property;

h.       as of the Effective Date, permanently enjoins the Scheme Creditors and

the Related Parties from (i) transferring, relinquishing, or disposing of any

property of the Debtor or of the Protected Parties located within the territorial

jurisdiction of the United States, or (ii) taking, or continuing any act to obtain

possession of, comingle, or exercise control over, such property, to the extent that

54

any such act under (i) or (ii) is inconsistent with the Scheme, the Restructuring

Documents or the Alternative Restructuring Documents, as applicable, and

English law relating to the Restructuring or the Alternative Restructuring, as

applicable;

i.          permanently enjoins the commencement of any suit, action, or proceeding

in the territorial jurisdiction of the United States to settle any dispute arising out

of any provision of the Scheme, the Restructuring Documents or the Alternative

Restructuring Documents, as applicable, and English law relating to the

Restructuring or the Alternative Restructuring, as applicable;

j.          as of the Effective Date, permanently enjoins all entities (as that term is

defined in section 101(15) of the Bankruptcy Code) subject to this Court's

jurisdiction from taking any action inconsistent with the Scheme, including,

without limitation, against the Debtor, the Protected Parties, or against any

property of the Debtor or of the Protected Parties within the territorial jurisdiction

of the United States;

k.          as of the Effective Date, permanently enjoins the Scheme Creditors and

the Related Parties from commencing or continuing in any manner, directly or

indirectly, including by way of counterclaim, any action, suit, or other proceeding

(including, without limitation, arbitration, mediation, or any judicial, quasi-

judicial, or administrative action, proceeding, or process in any judicial, arbitral,

administrative, or other forum), or employing any process, against the Foreign

Representative (in such capacity or personally), the Debtor, the Protected Parties,

or any of their respective successors, assigns, agents, representatives, advisors, or

55

attorneys (collectively, the "**Ancillary Parties**"), or any of them in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken by any of the Ancillary Parties as of the Effective Date in connection with this chapter 15 case or in preparing, disseminating, applying for, or implementing the Scheme, the Restructuring Documents or the Alternative Restructuring Documents, as applicable, or the Scheme Sanction Order;

l.      provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Scheme, the Restructuring Documents or the Alternative Restructuring Documents, any order entered in respect of this Petition, the chapter 15 case, any further order for additional relief in the chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative pursuant to section 1510 of the Bankruptcy Code;

m.      provides that, for the avoidance of doubt, nothing in the Order shall impair the rights of any entity granted under the Scheme or the Restructuring Documents or the Alternative Restructuring Documents, as applicable, having regard in particular to the exclusive right of the Courts of England & Wales to hear and determine any suit, action, or proceeding and to settle any dispute that may arise out of the Explanatory Statement or any provision of the Scheme, or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme;

56

n.      provides that this Court shall retain jurisdiction with respect to the effect,

enforcement, amendment, or modification of such Order; and

o.      provides such other and further relief as the Court deems proper and just

(together, the "**Relief Requested**").

## BASES FOR RELIEF REQUESTED

126.    The Relief Requested is based on the provisions of chapter 15 and certain other

parts of the Bankruptcy Code discussed in detail below.  The purpose of chapter 15 is to

"incorporate the Model Law on Cross-Border Insolvency (the "**Model Law**") so as to provide

effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).

Thus, the "language of chapter 15 tracks the Model Law, with adaptations designed to mesh with

United States law.  Congress prescribed a rule of interpretation that expressly requires United

States courts to take into account the statute's international origin and to promote applications of

chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions."  In

re Pro-Fit Int'l Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); see also In re ABC Learning

Centres Ltd., 728 F.3d 301, 304-06 (3d Cir. 2013), cert. denied, 134 S. Ct. 1283 (2014); In re

British Am. Ins. Co., 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in interpreting

chapter 15, a court is to "consider its international origin, and the need to promote an application

of . . . chapter [15] that is consistent with the application of similar statutes adopted by foreign

jurisdictions."  11 U.S.C. § 1508.[18]

---

[18] The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (as revised, the "**Guide**")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well."  H. R. Rep. No. 109-31, at 109-110 (2005).  UNCITRAL issued a revised Guide in 2013 that resulted in relocation of paragraphs from the original 1997 Guide.  The citations herein are to the Guide as revised.

**A.** **Recognition of the UK Proceeding as a Foreign Main Proceeding and of the Petitioner as Its Foreign Representative Is Appropriate**

127.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  In re Overnight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  As explained below, the UK Proceeding, the Petitioner, and this Petition satisfy all of the foregoing requirements.

(i)    The UK Proceeding Is a Foreign Main Proceeding

128.    The UK Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

129.    As an initial matter, the UK Proceeding comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

130.    Section 101(23) requires "(i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court;

and (vii) which proceeding is for the purpose of reorganization or liquidation." In re ABC Learning Ctrs. Ltd., 728 F.3d at 308; In re Ir. Bank Resolution Corp. (In Special Liquidation), No. 13-12159 (CSS), 2014 WL 9953792, *12 (Bankr. D. Del. Apr. 30, 2014); Armada (Singapore) Pte. Ltd. v. Shah (In re Ashapura Minechem Ltd.), 480 B.R. 129, 136 (S.D.N.Y. 2012); In re Betcorp Ltd., 400 B.R. 266, 276-77 (Bankr. D. Nev. 2009). The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3).

131.    There should be little doubt that the UK Proceeding qualifies as a "foreign proceeding" under section 101(23). As an initial matter, section 1516(a) of the Bankruptcy Code entitles this Court to presume that a foreign proceeding is a "foreign proceeding" if the decision commencing the foreign proceeding so indicates. See 11 U.S.C. §§ 1516(a), 1515(b)(1). Here, the UK Court has recognized in the Convening Court Order that the Petitioner "is the appointed foreign representative authorised in these proceedings [i.e, the UK Proceeding] to act as a foreign representative . . . in any Chapter 15 Proceedings in the United States Bankruptcy Court." (Convening Court Order ¶ 18.) Further, the UK Court declared that the Petitioner is authorized "to take any and all actions to execute, deliver, certify, file, and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Scheme including, for the avoidance of doubt, filing any petition or other request for relief intended to be filed under Chapter 15 of the US Bankruptcy Code . . . ." (Id. ¶ 19.) These passages indicate that the UK Court considers the UK Proceeding a "foreign proceeding," the Bankruptcy Code definition of which is drawn from and "nearly identical" to Article 2(a) of the

Model Law, H.R. Rep. No. 109-31, at 118 (2005), which was also adopted as law by the United Kingdom.  See Cross-Border Insolvency Regulations, 2006, S.I. 2006/1030, Reg. 2 (U.K.) (adopting the Model Law).  Accordingly, this Court is entitled to presume that the UK Proceeding is a "foreign proceeding."

132.    In addition, the UK Proceeding meets every element of the definition of "foreign proceeding."  The UK Proceeding is a judicial proceeding in that it required the Convening Court Order for it to commence, and will require the Scheme Sanction Order for the Scheme ultimately to be sanctioned and become effective.  Both the Convening Court Order and the Scheme Sanction Order are issued by the UK Court, a judicial body of the United Kingdom, which, under the Scheme, will have exclusive jurisdiction to hear and determine any suit, action, or proceeding and to settle any dispute that may arise out of the Explanatory Statement or any provision of the Scheme, or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme.  (Scheme §8.12.)  Thus, the UK Court will supervise the affairs of the Debtor in connection with the Scheme.

133.    The UK Proceeding is "collective" in the sense that it provides due process to all creditors whose rights and interests will be directly impacted by the Scheme, viz, the Scheme Creditors.  They have the right to vote on the Scheme at a creditors' meeting convened by order of the English Court.  Approval by a majority in number and at least seventy-five percent (75%) in value of the Scheme Creditors present and voting (in person or by proxy) is required in order for the Restructuring or the Alternative Restructuring to proceed.  In addition, Scheme Creditors are entitled to appear and instruct counsel to make submissions at the convening hearing and sanction hearing.  The Scheme is intended to benefit, directly or indirectly, all creditors collectively, rather than to benefit any single creditor alone.

134.     The UK Proceeding is pending in a foreign country – England (a constituent member of the political union comprising the United Kingdom) – under a law relating to adjustment of debt (i.e., Part 26 of the Companies Act 2006 (as amended)), for the purpose of reorganization, in this instance, the exchange of claims against the Debtor under the Existing Notes for equity and debt instruments under the Restructuring, or debt instruments under the Alternative Restructuring, as applicable, a classic restructuring scenario often implemented in prepackaged chapter 11 plans familiar to this Court.

135.     At its eighteenth session, the UNCITRAL Working Group on Insolvency Law, which oversaw the drafting of the Model Law, indicated that the term "foreign proceeding" was meant to include scheme and composition proceedings such as the UK Proceeding:

> The proposal was made to add to [the definition of "foreign proceeding"] a reference to composition proceedings, namely, <u>proceedings in which indebtedness was reduced while the debtor remained in control of its assets</u>.  The Working Group hesitated to add such a specific reference to composition proceedings.  One view in that direction was that the broad category of "reorganization", which might be read more as an economic than as a legal term, would widely be understood as encompassing composition and other such proceedings.  It was felt that adding such a specific reference to any particular form of reorganization might actually create uncertainty.  Furthermore, it was observed that attempting a list of reorganization proceedings would run the risk of excluding some types of proceedings intended to be covered.  <u>While it was generally agreed that composition proceedings should be covered</u>, the Working Group was not ready to reach a definitive decision on how best to achieve that result and deferred consideration of the matter to a later stage of its work.  Possible approaches suggested included a definition of the term "reorganization" to cover the point, or a reference to it in a guide to enactment.

U.N. G.A., United Nations Comm'n on International Trade Law, 29th Sess., Rep. of Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 108, U.N. Doc. A/CN.9/419 (Dec. 1, 1995) (emphasis added).

136.     The definition of "foreign proceeding" in the Bankruptcy Code is even clearer in that it adds the nonuniform phrase "or adjustment of debt" to the words "under a law related to insolvency."  11 U.S.C. § 101(23).  The legislative history indicates that the change is to

emphasize "that the scope of the Model Law and chapter 15 is not limited to proceedings involving only debtors which are technically insolvent, but broadly includes all proceedings involving debtors in severe financial distress, so long as those proceedings also meet the other criteria of section 101(24) [sic]."  H.R. Rep. 109-31, at 118 (2005).

137.    Accordingly, schemes under English law routinely have been recognized as foreign proceedings in chapter 15 cases, see, e.g., In re Zodiac Pool Solutions SAS., No. 14-11818 (Bankr. D. Del. Aug. 29, 2014); In re New World Resources, N.V., No. 14-12226 (Bankr. S.D.N.Y. Sept. 9, 2014); In re hibu, Inc., No. 8-14-70323-reg (Bankr. E.D.N.Y. Feb. 27, 2014); In re Zlomrex Int'l Fin. S.A., No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); In re Magyar Telecom B.V., No. 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013); In re Nortel Networks, Inc., 469 B.R. 478, 488 (Bankr. D. Del. 2012); In re Hellas Telecom. (Luxembourg) V., No. 10-13651 (Bankr. D. Del. Dec. 13, 2010); Highlands Ins. Co. (U.K.), No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); In re Castle Holdco 4, Ltd., No. 09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009); Europaische Rueckversicherungs-Gesellschaft in Zurich, Case No. 06-13061 (REG) (Bankr. S.D.N.Y. Jan. 22, 2007); In re Gordian RunOff (UK) Ltd., f/k/a GIO (UK) Ltd., No. 06-11563 (RDD) (Bankr. S.D.N.Y. Aug. 29, 2006); Petition of Lloyd (In re La Mutuelle du Mans Assurances IARD, U.K. Branch), No. 05-60100 (BRL), 2005 WL 3764946 (Bankr. S.D.N.Y. Dec. 7, 2005); see also In re Bd of Dirs. of Hopewell Int'l Ins. Ltd., 238 B.R. 25, 49-50, 66-68 (Bankr. S.D.N.Y. 1999) (finding Bermudan scheme of arrangement, the court's description of which is very similar to schemes under the Companies Act 2006, to be a "foreign proceeding" under former sections 101(23) and 304 and analogizing scheme to be prepackaged plan).

138.    In addition to qualifying as a "foreign proceeding" under section 101(23), the UK

Proceeding qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as

"a foreign proceeding pending in the country where the debtor has the center of its main interests

["**COMI**"]."  11 U.S.C. § 1502(4); see also 11 U.S.C. § 1517(b)(1) (providing that order of

recognition as foreign main proceeding shall be entered if foreign proceeding that is subject to

the petition "is pending in the country where the debtor has the center of its main interests").

139.    The Bankruptcy Code neither defines nor provides a conclusive test for

determining the location of a debtor's COMI, but it does establish a presumption that the place of

a debtor's "registered office" is its COMI "in the absence of evidence to the contrary."  11

U.S.C. § 1516(c).  In assessing the role of the presumption, one court has observed:

> This presumption permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true 'center' open to dispute in cases where the facts are more doubtful . . . . This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat.

In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 128

(Bankr. S.D.N.Y. 2007) (internal citations omitted).

140.    Courts have proposed various factors and tests that suggest the kind of evidence

that would be necessary to rebut the presumption.  For example, a debtor's COMI has been held

to be the location that third parties would objectively consider to be the location where the debtor

is conducting the administration of its affairs.  See In re Fairfield Sentry Ltd., 714 F.3d 127, 130

(2d Cir. 2013) (holding that relevant principle to determine debtor's COMI is that COMI lies

where debtor conducts its regular business, so that the place is ascertainable by third parties, and

among other factors to be considered are location of headquarters, decisionmakers, assets,

creditors, and law applicable to most disputes); Collins v. Oilsands Quest Inc., 484 B.R. 593, 596

(S.D.N.Y. 2012) (a company's COMI "should be ascertainable by third parties"); In re British

Am. Ins. Co., 425 B.R. at 912 ("The location of a debtor's COMI should be readily ascertainable by third parties."); see also Lavie v. Ran, 390 B.R. 257, 266 (Bankr. S.D. Tex. 2008) ("A debtor's centre of main interests must be identified by reference to criteria that are both objective and ascertainable by third parties." (internal quotation marks omitted) (citing Council Regulation (EC) 1346/2000 on insolvency proceedings (OJ 2000 L 160/1) (the "**EC Regulation**")); Bondi v. Bank of Am., N.A. (In re Eurofood IFSC Ltd.), Case 341/04, 2006 WL 1142304 (E.C.J. May 2, 2006) (stating that COMI must be identified based on criteria that are:  (1) objective and (2) ascertainable by third parties and that statutory presumption that it be identified with the debtor's registered office could be rebutted if such criteria allowed for establishment that debtor's registered office was nothing more than a "letterbox" company not carrying out any business in the location in which its registered office is situated); In re Stanford Int'l Bank Ltd., [2010] EWCA (Civ) 137, [53]-[56] (Eng.) (following Eurofood holding that presumption that registered office is COMI can be rebutted only by factors that are objective and ascertainable by third parties, and noting such factors must be in public domain, that third party would learn such facts in course of dealing with company, and any matters that "would need to be obtained by enquiry were irrelevant to determining COMI").  As noted above and recently endorsed in Fairfield, supra, in interpreting chapter 15 (in this context, a debtor's "center of main interests"), a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508; see also Lavie v. Ran, 406 B.R. 277, 281 (S.D. Tex. 2009) ("Likewise, statutes, cases, and interpretive materials of the European Union are also instructive."); In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 633 (Bankr. E.D. Cal. 2006) (noting that examination of term "center of main

interests" must include consideration of similar statutes adopted by foreign jurisdictions pursuant to section 1508).

141.    Some courts have held that an entity's "principal place of business" is that entity's COMI.  Tri-Cont'l Exch., 349 B.R. at 634; cf. In re ABC Learning Centres Ltd., 445 B.R. 318, 333 (Bankr. D. Del. 2010), on reconsideration in part (Jan. 21, 2011), subsequently aff'd, 728 F.3d 301 (3d Cir. 2013) (noting that Australia was the debtor's principal place of business and COMI).  Two tests are commonly employed to determine a corporation's principal place of business:

> The "nerve center" test defines the principal place of business as the nerve center from which a corporation radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective.  Under this test, courts focus on those factors that identify the place where the corporation's overall policy originates.  The other test has been labeled the "place of operations" or "locus of operations" test.  There, the effort is to identify the place in which a corporation conducts its principal operations.  Courts generally apply the "nerve center" test when a corporation's operations are geographically widespread, and the "locus of operations" test when a corporation is centralized.  Regardless of which is the more appropriate test, and they are much the same, the case law makes it clear that judges should not be straightjacketed by the formal requirements of each test, but rather should adapt the tests to the facts of each case.  A flexible approach is appropriate where the facts do not fall neatly within the parameters of either the "nerve center" or the "locus of operations" analysis.

Phoenix Four Inc. v. Strategic Resources Corp., 446 F.Supp.2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted); see also In re Tradex Swiss AG, 384 B.R. 34 (Bankr. D. Mass. 2008).

142.    Afren's registered office is located in England.  Its COMI is therefore presumed to be in the United Kingdom.

143.    Furthermore, no matter the test, the relevant facts overwhelmingly support the presumption, viz:

- Afren was incorporated and exists under the Companies Act 1985 as a public limited company registered by the Registrar of Companies for England and Wales;

- it conducts the administration of its interests on a regular basis in England;

- it maintains the entirety of its statutory books, records, and corporate documents at its headquarters in London;

- Afren's Board of Directors and shareholders meetings are held in London;

- its most important assets are equity interests in English companies such as Afren Nigeria Holdings Ltd.;

- key members of management are located and make their key decisions in the United Kingdom;

- all its employees are located in the United Kingdom;

- all of Afren's correspondence to third parties is sent from London;

- its administrative expenses consist primarily of employee expenses related to staff in its corporate head office in London;

- its principal advisors and auditors are located in London;

- its key negotiations in respect of this restructuring occurred in the United Kingdom

- its primary deposit accounts are in London; and

- it is tax resident in the United Kingdom.

These factors demonstrate that Afren's "nerve center" is in the United Kingdom.  Given that it is a holding company whose principal operations are holding shares of stock and issuing notes, the same is true of its "locus of operations."

144.    Moreover, the location of the center of Afren's main interests in the United Kingdom has been made public and therefore ascertainable by creditors and third parties in general, and the Scheme Creditors in particular, by reference to:

ACTIVE 30676937v1 07/02/2015

- the public record of Afren's status as an English company with a registered office in London is available at Companies House;

- the physical location of its corporate headquarters, which displays a sign stating its name, and of its other tangible assets is in London;

- its stationery sets forth its London address, from which its correspondence is mailed;

- its shares were listed on AIM in March 2005 and moved to the premium section of the main market of the London Stock Exchange in December 2009;

- it has published its United Kingdom contact details in the Offering Memoranda for the Existing Notes, which also note that it is subject to the insolvency law of England and Wales[19]; and

- its press releases similarly refer to its London address.

Accordingly, there is little doubt that most of Afren's creditors would objectively consider Afren to be conducting the administration of its affairs from England.

145.    Finally, it should not be forgotten that the UK Court satisfied itself in the Convening Court Order that the center of the Debtor's main interests is in England.  (Convening Court Order, at 1.)

146.    In summary, the Debtor has conducted, and continues to conduct, the administration of its affairs and decision-making from the United Kingdom.  Thus, the center of its main interests is in the United Kingdom.

---

[19] See, e.g., 2016 Notes Offering Memorandum at 46-48; 2019 Notes Offering Memorandum at 47-49.  Indeed, the 2020 Notes Offering Memorandum discloses that Afren has its registered office and conducts the administration of its business (and that of the Group as a whole) on a regular basis in England and Wales.  2020 Notes Offering Memorandum at 73 (unnumbered).  On that basis, it informs the prospective 2020 Noteholders that an English court would be likely to conclude Afren has its "centre of main interests" in England (albeit within the meaning of the EC Regulation), that it would be eligible to commence insolvency proceedings in England that would constitute "main insolvency proceedings" under article 3(1) of the EC Regulation, and that English law would apply to such main insolvency proceedings, subject to particular exceptions set out in the EC Regulation.  Though the memoranda reference the EC Regulation, the "centre of main interests" concept there was the model for the Model Law COMI concept.  Guide ¶ 81 (noting that the Model Law concept "corresponds to the formulation in article 3 of the EC Regulation (based upon the formulation previously adopted in the European Union Convention on Insolvency Proceedings . . .), thus building on the emerging harmonization as regards the notion of a 'main' proceeding.").  The relevant excerpts of Offering Memoranda are attached to the Vallely Declaration as **Exhibit** "**H**."  Full copies of the Existing Indentures and Offering Memoranda may be obtained by contacting the undersigned counsel.

147.    For all of the reasons set forth above, the UK Proceeding is, and should be recognized as, the foreign main proceeding in respect of the Debtor.

(ii)    The Petitioner Is a Foreign Representative Who Is a Person

148.    The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a person or body.  11 U.S.C. § 1517(a)(2).

149.    The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as

> A person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

Id. § 101(24).

150.    Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an] individual."  Id. § 101(41).

151.    The Petitioner in this case is an individual who has been (1) duly appointed by the Debtor's Board as "'foreign representative' for the purpose of recognition proceedings under Chapter 15 of the US Bankruptcy Code" (see Resolution of Appointment, §§ 14.3, 14.5) and (2) declared as authorized to act as "foreign representative" pursuant to the Convening Court Order.  (See id., ¶ 18.)  As such, the second requirement for the entry of an order recognizing the UK Proceeding under section 1517(a) of the Bankruptcy Code is satisfied.

(iii)    The Petition Meets the Requirements of Section 1515

152.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the requirements of section 1515 of the Bankruptcy Code.  11 U.S.C. § 1517(a)(3).  Section 1515 of

68

the Bankruptcy Code sets forth certain procedural requirements which the petition for recognition must meet, including evidence of the foreign proceeding.

153.    Here, all of the requirements of section 1515 of the Bankruptcy Code have been met.  First, the Debtor's chapter 15 case was duly and properly commenced by the Petitioner through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

154.    Second, evidence of the existence of the UK Proceeding and the appointment of the Petitioner as foreign representative thereof have been provided to the Court as required under section 1515(b)(1) and (d) of the Bankruptcy Code.  See **Exhibits** "**A**"-"**B**" to the Vallely Declaration (attaching true and correct copies of the Resolution of Appointment and the Convening Court Order).

155.    Third, in accordance with section 1515(c) of the Bankruptcy Code, the Vallely Declaration contains a statement identifying the UK Proceeding as the only foreign proceeding currently pending with respect to the Debtor.  (Vallely Decl., ¶ 112.)

156.    For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and, therefore, that the entry of an order recognizing the UK Proceeding as a foreign main proceeding is proper.

**B.**    **The Debtor Is Entitled to Automatic Relief Under 11 U.S.C. § 1520**

157.    Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States.  Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section

1517, the Petitioner respectfully submits that no further showing is required to the extent the

Court recognizes the UK Proceeding as a foreign main proceeding.

**C.**   **The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring or the Alternative Restructuring and Should Be Granted**

158.   Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to

grant "any appropriate relief" at the request of the recognized foreign representative "where

necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the

interests of the creditors."  11 U.S.C. § 1521(a).  Such relief may include:

> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);
> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;
> (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative . . . ;
> . . . and
> (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).  The court may grant relief under section 1521 if the interests of "the

creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C.

§ 1522(a); see also 11 U.S.C. § 1521(b) ("Upon recognition of a foreign proceeding, whether

main or nonmain, the court may, at the request of the foreign representative, entrust the

distribution of all or part of the debtor's assets located in the United States to the foreign

representative or another person, including an examiner, authorized by the court, provided that

the court is satisfied that the interests of creditors in the United States are sufficiently

protected.").

159.    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

160.    In granting discretionary relief, the Court also may act pursuant to section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law.  11 U.S.C. § 1507(a).  The legislative history to section 1507 states that the section provides authority for "additional relief" beyond that permitted under sections 1519 to 1521. H.R. Rep. No. 109-31, at 109 (2005).  In exercising discretion to grant relief under section 1507, courts will be guided by the standards set forth in section 1507.  Section 1507(b) provides:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> (1) just treatment of all holders of claims against or interests in the debtor's property;
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

161.    Section 1507(b) of the Bankruptcy Code substantially incorporates the provisions of former section 304(c) of the Bankruptcy Code that courts considered in deciding whether to grant relief under chapter 15's statutory predecessor.  11 U.S.C. § 304, repealed by Pub.L. No. 109-8, tit. VIII, sec. 802, 119 Stat. 23, 146 (2005) on April 20, 2005, repeal effective October 17, 2005 ("former section 304").  Accordingly, courts have considered jurisprudence under former section 304 in applying section 1507 of the Bankruptcy Code.  See In re Atlas Shipping A/S, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009).

162.    As noted above, the purpose of chapter 15 is to incorporate the Model Law into the United States bankruptcy law.  See ABC Learning Ctrs.,728 F.3d at 305 (chapter 15 "adopts, nearly in its entirety, the Model Law").  The Model Law's statutory objectives (as adopted under chapter 15) are thus relevant to considering Relief Requested.  Section 1501 states that chapter 15 is designed "to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of –

> (1)     cooperation between—
> (A)     courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
> (B)     the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
> (2)     greater legal certainty for trade and investment;
> (3)     fair and efficient administration of cross-border insolvencies that protects the interests  of all creditors, and other interested entities, including the debtor;
> (4)     protection and maximization of the value of the debtor's assets; and
> (5)     facilitation of the rescue of financially troubled businesses, thereby protecting  investment and preserving employment.

11 U.S.C. § 1501(a); ABC Learning Ctrs., 728 F.3d at 304-05.  "Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee."  11 U.S.C. § 1525(a); see also 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, the court in the United States shall grant comity or cooperation to the foreign representative);[20] In re Toft, 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011) (quoting section 1509); In re Grand Prix Associates Inc., No.: 09-16545 (DHS), 2009 WL 1410519, *5 (Bankr. D.N.J. May 18, 2009) ("All United States courts must grant comity and cooperation to the foreign representative.").

---

[20] The term "cooperation" appears to be even broader than the term "comity."  See Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB de CV (In re Vitro SAB de CV), 701 F.3d 1031, 1047 (5th Cir. 2012 ) ("Although use of the word 'comity' connotes recognition of another judicial proceeding, the word 'cooperation' suggests a much broader meaning."), cert. denied sub nom. Vitro, S.A.B. de C.V. v. Ad Hoc Group of Vitro Noteholders, 133 S.Ct. 1862 (2013) (Mem).

163.    For the reasons that follow, the Petitioner urges this Court to exercise its discretion under sections 105, 1507, and 1521 to grant the remaining Relief Requested, which is in addition to recognition of the UK Proceeding as a foreign main proceeding (and of the Petitioner's position as "foreign representative" in respect thereof) and the effects of such recognition under section 1520.

(i)    Discretionary Relief Appropriate Under Section 1521

164.    The remaining portion of the Relief Requested, which is in addition to the relief obtained automatically pursuant to section 1520(a) but which the Court may grant in its discretion, is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, is a necessary and contractual precondition to effect the Restructuring or the Alternative Restructuring and the fair administration of the Scheme, and, if granted, would promote all of the legislative objectives set forth in section 1501(a).

165.    Fair and efficient administration of the Restructuring or the Alternative Restructuring that protects all parties in interest requires that all Scheme Creditors be bound by the terms of the Scheme and other Restructuring Documents or Alternative Restructuring Documents, as applicable, as sanctioned and made effective by the UK Court and the laws of England and Wales.  As the Court of Appeals for the Second Circuit has recognized, the "equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."  Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713-14 (2d Cir. 1987).

73

166.    The United States has a long history of granting comity to foreign restructuring

plans.  In 1883, the Supreme Court recognized the necessity of giving effect to foreign schemes

of arrangement in order to further these goals, reasoning that

> [u]nless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail.  All home creditors can be bound.  What is needed is to bind those who are abroad.  Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883).

167.    The Scheme here is the most important in a series of steps to effect the overall

Restructuring or Alternative Restructuring of the Group.  The Board of Directors believes that

the Restructuring or the Alternative Restructuring is in the best interests of the Group, including

the Debtor, and its stakeholders.

168.    It is feared, however, that certain Scheme Creditors or other entities may seek to

obtain judgments in the United States against the Debtor, the Guarantors, or others involved in

the Restructuring or the Alternative Restructuring, as applicable, as effected by the Scheme and

the Restructuring Documents or the Alternative Restructuring Documents, as applicable, in order

to obtain more than the *pro rata* treatment to which they are entitled pursuant to the terms of the

Scheme.  If such Scheme Creditors effectively can evade the terms of the Scheme and other

Restructuring Documents, or Alternative Restructuring Documents, as applicable, by

commencing actions in the United States, the Debtor, the Guarantors, or others involved in the

Restructuring or the Alternative Restructuring, as applicable, would be required to litigate and

take other actions in defense, depleting the resources of the restructured business and reducing its

reorganized value.  The Relief Requested is necessary to prevent individual creditors acting to

frustrate the purposes of the Scheme, the foremost of which is the fair and efficient

administration of the Restructuring or the Alternative Restructuring, as applicable, in order to maximize value for all creditors.

          (ii)     The Discretionary Relief Requested Meets the Standards for Injunctive Relief

169.    To the extent the standards for injunctive relief apply to granting the Relief Requested herein, those standards are met.  Permanent injunctive relief generally is appropriate where the movant can show a likelihood of irreparable harm.  Irreparable harm to an insolvency estate exists where the orderly determination of claims and the fair distribution of assets are disrupted.  See Victrix, 825 F.2d at 713-14 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); see also In re Garcia Avila, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when failure to enjoin local actions will disrupt orderly reconciliation of claims and fair distribution of assets in single, centralized form." (quoting 2 Collier on Bankruptcy ¶ 304.04, at 304-21 (Alan N. Resnick & Henry J. Somme reds., 15th ed. Rev. 2003))); In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); In re Gercke, 122 B.R. 621, 626 (Bankr. D.D.C. 1991) ("Harm to the estate exists from the failure to grant injunctive relief in the form of disruption of an orderly determination of claims and the fair distribution in a single case."); In re Lines, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.").

170.    Courts have recognized a federal court's authority to grant permanent injunctive relief to enforce foreign plans and discharges.  See, e.g., Gebhard, 109 U.S. at 539 (concluding

that actions brought in United States by plaintiff bondholders who did not participate in Canadian insolvency restructuring of bond issuer on old bonds could not be maintained, even though such bonds were payable in New York); The Argo Fund Ltd. v. Bd. of Dirs. Of Telecom Arg., S.A., as Foreign Rep. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.), 528 F.3d 162, 174-75 (2d Cir. 2008) (concluding that bankruptcy court did not abuse its discretion in granting full force and effect to Argentine plan and approval order in United States); In re Sino-Forest Corp., 501 B.R. 655, 666 (Bankr. S.D.N.Y. 2013) (recognizing, enforcing, and granting permanent injunctive relief in chapter 15 case in respect of foreign plan that included protection for third party releases in Canadian plan); In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (same); In re Ho Seok Lee, 348 B.R. 799, 803 (Bankr. W.D. Wash. 2006) (granting permanent injunctive relief in chapter 15 case as an "effective mechanism" to prevent creditor from seeking to recover amounts in excess of those provided under Korean plan of reorganization); In re Bd. of Directors of Hopewell Int'l Ins., Ltd., 238 B.R. at 69 (extending injunction of Bermuda court to prohibit any creditor from commencing or continuing actions or proceedings in United States contrary to Bermudan plan in case under former section 304 of the Bankruptcy Code); In re Petition of Brierley, 145 B.R. 151, 168-69 (Bankr. S.D.N.Y. 1992) (granting permanent injunction under former section 304 prohibiting suits against the foreign debtor, its property or its administrators arising out of claims that could have been asserted prior to the filing of the ancillary petition).

171.    Moreover, such relief has been granted in many chapter 15 cases without reported decisions.  See, e.g., In re JSC Alliance Bank, No. 14-13192 (Bankr. S.D.N.Y. Dec. 22, 2014); LDK Solar CO., Ltd., No. 14-12387 (Bankr. D. Del. Oct 21, 2014); (enforcing a sanction order from a Cayman Island scheme of arrangement, including a permanent injunction); In re New

World Res., N.V., No. 14-12226 (Bankr. S.D.N.Y. Sept. 9, 2014); In re Zodiac Pool Solutions

SAS., et al., No. 14-11818 (Bankr. D. Del. Aug. 29, 2014); In re Zlomrex Int'l Fin. S.A., No. 13-

14138 (Bankr. S.D.N.Y. Jan. 31, 2014 (granting recognition and giving full force and effect to

UK scheme of arrangement); In re Magyar Telecom B.V., No. 13-13508 (Bankr. S.D.N.Y. Dec.

11, 2013) (granting recognition and giving full force and effect to UK scheme of arrangement);

In re "BTA Bank" JSC, No. 12-13081 (Bankr. S.D.N.Y. Jan. 6, 2011); In re Hellas Telecom

(Luxembourg) V, No. 10-13651 (Bankr. D. Del. Dec. 13, 2010); (granting recognition and giving

full force and effect to UK scheme of arrangement); Highlands Ins. Co. (U.K.) Limited, No. 07-

13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); In re Gordian RunOff (UK) Ltd., f/k/a GIO (UK)

Ltd., No. 06-11563 (RDD) (Bankr. S.D.N.Y. Aug. 29, 2006); In re Castle Holdco 4, Ltd., No.

09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009); Europaische Rueckversicherungs-Gesellschaft

in Zurich, No. 06-13061 (REG) (Bankr. S.D.N.Y. Jan. 22, 2007); Petition of Lloyd (In re La

Mutuelle du Mans Assurances IARD, U.K. Branch), No. 05-60100 (BRL), 2005 WL 3764946

(Bankr. S.D.N.Y. Dec. 7, 2005).

172.    If the Restructuring or the Alternative Restructuring as contemplated by the

Scheme and other Restructuring Documents or Alternative Restructuring Documents,

respectively, is not given effect in the United States, there is a risk that dissident Scheme

Creditors could bring proceedings in the United States against the Debtor, the Guarantors, and/or

other parties protected by the Scheme and the Restructuring Documents or the Alternative

Restructuring Documents, respectively, based upon the clause in the Existing Indentures

consenting to jurisdiction.  In addition, obtaining an order giving the Scheme full force and effect

in the United States is a condition precedent to implementation of the Scheme.  Therefore, unless

this Court grants the Requested Relief, irreparable harm could come to the integrity of the

Scheme and the Restructuring or the Alternative Restructuring, which ultimately could lead to the liquidation of the Group's operating companies, to the detriment of the Debtor, its creditors, and all members of the Group.

> (iii)    Granting the Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected" and Will Not Be "Manifestly Contrary to the Public Policy of the United States"

173.    The Relief Requested under section 1521 is founded on the congressional mandate to cooperate with foreign proceedings and foreign representatives to promote the goals of chapter 15.  11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.").  As shown above, such relief is "appropriate" as that term is used in section 1521 because it is necessary to ensure the success of the UK Proceeding, the Scheme, and the Restructuring or the Alternative Restructuring.  As noted, however, the Court may grant such relief only if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).

174.    The Bankruptcy Code does not define what constitutes sufficient protection.  The legislative history indicates that the limitation was meant to apply "if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H.R. Rep. No. 109-31, at 116 (2005).

175.    A determination of sufficient protection "requires a balancing of the respective parties' interests."  In re AJW Offshore, Ltd., 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013); see also In re Qimonda AG Bankr. Litig., 433 B.R. 547, 556-58 (E.D. Va. 2010); CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); Tri-Cont'l Exch., 349 B.R. at 637.  "This balance is necessary to achieve the objectives of cross border insolvency legislation."  Guide ¶ 196; see also In re Sivec SRL, 476 B.R. 310, 323 (Bankr. E.D. Okla. 2012)

(citing Guide); In re Lee, 472 B.R. 156, 180-81 (Bankr. D. Mass. 2012) (same); In re Int'l

Banking Corp., 439 B.R. 614, 626-27 (Bankr. S.D.N.Y. 2010) (same).  Section 1522 "gives the

bankruptcy court broad latitude to mold relief to meet specific circumstances."  Int'l Banking,

439 B.R. at 626-27 (internal quotations omitted); see also In re Zhejiang Topoint Photovoltaic

Co., Ltd., 14-24549 (GMB), 2015 WL 2260647, at *3 (Bankr. D.N.J. May 12, 2015) (the

purpose of section 1522 is "to ensure a balance between the relief that may be granted to the

foreign representative and the interests of the persons potentially affected by such relief . . . .

Section 1522 gives the bankruptcy court broad latitude to mold relief to meet specific

circumstances, including appropriate response if it is shown that the foreign proceeding is

seriously and unjustifiably injuring United States creditors" (alterations and emphasis in original)

(quoting In re Cozumel, 482 B.R. at 108) (unpublished)).

176.    Here, all creditors are "sufficiently protected" by the treatment afforded them by

the Scheme, the Restructuring Documents or the Alternative Restructuring Documents, as

applicable, and the process by which they will be approved because (i) all Scheme Creditors will

be treated similarly, (ii) U.S. claimants are not subject to undue inconvenience or prejudice, and

(iii) the distribution of consideration under the Scheme is substantially similar to what might

occur under U.S. law.  See Atlas Shipping, 404 B.R. at 740.  Indeed, the Restructuring and the

Alternative Restructuring contemplated by the Scheme are similar to a consensual prepackaged

chapter 11 plan.  Further, the Relief Requested "would assist in the efficient administration of

this cross-border insolvency proceeding, and it would not harm the interests of the debtor[] or

[its] creditors."  In re Grant Forest Prods., Inc., 440 B.R. 616, 621 (Bankr. D. Del. 2010).  That

certain creditors "may be denied an advantage over the debtor's other . . . creditors is not a valid

reason to deny relief to the foreign representative."  Atlas Shipping, 404 B.R. at 742.

177.    Additionally, a court also may deny a request for any chapter 15 relief that would

be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The

legislative history indicates that the "public policy" exception is narrow, applying only to the

"most fundamental policies of the United States."  H. R. Rep. No. 109-31, at 109 (2005).

178.    The United States Court of Appeals for the Third Circuit recently observed that

the "public policy exception has been narrowly construed, because the 'word "manifestly" in

international usage restricts the public policy exception to the most fundamental policies of the

United States.'"  In re ABC Learning Ctrs., 728 F.3d at 309 (quoting H.R. Rep. No. 109-31); see

also In re Ir. Bank Resolution Corp., 2014 WL 9953792, *18.  The ABC Learning Centres court

went on to state that the public policy exception applies where the procedural fairness of the

foreign proceeding is in doubt or cannot be cured by the adoption of additional protections, or

where recognition would impinge severely a U.S. constitutional or statutory right.  728 F.3d at

309.  One court has determined, for example, that the lack of an opportunity for a jury trial is not

manifestly contrary to U.S. public policy.  In re Ephedra Prod. Liab. Litig., 349 B.R. 333, 335-36

(S.D.N.Y. 2006).  Accordingly, it is not necessary that the result achieved in the UK Proceeding

be identical to that which would be had in the United States.  Rather, it is sufficient if the result is

"comparable" or "similar."  Vitro, 701 F.3d at 1044 (citing cases); Sino-Forest, 501 B.R. at 665;

Metcalfe, 421 B.R. at 697.  The mere fact that a foreign representative requests relief that would

be available under the law of the foreign proceeding, but not in the United States, is not by itself

grounds for denying comity.  See  In re Condor Ltd., 601 F.3d 319, 327 (5th Cir. 2010).

179.    As noted above, most of the Requested Relief is substantially similar to the type

of relief that would be available pursuant to a plan of reorganization confirmed in a chapter 11

case.  To the extent that certain of the releases and covenants not to sue may apply to non-debtor

80

third parties such as the Guarantors and other Protected Parties and will bind any Scheme

Creditors who vote against the Scheme (or do not vote), comparable releases have been granted

in chapter 11 cases in this Circuit.  For example, in <u>Gillman v. Continental Airlines (In re</u>

<u>Continental Airlines)</u>, 203 F.3d 203, 214 (3d Cir. 2000), the Third Circuit identified the

"hallmarks of permissible non-consensual releases [as] fairness, necessity to the reorganization,

and specific factual findings to support these conclusions."  Courts in the Third Circuit have

considered a multifactor test announced in <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591,

607-08 (Bankr. D. Del. 2001), to evaluate the appropriateness of a non-consensual third party

release:  (i) the non-consensual release is necessary to the success of the reorganization; (ii) the

releasees have provided a critical financial contribution to the debtor's plan; (iii) the releasees'

financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the

non-consenting.  <u>See also</u> <u>In re Lower Bucks Hosp.</u>, 488 B.R. 303, 323 (E.D. Pa. 2013) <u>aff'd</u>,

571 Fed. Appx. 139 (3d Cir. 2014) (unpublished) (citing <u>Genesis</u> and applying a slightly

modified set of factors:  (1) the third party to be protected by the release had made an important

contribution to the reorganization; (2) the requested release was essential to the confirmation of

the plan; (3) a large majority of the creditors in the case had approved the plan; (4) there was a

close connection between the case against the third party and the case against the debtor; and (5)

the plan provided for payment of substantially all of the claims affected by the release); <u>In re</u>

<u>Trib. Co.</u>, 464 B.R. 126, 203 (Bankr. D. Del. 2011) <u>on reconsideration,</u> 464 B.R. 208 (Bankr. D.

Del. 2011) (applying the <u>Genesis</u> factors); <u>In re Spansion, Inc.</u>, 426 B.R. 114, 144-45 (Bankr. D.

Del. 2010) (same).

   180. Courts in England are similarly sensitive to third party releases contained in

schemes of arrangements, and case law and practice has developed to deal with them.  <u>See, e.g.</u>,

Re Lehman Bros. Int'l (Europe), [2009] EWCA Civ. 1161 (considering circumstances in which third party release can be approved, including when release covers the same claim or loss as the scheme claims); Re La Seda de Barcelona, [2010] EWGC 1364 (Ch) (same).  As set forth in the Pilkington Declaration starting at paragraph 14, it is now well established that a company, through an English scheme, may cause the release of its creditors' claims under guarantees provided by third parties where the guarantees are of the debt being compromised under the scheme.  In accordance with applicable case law, the UK Court will consider the release only of claims that (i) are closely connected with the scheme creditors' rights as creditors against the scheme company, (ii) are personal and not proprietary rights, and (iii) if exercised and leading to a payment by the third-party guarantor, would result in a reduction of the scheme creditors' claims against the company.  (Pilkington Decl. ¶ 14.)

181.    Like the Genesis factors, these stringent tests ensure that the ability to release third party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the jurisdiction of the UK Court.  In this case, the tests are met.  The releases as they relate to the Guarantors are essential because without them any amounts the Guarantors paid on the debt to the holders of Existing Notes merely would be transformed into contribution or subrogation claims of each Guarantor against the Debtor and/or the other Guarantors.  For the same reason, the "close connection" and "reduction in claims against the company" requirements are met.  The released rights are for satisfaction of a debt and are thus personal rather than proprietary in nature – any release of a proprietary security right being only a result of a release of such debt.  Without the releases, demands for payment would mean that the Guarantors would have to undergo uncertain and expensive restructuring alternatives or liquidate – risks and expenses that the vast majority of holders of Existing Notes are unwilling to take on given the

possibility of compromise under the Scheme.  In the present circumstances, a requisite "give and take" between Guarantors and the holders of Existing Notes will be present to allow for a release of third party guarantee claims given that they relate to such holders' claims against the Debtor, and the overall Scheme inures to the benefit of both the holders of Existing Notes and the Guarantors as the financial position of the Debtor and its affiliates will be improved and value preserved in comparison to the alternatives.  Furthermore, the Guarantors will guarantee the New Senior Notes (issued pursuant to the Restructuring) or the Alternative New Senior Notes (issued pursuant to the Alternative Restructuring), thus affirmatively contributing to the success of the Restructuring or Alternative Restructuring.

182.     The releases as applied to the Protected Parties other than the Guarantors also are essential for the success of the Restructuring or the Alternate Restructuring contemplated under the Scheme.  Absent the implementation of the releases, the Restructuring or the Alternate Restructuring, which are value accretive to the Group's stakeholders, effectively could be undermined if dissident creditors could sidestep the Scheme by commencing litigation against the Protected Parties.  As such, the releases are an important part of the Debtor's reorganization. Moreover, absent the entry of the releases, the directors, advisors and other actors would not be willing to take the actions necessary to consummate the Scheme.  The release of corporate agents, such as directors and professionals like those to be released in the Scheme, are not uncommon in plenary chapter 11 cases and have been approved in cases where claims asserted against such parties would result in an indirect claim against a debtor's estate or otherwise stall or imperil the debtor's reorganization.  See, e.g., In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 293 (2d Cir. 1992) (finding that injunction limiting suits brought against directors was essential because if such directors feared additional suits, they would be disinclined to settle, thus

holding up debtor's reorganization); In re A.H. Robins Co., 880 F.2d 694, 701 (4th Cir. 1989) (noting that release of professionals was important to successful reorganization of debtor because causes of action against them would give rise to indemnity or contribution claims against debtor)

183.    In summary, the releases are an essential part of a pragmatic, balanced, and extensively negotiated restructuring solution which maximizes enterprise value without undue prejudice to the rights of creditors.  Accordingly, the Petitioner expects that the UK Court will sanction the Scheme, including the releases, as fair and reasonable before this Court holds a hearing in respect of the Requested Relief.  See, e.g., In re Magyar Telecom B.V., [2013] EWHC 3800 (Ch) (noting that third party releases were "not an extraneous feature but . . . a commercially important part of the [scheme] proposals and indeed is integral to them.  There would be little point in proceeding with the proposed exchange of the Existing Notes for new notes and equity, while leaving the guarantees in place.  The authorities establish that the variation or release of rights against third parties can properly form part of, or even in the right circumstances constitute, the proposals embodied in a scheme . . . .").

184.    Given the care with which the English courts approach third party release issues, bankruptcy courts in the United States have granted comity to English schemes that include releases of claims against the types of third parties who would be released under the Scheme and UK law in this case.  See, e.g., In re New World Resources, N.V., No. 14-12226 (Bankr. S.D.N.Y. Sept. 9, 2014); In re Zodiac Pool Solutions SAS., et al., No. 14-11818 (Bankr. D. Del. Aug. 29, 2014); In re Zlomrex International Finance S.A., No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); In re Magyar Telecom B.V., No 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013).  The courts in these cases primarily relied on the precedent set by Judge Glenn in In re Metcalfe & Mansfield Alternative Investments on the question of when a court in a chapter 15 case may

approve injunctive relief to enforce a foreign insolvency plan that includes nonconsensual, third-party releases like the releases contemplated in this case.  In <u>Metcalfe</u>, the monitor in a proceeding under Canada's Companies' Creditors Arrangement Act sought recognition and an order from the bankruptcy court enforcing orders of a Canadian court sanctioning a Canadian scheme that included "a very broad third party release."  421 B.R. at 687-88.  The Canadian restructuring concerned various rights in connection with asset-backed commercial paper.  The assets backing the commercial paper consisted mostly of credit default swaps.  The release at issue was designed to primarily benefit the "asset providers" who were the counterparties to the debtor under the swaps.  <u>See id.</u> at 692.  In addition to themselves, the asset providers conditioned their participation on a release of all parties whom the commercial paper investors could have sued, "because such parties might then [have claimed] against the Asset Providers," so the release also included such parties.  <u>Id.</u> at 692-93.

185.    The <u>Metcalfe</u> court was uncertain as to whether the releases allowed in Canada would have been allowed as part of a plan of reorganization in a chapter 11 case in the United States.  <u>Id.</u> at 694-95.  The court observed, however, that the correct inquiry is not whether the scheme could have been approved in a chapter 11 case but rather "whether the foreign orders should be enforced in the United States."  <u>Id.</u> at 696; <u>see also</u> <u>Sino-Forest</u>, 501 B.R. at 662 (citing Metcalfe); <u>cf.</u> <u>Oui Fin. LLC v. Dellar</u>, No. 12-cv-07744-RA, 2013 WL 5568732, at *10-11 (S.D.N.Y. Oct. 9, 2013) (applying New York comity doctrine to dismiss action seeking to enforce, in contravention of French restructuring plan, non-debtor guarantor's New York law obligations which were "clearly, closely intertwined" with the debtor's obligations, because granting judgment would interfere with the implementation of the restructuring plan, and stating that "the issue here is properly framed not as whether [the guarantor] seeks an impermissible

'end-run' around his contractual obligations, but rather . . . whether Plaintiff's attempt to sue [the guarantor] here constitutes the sort of end-run around a parallel foreign bankruptcy proceeding of which [the Second Circuit has] repeatedly disapproved." (internal citations omitted)).

186.    In analyzing whether granting the requested relief would be manifestly contrary to the public policy of the United States, the court in Metcalfe noted that relief requested in support of a foreign proceeding need not be identical to relief available in a plenary case in the United States and that the "public policy" exception is to be narrowly construed to include only the most fundamental policies of the United States within its scope.  421 B.R. at 697.  The court understood that the "key determination" it was required to make was "whether the procedures used in Canada [met American] fundamental standards of fairness."  Id. (citing Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 457 (2d Cir. 1985)); see also Sino-Forest, 501 B.R. at 665 (citing Metcalfe); Oilsands Quest, 484 B.R. at 597 ("[A] a foreign judgment should generally be accorded comity if its proceedings are 'fair and impartial.'").  Without setting out in detail the applicable standards for approval of third party releases in U.S. plenary cases, the court stated that applicable Second Circuit precedent and the decision of the Ontario Court of Appeals "both reflect similar sensitivity to the circumstances justifying approving such provisions." Metcalfe, 421 B.R. at 697-98; see also Vitro, 701 F.3d at 1068 (observing that such sensitivity was absent from the process of approval of a Mexican restructuring plan that included releases of non-debtor liability and that was accepted only by counting the insider votes of the very parties to be released within the same class as other creditors (and where the requisite level of acceptance would not have been reached without the insider votes) and affirming denial of relief in aid of enforcement of such plan); Telecom Argentina, 528 F.3d at 173 (stating that comity "does not require that foreign proceedings afford a creditor identical protections as under U.S.

bankruptcy law" and holding that the absence of a "best interests" test does not prevent

recognizing of ancillary foreign proceedings under former section 304); see also Sino-Forest,

501 B.R. at 665 (citing high level of support for plan that does not rely on the support of insiders

and a similar sensitivity by the foreign court to the circumstances justifying approving such

provisions as those considered by U.S. courts); Hopewell, 238 B.R. at 56-61 (barring objections

not raised before the foreign insolvency court and stating, "As long as the manner in which the

scheme acquired statutory effect comports with our notions of procedural fairness, comity should

be extended to it." (citations omitted)); In re Gee, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985)

(stating that "[f]or comity to be extended, it is necessary only that the foreign court abide by

fundamental standards of procedural fairness" and noting that the ancillary court, if satisfied with

the procedural fairness of the foreign proceeding, "should not sit as an appellate court over the

foreign proceedings").

187.    The Metcalfe court therefore examined the Canadian scheme using the traditional

standards American courts employ to analyze whether ordinary foreign judgments should be

recognized and enforced, i.e., whether the forum provides "a full and fair trial abroad before a

court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation

or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an

impartial administration of justice between the citizens of its own country and those of other

countries, and there is nothing to show either prejudice in the court, or in the system of laws

under which it is sitting." Metcalfe, 421 B.R. at 698 (internal citations omitted).

188.    The UK Proceeding readily meets these standards.  The UK Court's exercise of

jurisdiction over the Debtor and its Scheme was proper pursuant to its own law (Part 26 of the

Companies Act 2006 and the Insolvency Act 1986), and the evidence demonstrating that the

United Kingdom is the country in which the Debtor maintains the center of its main interests also leads to the conclusion that the UK Court's exercise of jurisdiction to adjudicate was proper under United States and international norms.  See Restatement of the Law (Third), Foreign Relations Law of the United States § 421 (1987) (setting forth "reasonableness" standard for exercise of jurisdiction to adjudicate and citing, *inter alia*, presence, regular conduct of business, and consent to jurisdiction as indicators of reasonable exercise of such jurisdiction by a particular country's courts over a company).  Given the United States' own rather minimalist standards to establish jurisdiction to adjudicate plenary bankruptcy cases based only on a debtor having property or a place of business in the United States, 11 U.S.C. § 109(a), those norms are unquestionably met here.  See In re Global Ocean Carriers Ltd., 251 B.R. 31, 39 (Bankr. D. Del. 2000) (law firm retainers constitute property in the United States for purposes of eligibility under section 109 of the Bankruptcy Code).

189.    As to procedural fairness, the Petitioner submits that the steps undertaken and to be undertaken before the Scheme and the Restructuring Documents or the Alternate Restructuring Documents, as applicable, can become effective sufficiently to conform to American notions of due process such that this Court should grant comity to the Scheme Sanction Order (if issued and duly lodged with the Registrar of Companies) and to recognize and enforce the Scheme and the Restructuring Documents or the Alternative Restructuring Documents, as applicable, if they become effective.  As an initial matter, it should be noted that the American concept of due process is rooted in the common law tradition of England and the ancient rights developed and recognized in that country long before American independence.  As such, this Court should take comfort in the fact that the Scheme will have been sanctioned by an English court under the laws of England and Wales.  See Hopewell, 238 B.R. at 66 ("[W]hen the

foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings.") (internal quotation marks and citations omitted); see also Metcalfe, 421 B.R. at 698 (quoting Hopewell).

190.    Second, the specific steps followed and to be followed in the UK Proceeding as outlined above demonstrate a commitment to adequate process.  Notice of the application to convene a creditors' meeting, i.e., the Scheme Meeting, and the hearing thereon was delivered to all Scheme Creditors pursuant to the Practice Statement Letter on June 8, 2015 (and the Update Notice on June 19, 2015), by being posted on the Information Agent's website, sent to the Existing Notes Trustee and the depositaries, e-mailed to known Existing Noteholders, and through the Luxembourg Bourse.  The UK Court has ordered that the Notification Documents be published on the Information Agent's website and notice be given on such website and be delivered to the Existing Notes Trustee and depositaries, and as they shall direct.  Notice was also published in the Luxemburger Wort newspaper and on the Debtor's website.

191.    To the extent United States creditors were not aware of the UK Proceeding, notice of this Petition and the Relief Requested herein will be (i) delivered to the Information Agent for distribution to the Scheme Creditors and (ii) published in the National Edition of the Wall Street Journal well in advance of the July 29, 2015 Scheme Meeting and July 30, 2015 Fairness Hearing.

192.    In addition to having been able to participate at the hearing to consider the Convening Court Order and in negotiations in respect of the Scheme up to this point, each of the Scheme Creditors will have the opportunity to attend the Scheme Meeting, ask questions, and

raise concerns in respect of the Scheme, and ultimately to vote against it in person or by proxy if believed to be outside the best interests of the Scheme Creditors.

193.     As noted above, in order for the Scheme to become binding, it also must be sanctioned by the UK Court following the Scheme Meeting (assuming the requisite majority votes in favor have been obtained) at the Fairness Hearing.  All Scheme Creditors will have another opportunity to raise objections to the Scheme and submit evidence at the Fairness Hearing.

194.     If the UK Court sanctions the Scheme, the Scheme Sanction Order will be appealable by the Scheme Creditors.

195.     United States and other non-English creditors have the same rights to participate in the UK Proceeding as English creditors.

196.     The procedures followed and to be followed regarding notice, information, voting, and opportunity to object and present evidence in the UK Proceeding are similar to those employed in chapter 11 cases in the United States.

197.     In addition to the matters set forth above, the Scheme has the following features that ensure the fairness of the Scheme:

     (a)     there is only one (1) class of creditors – the Scheme Creditors;

     (b)     acceptance of the Scheme requires seventy-five percent (75%) in value and a majority in number of the class of Scheme Creditors that vote;

     (c)     the rights of the class of Scheme Creditors are materially the same, and there can be no "cramdown" of a dissenting class of creditors;

     (d)     rights and priority of secured interests will be protected under the Scheme; and

     (e)     the interests of the Scheme Creditors will be applied *pro rata* under the Scheme, and the rights of other creditors of the Debtor will not be impaired.

198.    The exception to the *pro rata* distribution is the limited distortive effect of the Early Subscriber Issue (or Alternative Early Subscriber Issue) to be distributed to the Restructuring Backstop Providers (or Alternative Backstop Providers), but all the Existing Noteholders were given the opportunity to earn the Early Subscriber Issue (or Alternative Early Subscriber Issue), so the distortion does not cause any great inequity; it should be noted, however, as described in paragraphs 64-67 above and paragraphs 73-76 above, that only members of the Ad Hoc Group were given the opportunity to earn the Initial Provider Fee (or, if applicable, the Alternative Initial Provider Fee).

199.    Accordingly, the Petitioner submits that the standards required to "sufficiently protect" creditors and other parties in interest have been met, that granting the Requested Relief would not be manifestly contrary to the public policy of the United States, and that the Requested Relief is appropriate and can and should be granted.

      (iv)    <u>Granting the Relief Requested Meets the Traditional Standards of "Comity" Under Section 1507(b)</u>

200.    While satisfaction of the standards set forth in sections 1521 and 1522 appear to be sufficient to grant the discretionary portions of the Relief Requested, to the extent the Court holds that section 1507(a) is a necessary predicate to granting such relief, the Petitioner submits that granting such relief meets the standards of comity set forth in section 1507(b) of the Bankruptcy Code.

201.    The first factor under section 1507(b) is whether the additional assistance contemplated will reasonably assure "just treatment of all holders of claims against or interests in the debtor's property."  Under former section 304(c) jurisprudence, courts uniformly held that this requirement is satisfied where the foreign insolvency law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all

of the estate's creditors in one proceeding.  See, e.g., The Bank of New York v. Treco (In re

Treco), 240 F.3d 148, 158 (2d Cir. 2001); In re Culmer, 25 B.R. 625, 629 (Bankr. S.D.N.Y.

1992).  As noted above, the Scheme Claims consist of beneficial interests under debt instruments

issued under the Existing Indentures.  The Scheme provides for the Scheme Creditors to receive

distributions on essentially a *pro rata* basis, and each Scheme Creditor has equal rights of

participation in the UK Proceeding.  The Debtor's other creditors' claims are not impaired by the

Scheme.

      202.    The second enumerated factor, "protection of claim holders in the United States

against prejudice and inconvenience in the processing of claims in such foreign proceeding," 11

U.S.C. § 1507(b)(2), is satisfied where creditors are given adequate notice of timing and

procedures for filing claims, and that such procedure does not create any additional burdens for a

foreign creditor to file a claim.  See, e.g., Treco, 240 F.3d at 158; In re Petition of Hourani, 180

B.R. 58, 68 (Bankr. S.D.N.Y. 1995).  As set forth above, given the fact that the Debtor does not

have a comprehensive schedule of the identities of the Scheme Creditors, it has taken measures

reasonably calculated to effect adequate notice by delivering notice of the Scheme, the Scheme

Meeting, etc. to the relevant depositaries through the Information Agent for distribution to

Account Holders and on to the Scheme Creditors through the regular channels by which notices

are normally delivered.  In addition, the Debtor has publicized the proceedings through

advertisements in a Luxembourg newspaper and has provided a website with links to information

respecting the Scheme and the UK Proceeding, making hard copies of the relevant documents

available to Scheme Creditors at the Debtor's expense.  Non-UK Scheme Creditors and UK

Scheme Creditors are treated equally.

203.     Section 1507(b)(3) requires that the "additional assistance" being considered will reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor. This consideration has little relevance here as Afren is merely a holding company whose primary activities are holding shares of other companies and making payments on the Existing Notes along with certain administrative services for the Group; absent from the instant case are myriad trade and other creditors which, in other circumstances, could give rise to preference or fraudulent transfer concerns.

204.     Section 1507(b)(4) requires that the distribution of the Debtor's property substantially accords with the order of distribution available under the Bankruptcy Code.  See, e.g., In re Gee, 53 B.R. 891, 904 (Bankr. S.D.N.Y. 1985); see also Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007, 1014 (D.C. Cir. 1999) (Taiwanese distribution system was substantially in accordance with U.S. law because priority afforded to certain classes of claims as under the Bankruptcy Code).  Simply put, the requirement is that the "foreign distribution scheme be 'substantially in accordance' with United States bankruptcy law; it does not have to mirror the United States distribution rules."  In re Ionica, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) (citations omitted).  "Consequently, this factor does not preclude deference merely because the foreign distribution scheme subordinates or accords a lower priority to the U.S. creditor's claim. Rather, the distribution scheme must not be repugnant to a fundamental principle of American law, or render the claim unenforceable."  Id. at 837 (internal citations omitted).  Priority both in right of payment and in distribution of proceeds of enforcement of security interests is respected in substantially the same way it is respected under the Bankruptcy Code.

205.     Section 1507 of the Bankruptcy Code also requires that any determination of a request for assistance under chapter 15 be "consistent with principles of comity."  11 U.S.C. §

1507.  As the House Judiciary Committee noted in its report, "comity is raised to the introductory language to make clear that it is the central concept to be addressed." H.R. Rep. 109-31, at 109; see also 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, the court in the United States shall grant comity or cooperation to the foreign representative); United States v. J.A. Jones Constr. Grp, LLC, 333 B.R. 637, 638 (E.D.N.Y. 2005) (citing legislative history and statute); Toft, 453 B.R. at 190 (quoting section 1509(b)(3)); Atlas Shipping, 404 B.R. at 733 (granting comity to orders in Danish proceeding).

206.    Principles of comity support the grant of the Relief Requested.  Federal courts generally extend comity "whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." See Victrix, 825 F.2d at 713 (citing Hilton v. Guyot, 159 U.S. 113, 202-03 (1895)); see also Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 457 (2d Cir.1985); Atlas Shipping, 404 B.R. at 733.  As noted above, particularly in the bankruptcy context, "American courts have long recognized the need to extend comity to foreign bankruptcy proceedings," because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." Victrix, 825 F.2d at 713-14.  Other courts have similarly underscored the importance of extending comity to foreign bankruptcy proceedings. See Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d. Cir. 1999); Maxwell Commc'ns Corp., 93 F.3d at 1048; Cunard, 773 F.2d at 458.  Indeed, comity should be withheld only when the recognition of foreign proceedings would be adverse to the public policy interests of the United States.  See ABC Learning Ctrs., 728 F.3d at 309; Somportex, Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3rd Cir. 1971); see also Cunard, 773 F.2d at 457 (citing

Somportex).  American courts have consistently recognized the interests of foreign countries in winding up the affairs of their own businesses.  See Cunard, 773 F.2d at 458 (and cases cited therein); In re Gee, 53 B.R. 891, 901 (Bankr. S.D.N.Y. 1985) ("Particularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed.") (citing Clarkson Co. v. Shaheen, 544 F.2d 624, 630 (2d Cir. 1976)).  Because the Scheme is not contrary or prejudicial to the interests of creditors in the United States, the doctrine of comity supports the granting of permanent relief enforcing the Scheme under sections 1507 and 1521 of the Bankruptcy Code in this case.

207.    Accordingly, the Requested Relief should be granted.

## NOTICE

208.    Notice of this Petition has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) the Information Agent for distribution to the Scheme Creditors, (iii) the Existing Notes Trustee, (iv) counsel to the Ad Hoc Committee, and (v) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware.  It is also being published in the National Edition of the Wall Street Journal.  The Petitioner submits that no other or further notice need be provided.

## NO PRIOR REQUEST

209.    No previous request for the relief requested herein has been made to this or any

other court.

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that

this Court enter an order granting (i) the Relief Requested herein and (ii) the Petitioner and

Debtor such other and further relief as the Court deems proper and just.

Dated:   Wilmington, Delaware                FOX ROTHSCHILD LLP
         July 2, 2015

                                    By:  /s/ L. John Bird
                                         Jeffrey M. Schlerf (DE No. 3047)
                                         L. John Bird (DE No. 5310)
                                         Citizens Bank Center
                                         919 North Market Street, Suite 300
                                         Wilmington, Delaware 19899-2323
                                         Telephone:  (302) 654-7444
                                         Email:  jschlerf@foxrothschild.com
                                         Email:  lbird@foxrothschild.com

                                         -and-

                                         WHITE & CASE LLP


                                         Richard S. Kebrdle
                                         Richard A. Graham
                                         1155 Avenue of the Americas
                                         New York, New York 10036-2787
                                         Telephone:  (212) 819-8200
                                         Email:  rkebrdle@whitecase.com
                                         Email:  rgraham@whitecase.com

                                         Attorneys for Anne Vallely as Petitioner and
                                         Foreign Representative

ACTIVE 30676937v1 07/02/2015