**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| Afren plc, | ) Case No. 15-11452 (KG) |
| | ) |
| | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

<u>**DECLARTATION OF ANNE VALLELY PURSUANT TO 28 U.S.C. § 1746**</u>

I, Anne Vallely, duly appointed by a resolution dated June 5, 2015  (the "**Resolution of**

**Appointment**") of the board of directors of Afren plc ("**Afren**," or the "**Debtor**," and such

board, the "**Board of Directors**," or the "**Directors**"), a public limited company incorporated

under the laws of England, and declared as authorized to act by a June 30, 2015 order (the

"**Convening Court Order**") of the Chancery Division (Companies Court) of the High Court of

Justice of England and Wales (the "**UK Court**") as the foreign representative in respect of a

voluntary restructuring proceeding (the "**UK Proceeding**") concerning the Debtor currently

pending before the UK Court,[1] acting in such capacity and by and through my undersigned

counsel, respectfully submit this declaration (the "**Declaration**") pursuant to 28 U.S.C. § 1746 in

support of the verified petition in furtherance of the Form of Voluntary Petition filed

concurrently herewith [Docket No. 1] (collectively, the "**Petition**"), for entry of an order,

substantially in the form of the proposed order annexed thereto as **Exhibit "A,"** (i) recognizing

the UK Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11

of the United States Code (the "**Bankruptcy Code**"),[2] (ii) granting related relief pursuant to

---

[1] True and correct copies of each of the Resolution of Appointment and the Convening Court Order are attached hereto as **Exhibits "A"** and **"B,"** respectively.
[2] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief pursuant to

sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a), and 1525(a) of the Bankruptcy Code in

support of the restructuring of the Debtor and certain of its affiliates under English law (the

"**Restructuring,**" or if the Restructuring does not obtain the necessary consent of shareholders of

Afren, an alternate financial restructuring, the "**Alternative Restructuring**"), through, among

other things, a scheme of arrangement (the "**Scheme**"), if such Scheme is duly approved by a

requisite majority of affected creditors and sanctioned by the UK Court, all in accordance with

applicable English law.

I make this Declaration on the basis of documentation in my possession or supplied to me

and on facts and matters that are known to me or of which I have been informed by others.

Where I have been informed by others, the information is true to the best of my knowledge and

belief.

A.      **The Debtor, the Debtor's Group, and the Foreign Representative**

1.      I am Afren's Acting General Counsel and, as such, am fully aware of, and closely

involved in, all of the legal affairs of the Debtor and the Group and the proposed financial

restructuring.  Prior to working at Afren, I was awarded a degree in Modern Languages at the

University of Oxford and subsequently qualified as a solicitor in 1995.  I worked in the project

finance teams at law firms Norton Rose and Linklaters.  I have worked as an in-house lawyer in

the oil and gas industry for 13 years working at BP, BHP Billiton, and for the last five years at

Afren, initially as Deputy General Counsel and since January 2014 as Acting General Counsel.

2.      As noted above, I was duly appointed foreign representative pursuant to the

Resolution of Appointment.  (<u>See</u> <u>id.</u>, § 14.5.)  Pursuant to the Convening Court Order, the UK

Court declared that I have been specifically authorized in the UK Proceeding to act as a foreign

representative in respect of the UK Proceeding in restructuring-related proceedings concerning the Debtor in the United States, including in this chapter 15 case, and regarding the relief requested by this Petition.  (See id., ¶ 18.)

3.      Afren is a public limited company incorporated under the Companies Act 1985, a statute of England and Wales (which are constituent parts of the United Kingdom), and was registered on December 3, 2004 by the Registrar of Companies for England and Wales (the agent responsible for registering English companies) under number 05304498.  Its registered office and corporate headquarters is at Kinnaird House, 1 Pall Mall East, London, United Kingdom SW1Y 5AU.  It was listed on AIM (the London Stock Exchange's international market for smaller growing companies) in March 2005 and moved to the premium section of the main market of the London Stock Exchange in December 2009.  Afren's market capitalization was approximately £20.7 million, based on a share price of 1.87 pence at the close of business on June 18, 2015.

4.      Afren conducts the administration of its interests on a regular basis from its corporate offices in London, England, where it maintains the entirety of its statutory books, records, corporate documents and tangible assets.  Its primary deposit accounts are in London, and it is also a resident of the United Kingdom for tax purposes.  Since it was formed, all meetings of Afren's Board of Directors and shareholders have been held in London.  Key members of its management, its advisors and auditors are located in London, and its key management decisions are made in the United Kingdom, where all key negotiations in respect of the present liquidity crisis and restructuring have occurred.  All of Afren's correspondence to third parties is sent from London.  Afren's press releases similarly refer to its London address. Its administrative expenses consist primarily of employee expenses related to staff in its

corporate head office in London, where all its employees work and a sign stating its name is displayed.

5.      Afren is a holding company and the ultimate parent of 52 direct and indirect subsidiaries (together with Afren, the "**Group**").  Its most important assets are equity interests in English companies, especially Afren Nigeria Holdings Ltd., and claims arising from intercompany to members of the Group.  Annexed hereto as **Exhibit "C"** is a chart illustrating the corporate structure of the Group.

6.      The Group is focused on the exploration, development, and production of oil assets.  Through various operating subsidiaries, it maintains a portfolio of producing assets, appraisal and development opportunities and exploration prospects, with its core producing assets located in Nigeria.  As of December 31, 2014, it had 86 millions of barrels of independently certified proved oil and gas reserves and 162 millions of barrels of independently certified proved plus probable oil and gas reserves.  Daily gross and net oil production averaged approximately 47,560 barrels of oil per day and 31,819 barrels of oil per day, respectively, for the year ended December 31, 2014.

7.      The Group's portfolio of 20 assets predominantly consists of oil production, development, and exploration opportunities.  Its three core producing assets – Ebok, Okoro, and OML 26 – are located in Nigeria.  The Ebok field and the Okoro field offshore Nigeria are the Group's two primary producing assets.  It has further development or exploration interests in Nigeria and in East, West, and South Africa, including in Kenya, Tanzania, Ethiopia, Seychelles, Madagascar, Côte d'Ivoire, Ghana, Congo Brazzaville, and South Africa.

8.      The Group's main operating companies are:

a.      Afren Resources Limited ("**Afren Resources**"), a wholly-owned indirect subsidiary of Afren, which has entered into a joint operating agreement with Oriental Energy Resources Limited, an unaffiliated Nigerian-based company, to develop the Ebok field, under which agreement Afren Resources is responsible for funding fifty percent (50%) of all capital and operating costs for the development of the Ebok field;

b.      Afren Energy Resources Limited ("**AERL**"), a wholly owned subsidiary of Afren, which has contracted to develop and exploit the Okoro field pursuant to a production sharing and technical services agreement with AMNI International Petrolium Development Company, Limited, an unaffiliated Nigerian-based company;

c.      First Hydrocarbon Nigeria Company Limited ("**FHN**"), a subsidiary set up with two leading Nigerian financial institutions, of which Afren currently holds (directly and indirectly) seventy-eight percent (78%) of the issued share capital and has entered into binding terms with the two minority shareholders for the acquisition of the remaining twenty-two percent (22%);

d.      FHN 26 Limited ("**FHN 26**"), a wholly owned subsidiary of FHN, which has been contracted to develop and exploit the OML 26 field pursuant to a joint operating agreement with Nigerian Petroleum Development Company, an unaffiliated Nigerian-based company; and

e.      Afren Exploration & Production Nigeria Alpha Limited ("**Afren E&P**"), a wholly owned subsidiary of Afren, which is party to a joint operating agreement with Oriental Energy Resources Limited in order to develop the Okwok field.

B.      **The Group's Capital Structure**

9.      The Group has raised debt finance by way of the bank facilities described below, the Existing Notes (as hereinafter defined), and equity finance by listing Afren's shares on the London Stock Exchange.  The Group has net current liabilities of approximately $458.5 million as of December 31, 2014 and total gross debt in the amount of $1.304 billion as of December 31, 2014, reflecting a $175 million increase over total gross debt as of December 31, 2013.  As of June 26, 2015, the Group's outstanding debt under the Existing Notes (including accrued interest) was approximately $920 million, and interest on such debt continues to accrue.

10.     <u>Bank Facilities</u>.  The Group has a number of bank facilities in place, the most significant of which are:

   a.      A $300 million senior secured loan and letter of credit facility under an agreement dated March 24, 2010 (as amended and restated from time to time, the "**Ebok Facility**"), between, among others, Afren Resources, as borrower, Afren, as guarantor, BNP Paribas, as facility agent, and the lenders (the "**Ebok Lenders**") named therein and secured by (i) a fixed and floating charge and security over substantially all of the assets and undertakings of Afren Resources, (ii) a pledge by Afren Nigeria Holdings Limited of the shares in Afren Resources, (iii) account pledges over Afren Resources' onshore and offshore bank accounts and (iv) assignment of insurances, reinsurance rights and major contracts. Currently, the full $300 million is drawn under the senior secured loan and $6 million is outstanding under various letters of credit.

   b.      A $100 million loan under an agreement dated February 27, 2014 (as amended from time to time, the "**OML 26 Facility**"), between FHN 26, as

borrower, and Zenith Bank plc, as lender, which is fully drawn.  The OML 26

Facility is secured by (i) a deed creating a charge over FHN 26's interest in OML

26 in favor of Zenith Bank; (ii) a deed of pledge over FHN 26's account

receivables and cash flows on OML 26; and (iii) a letter of awareness from Afren.

c.      A $550 million facility under an agreement dated September 30, 2014 (as

amended from time to time, the "**Okwok/OML 113 Facility**," and together with

the Ebok Facility and the OML 26 Facility, the "**Existing Bank Facilities**"),

between Afren E&P, as borrower, Afren and FHN 113 Limited, as guarantors,

and Access Bank plc, as lender, which is fully drawn.  The Okwok/OML 113

Facility is secured by:  (i) a Nigerian law all assets debenture granted by Afren

E&P, including, but not limited to (a) a fixed and floating charge over all its

shares in its subsidiaries and the secured bank accounts held with Access Bank

and (b) an assignment over insurances and material contracts (subject to obtaining

any relevant consents of the counterparties); (ii) a Nigerian law all assets

debenture granted by FHN 113 Limited, including, but not limited to (a) a fixed

and floating charge over all its shares in its subsidiaries and (b) an assignment

over insurances and material contracts (subject to obtaining any relevant consents

of the counterparties); (iii) a Nigerian law governed share charge over the shares

in Afren E&P and FHN 113 Limited; and (iv) an irrevocable undertaking to

domicile free and unencumbered cashflows into Afren's account.

11.     Other than the OML 26 Facility, which will remain in place without being

restructured, the Existing Bank Facilities will be restructured on a fully consensual basis as part

of the wider financial restructuring of the Group.

12.     <u>Existing Notes</u>.  The Debtor's creditors subject to the Scheme have beneficial interests in the following notes:  (i) 11.5% senior secured notes due February 1, 2016 with an aggregated principal amount outstanding of approximately $253 million (the "**2016 Notes**"), (ii) 10.25% senior secured notes due April 8, 2019 with an aggregate principal amount outstanding of approximately $250 million (the "**2019 Notes**"), and 6.625% senior secured notes due December 9, 2020 with an aggregate principal amount outstanding of approximately $360 million (the "**2020 Notes**," and together with the 2016 Notes and the 2019 Notes, the "**Existing Notes**").

    a.     The 2016 Notes were issued by Afren pursuant to an indenture between, among others, Afren and Deutsche Bank Trust Company, Americas (subsequently replaced by UMB Bank, N.A.), as trustee (the "**Existing Notes Trustee**"), dated February 3, 2011 (as amended from time to time, the "**2016 Indenture**").  The principal amount of the 2016 Notes is payable on their maturity on February 1, 2016, and the 2016 Notes bear interest at the rate of 11.5% payable twice annually (on February 1 and August 1), until maturity.

    b.     The 2019 Notes were issued by Afren pursuant to an indenture between, among others, Afren and the Existing Notes Trustee, dated March 8, 2012 (as amended from time to time, the "**2019 Indenture**").  The principal amount of the 2019 Notes is payable on their maturity on April 8, 2019, and the 2019 Notes bear interest at the rate of 10.25% payable twice annually (on April 8 and October 8) until maturity.

    c.     The 2020 Notes were issued by Afren pursuant to an indenture between, among others, Afren and the Existing Notes Trustee, dated December 9, 2013 (as

amended from time to time, the "**2020 Indenture**," and together with the 2016

Indenture and the 2019 Indenture, the "**Existing Indentures**").  The principal

amount of the 2020 Notes is payable on their maturity on December 9, 2020, and

the 2020 Notes bear interest at the rate of 6.625% payable twice annually (on June

9 and December 9) until maturity.

All of the Existing Notes are listed on the Official List of the Luxembourg Stock Exchange and

traded on the Euro MTF Market, and all of the Existing Indentures are governed by New York

law.

13.    Each of the Existing Indentures contains covenants typical for high yield notes,

including restrictions on liens, the making of certain payments, incurrence of debt, and changes

of control.

14.    On April 30, 2015, Afren issued $211.6 million of private placement notes (the

"**Bridge Securities**") under a note purchase and private shelf agreement.  The Bridge Securities

were issued for a term of 360 days at an original issue discount of 5.5% and have an annual

interest rate, payable in kind, of 15%.  This interim funding has provided the Group with

immediate liquidity and necessary time to implement the required steps to complete the

Restructuring (or the Alternative Restructuring).  Without the provision of such interim funding,

the Directors considered that Afren would have been unable to continue as a going concern and

would have commenced insolvency proceedings prior to the publication of its accounts on April

30, 2015 for the year ended December 31, 2014.

15.    The Existing Notes are secured by assets connected to the Ebok field (the "**Ebok

Collateral**") and the Okoro field (the "**Okoro Collateral**").

16.     With respect to the Ebok Collateral, the relative rights of the holders of the

Existing Notes (the "**Existing Noteholders**") and other creditors of the Group are governed by:

> a.     An intercreditor agreement between, among others, the trustee for the
>
> 2016 Notes and BNP Paribas (in its capacities as agent and security agent for the
>
> Ebok Lenders and also in its capacity as collateral agent for the Existing
>
> Noteholders), dated February 3, 2011 (the "**Ebok Intercreditor Agreement**");
>
> b.     An intercreditor agreement, dated April 30, 2015 entered into in
>
> connection with the implementation of the Bridge Securities, which provides,
>
> among other things, that the claims of holders of the Bridge Securities (the
>
> "**Bridge Noteholders**") rank ahead of the claims of the Existing Noteholders; and
>
> c.     An intercreditor agreement, dated April 30, 2015 entered into in
>
> connection with the implementation of the Bridge Securities, which provides,
>
> among other things, that the claims of the Bridge Noteholders rank ahead of the
>
> claims of the Ebok Lenders.

17.     As a result of the foregoing, (i) the claims of the Bridge Noteholders in respect of

the Ebok Collateral rank ahead of the claims of the lenders under the Ebok Facility, (ii) the

claims of the Ebok Lenders rank ahead of the claims of the Existing Noteholders, and (iii) the

claims of the Existing Noteholders rank pari passu among each other.

18.     With respect to the Okoro Collateral, the relationship among the Bridge

Noteholders, the holders of the 2016 Notes, the holders of the 2019 Notes, and the holders of the

2020 Notes is governed by an amended and restated intercreditor agreement entered into on

December 9, 2013 between Afren and Deutsche Bank Trust Company Americas (subsequently

replaced by UMB Bank, N.A.), and to which UMB Bank, N.A. acceded on April 30, 2015 as

Okoro Security Trustee, pursuant to which, among other things, the parties have agreed that they share the Okoro Collateral on a pari passu basis.

19.    The Existing Notes will be restructured by way of the Scheme and will be the only debt subject to the Scheme.

C.    **Recent Financial Difficulties**

20.    A number of factors have caused Afren and its subsidiaries to underperform substantially against expectations and put pressure on the Group's short-term liquidity position. Chief among these is that the price of oil fell significantly in 2014 and the resulting depressed price is still in place in 2015.

21.    Afren's liquidity requirements arise principally from its capital expenditure, debt service and working capital requirements.  Afren has traditionally met its working capital requirements primarily from the proceeds of debt financings and oil and gas sales.  Historically, Afren has utilized a combination of short and long term financial instruments to supplement cash flow from operations to finance its cash needs.  Events following the dismissal of the Group's former chief executive officer and chief operating officer, including Afren's inability to continue the planned refinancing of debt obligations in 2014, as well as the sharp decline in oil prices, have placed significant pressure on the Group's liquidity position, resulting in the Group having net current liabilities of $458.5 million as of December 31, 2014.  As of March 31, 2015, the Group had net current liabilities of $1,068 million and cash and cash equivalents of $100 million. The net current liabilities have increased by $609 million from $458.5 million as of December 31, 2014 to $1,068 million as of March 31, 2015 principally due to the following:

a.    a decline in the cash and cash equivalents position that led to current liabilities of $136 million;

b.      an increase in trade and other payables due to the delay of supplier payments that led to current liabilities of $102 million;

c.      a recognition of the 2016 Notes and $50 million of the Ebok Facility as current borrowings that led to current liabilities of $307 million; and

d.      a decrease in trade receivables and inventory and an increase in tax liabilities that led to current liabilities of $523 million.

22.      In light of the significant uncertainty in the industry and related financing markets resulting from the rapid decline in oil prices, and the material funding constraints faced by the business from January 2015, the Directors initiated a series of actions to stabilize the Group's capital structure and a review of the Group's liquidity requirements and funding sources.  The actions and review were intended to address the immediate funding requirements of the business and manage the overall high leverage of the Group.  This process ultimately resulted in the Directors' approval of the Bridge Securities to enable the Group to continue to operate while the Restructuring (and the Alternative Restructuring) were developed so as to be capable of implementation, in part, by the Scheme.

23.      As of December 31, 2014, the Group had a consolidated cash position of approximately $237 million.  Available liquidity, however, was significantly lower as a result of restricted or segregated cash balances in place to address operational requirements.  These balances are held in project accounts and ring-fenced for expenditure on specific assets and therefore cannot be freely used to meet other liabilities of the Group.  Afren's near term cash flow was also impacted by ongoing development programs on the Group's producing assets and capital expenditures incurred in late 2014 before operational changes had been implemented to adapt to the new lower oil price environment.

24.     Furthermore, Afren faced, and continues to face, significant debt service obligations in 2015 and 2016.  As a first step in managing those obligations, the Group entered into discussions with the lenders under the Ebok Facility in the second half of 2014. Unfortunately, having fully documented the terms of an amended facility, the week the amendment agreement was due to be signed, the former chief executive officer and chief operating officer were suspended, which derailed the process.

25.     Overall, the Board of Directors concluded in its results for the year ended December 31, 2014 that there was material uncertainty as to whether the Group could continue as a going concern.

26.     As a result of the need to preserve cash in light of insufficient liquidity to fund working capital requirements, committed capex requirements and forthcoming interest and principal payments, the Group took a number of significant steps in early 2015 as a means to avoid potential insolvency proceedings.  These included significant reductions in expenditures, including cutting capex by suspending major developments on key oil fields, stopping all discretionary exploration activity and curtailing all non-essential expenses.

27.     On January 12, 2015, Afren announced its intention to review its strategic options in respect of the Barda Rash oil field, located in the Kurdistan region of Iraq, reflecting both disappointing operational results at the field and a significant reserves and resources downgrade. This, combined with the impact of lower oil prices on producing assets, resulted in a material impairment charge in 2014 in respect of the reserves relating to production and development assets (including goodwill) with Barda Rash fully written off.  In addition, material impairment charges were recorded in relation to the Group's exploration and evaluation assets as future capital expenditure, which have since been curtailed due to the materially lower oil price

environment and Afren's current financing constraints.  As a result, the Group incurred pre-tax impairment charges of approximately $2.2 billion in 2014.

D.    **Steps Taken Toward Financial Restructuring**

28.    The Group has also taken a number of significant steps in order to address its short term liquidity position and to avoid potential insolvency proceedings, including (but not limited to):

a.    in December 2014, Afren sold its 2015 hedges of 2.85 million of barrels of crude oil, realizing a cash benefit of $80 million;

b.    on February 2, 2015, Afren, Afren Resources and Afren Nigerian Holdings Limited agreed with the Ebok Lenders to a deferral of a $50 million amortization payment due on January 31, 2015 until February 27, 2015.  On April 30, 2015, Afren, Afren Resources and Afren Nigerian Holdings Limited agreed with the Ebok Lenders to a further deferral of this amount, together with a deferral of a $50 million amortization payment due on April 30, 2015 and a $50 million amortization payment due on July 31, 2015, until the completion of the Restructuring (or the Alternative Restructuring), subject to a long-stop date of September 7, 2015.  The Ebok Facility is being restructured on a fully consensual basis;

c.    on February 1, 2015, Afren took advantage of a 30-day grace period on an interest payment which became due under the 2016 Notes.  On March 3, 2015, it determined not to make the approximately $15 million interest payment that was due and owing.  Certain 2016 Noteholders have agreed to refrain from accelerating amounts owing under the 2016 Notes following the missed coupon payment.  In return for this forbearance, Afren has agreed to pay a forbearance fee.  Afren considered that the payment of the forbearance fee was a necessary part of the restructuring process.  It

provided comfort to the Debtor that the 2016 Noteholders were not going to accelerate, which would have triggered cross-acceleration provisions in the 2019 Notes and the 2020 Notes and almost certainly left the Directors with little choice but to commence an insolvency proceeding (which, given the Debtor's severe liquidity issue, would likely have been a compulsory liquidation). Afren also considered that the quantum of the forbearance fee was commercially justifiable;

d.      on April 9, 2015, the Group announced that it would not make the approximately $12.8 million interest payment that had been due on April 8, 2015 under the 2019 Notes. The 30-day grace period expired on May 6, 2015, and accordingly, an amount equivalent to approximately $12.8 million of interest (excluding default interest) is now due and payable. However, in contrast to the position above, the Debtor decided not to enter into a forbearance arrangement with the 2019 Noteholders. This was principally because discussions in relation to the Restructuring and the Alternative Restructuring were more advanced and, in the Debtor's opinion, the risk of the 2019 Noteholders accelerating the outstanding indebtedness under the 2019 Notes was remote; and

e.      on June 9, 2015, Afren failed to make the approximately $11.9 million interest payment due under the 2020 Notes. The Debtor has a 30-day period, after which time, if the interest payment is not made, there will be an event of default under the 2020 Indenture.

29.     Afren engaged Alvarez & Marsal on January 12, 2015 to provide services as chief restructuring officer and cash management support. In addition, Afren has been working with legal counsel White & Case LLP and financial advisors Morgan Stanley & Co. International plc

("**Morgan Stanley**") to develop plans and contingencies to work through its financial difficulties and find and implement a restructuring solution.  In March 2015, the Group engaged Lucid Issuer Services Limited (the "**Information Agent**"), a specialist bondholder communications firm, to contact Existing Noteholders in relation to the Group's restructuring and to engage with them in relation to it.

30.     The Group has taken, and continues to take, steps to grow its revenues and reduce its costs.  However, despite the changes being implemented across the Group and the streamlining of its businesses, it became apparent that the Group's liquidity position places it in severe risk of being forced to commence some form of insolvency proceedings in the event that the Restructuring (or the Alternative Restructuring) is not implemented.

31.     In parallel with the above, Afren commenced detailed discussions with its key creditors in January 2015, including the Ebok Lenders and an ad hoc committee of Existing Noteholders (the "**Ad Hoc Committee**"), which, at the time, represented approximately 54.1% in aggregate principal value of the 2016 Notes, 41.4% in aggregate principal value of the 2019 Notes, and 31.4% in aggregate principal value of the 2020 Notes.

32.     These discussions were with a view to determining whether such creditors would be prepared to provide additional funding or otherwise amend the terms of their existing credit facilities.  Afren also indicated that it was in discussions with the advisers to the Ad Hoc Committee regarding the immediate liquidity and funding needs of the business.

33.     Following discussions with third parties, the Debtor was of the view that, given the terms offered and the significant uncertainty that any of the offers were capable of being implemented, no third party alternative additional funding was either available or could be completed within the relevant time frame available to avoid insolvency proceedings.  The only

offer that was available, capable of execution within the timeframe of the Group's liquidity requirements, and capable of garnering the support of the creditors necessary to receive such funding within the structure and terms of the Group's existing debt was from the Ad Hoc Committee in the form of the Bridge Securities.  This offer addressed the short-term funding requirements of the business and was structured in a manner that was capable of being implemented.  The offer required the agreement of the Ebok Lenders and the lenders under the Okwok/OML 113 Facility, however, as it required that the proposed interim funding be made on a senior secured basis to the Group's existing secured facilities.

34.    <u>Agreement on the terms of the Restructuring and Alternative Restructuring</u>.  On March 13, 2015, the Debtor announced it had agreed in principle on the terms of a financial restructuring with the Ad Hoc Committee and certain lenders under the Ebok Facility.  Those terms were documented under a restructuring agreement on March 12, 2015 (as amended from time to time, the "**Restructuring Agreement**"[3]) and which included:

a.    a proposal from the Ad Hoc Committee to provide $200 million in net cash proceeds to Afren as an interim funding measure.  Without the provision of such interim funding, the Directors considered that the Debtor would have been unable to continue as a going concern and would have commenced insolvency proceedings prior to the publication of its accounts on April 30, 2015 for the year ended December 31, 2014; and

b.    an agreement from the parties thereto to support the Restructuring (and the Alternative Restructuring) and refrain from taking certain actions, including accelerating sums owing by the Group or taking enforcement action over any

---

[3] A copy of the Restructuring Agreement is annexed hereto as **Exhibit "D."**

security, which may frustrate the implementation of the Restructuring or the Alternative Restructuring.[4]

35.     On April 30, 2015, in connection with the provision of the interim funding, which was provided in the form of the Bridge Securities, as described further below, the Restructuring Agreement was amended and restated to provide for, among other things, the final negotiated position between Afren and the parties thereto in respect of the terms of the Restructuring and the Alternative Restructuring.  Holders of approximately 42% of the aggregate principal amount of the Existing Notes and holders of 100% of the aggregate principal amount of the Ebok Facility were parties to or acceded to the Restructuring Agreement, as amended and restated.  The Scheme that is being proposed is in line with the terms of the Restructuring Agreement.

36.     The Existing Noteholders' interests have been represented throughout the discussions over the Restructuring (and the Alternative Restructuring) by the Ad hoc Committee, which has itself been advised by a legal adviser – Akin Gump Strauss Hauer & Feld LLP ("**Akin**") – and Blackstone Advisory Partners as financial adviser.  Akin, in particular, have negotiated the Restructuring Documents and the Alternative Restructuring Documents (each as hereafter defined).

37.     <u>Alternatives to the Restructuring</u>.  Prior to considering the Restructuring and the Alternative Restructuring, the Board of Directors of Afren, and Afren's financial and legal advisers, considered a number of alternatives to deal with the Group's debt burden, none of which proved viable.

38.     An exchange-solicitation was considered, whereby Afren would have requested that the Existing Noteholders exchange the Existing Notes for new securities.  This would have

---

[4] The Restructuring Agreement terminates on September 12, 2015, though it may be extended by agreement of certain applicable majorities of Existing Noteholders.

required the terms of the Existing Notes to be amended, and under the Existing Indentures, the

consent threshold that would have been needed was ninety percent (90%) of the aggregate

principal amount of the Existing Notes then outstanding.  Given that the Existing Notes are

widely held and the short time frame Afren has to implement the Restructuring or the Alternative

Restructuring, an exchange-solicitation was considered unworkable.

      39.    Afren also explored whether additional equity could have been raised by way of a

capital injection or equity offering from its existing shareholders (the "**Existing Shareholders**").

Unfortunately, by mid-January 2015, Afren's share price had significantly fallen, leaving its

market capitalization (i.e. share price multiplied by total number of shares on issue) at

approximately $200 million (down from approximately $700 million in October 2014).  It was

not commercially feasible for the existing shareholders to provide the amount of capital which

was required by the Group given the value of their equity investment (and, more specifically, the

reduction in value thereof) at that time, particularly given Afren's urgent need for additional

funds and the disparate nature of the shareholder base.

      40.    Afren also had tried to attract new financing and/or refinance its outstanding

indebtedness.  Unfortunately, its attempts to refinance the Ebok Facility were derailed by the

sudden dismissal of its former Chief Executive Officer and former Chief Operating Officer in the

middle of 2014.  The Debtor also did not receive any third party offers which were capable of

implementation.

      41.    Afren also explored with Morgan Stanley whether a merger could be a potential

solution to its financial difficulties.  It was approached by several potential strategic partners, the

most significant being Seplat Petroleum Development Company plc, a Nigerian oil producer.

However, after two months of due diligence, Afren terminated discussions on the basis that the

proposal put forward by Seplat was not capable of being implemented within the time frame available and, therefore, was not in the best interests of Afren's shareholders.

42.     Afren also considered pursuing a restructuring under chapter 11 of the Bankruptcy Code given that the Existing Notes are all governed by New York law.  However, it was determined, among other things, that the costs of such a restructuring likely would be considerably higher than the estimated cost of the Restructuring (or the Alternative Restructuring) implemented through the Scheme.

43.     Interim Funding.  On April 30, 2015, Afren entered into a note purchase agreement with the Bridge Noteholders for the provision of interim funding of $200 million in net cash proceeds, through the issuance of the Bridge Securities.  The Bridge Securities were issued for a term of 360 days at an original issue discount of 5.5% and have an annual interest rate, payable in kind, of 15%.  This interim funding has provided the Group with immediate liquidity and necessary time to implement the required steps to complete the Restructuring (or the Alternative Restructuring).

44.     The Bridge Noteholders comprise those Existing Noteholders who are (or were at the time) on the Ad Hoc Committee.  The Group's financial crisis meant that securing new sources of funding from external sources was extremely difficult, and the only third party financing that could be obtained on acceptable terms was from the Ad Hoc Committee.

45.     Given the financial condition of the Group, the Bridge Noteholders were willing to fund the Bridge Securities only if they received security that ranked ahead of the Existing Notes.  As a result, in connection with the provision of the interim funding, Afren entered into additional intercreditor agreements which, among other things, provide that the Bridge Securities and the security in respect thereof rank ahead of the Existing Notes.

46.     The interim funding was, and continues to be, needed to address the immediate operational requirements of the Group.  The money is kept in an escrow account in the name of the agent under the Bridge Securities, and Afren is allowed to draw down on the money in tranches based on its projected cash flow needs.  The aggregate amount of interim funding which was provided under the Bridge Securities was based on the amount of money which the Debtor forecasted it would need until the end of June.  The new money is committed but can be withdrawn at any time in the event of certain limited circumstances.

47.     The proceeds of the Bridge Securities have been applied towards the payment of essential services and key suppliers.  Without making these payments, the Group would not have been able to have continued as a going concern, and the Directors would have commenced insolvency proceedings prior to the publication of its accounts on April 30, 2015 for the year ended December 31, 2014.

48.     Under the terms of the Bridge Securities, Afren has the option to issue another $50 million of private placement notes.  If the Restructuring (or the Alternative Restructuring) does not complete by the end of the third week in July and Afren therefore does not receive the cash injection from the proceeds of the New Senior Notes (or the Alternative New Senior Notes), Afren expects that it will be very close to running out of the liquidity it needs in order to continue to operate as a going concern.  In anticipation of this, Afren has recently approached the Bridge Noteholders with a view to increasing the amount borrowed under the Bridge Securities by an additional $30 million in net cash proceeds to provide additional working capital, but there is no assurance that they will agree to more funding.

49.     It is intended that the Bridge Securities will be repaid:

a.      under the Restructuring, through a combination of the proceeds raised by the issuance of New Senior Notes (described below) and the issue to the holders of the Bridge Securities (or their nominees) of new ordinary shares in Afren representing 5% of the fully diluted share capital of Afren (in return for the conversion of $5 million of the Bridge Securities) following the Debt-for-Equity Swap, the New Senior Notes Share Issue and the Open Offer (as defined below), each as further described below; and

b.      under the Alternative Restructuring, out of the proceeds from the issuance of the Alternative New Senior Notes and the issue of $5 million of Alternative New Senior Notes to the Bridge Noteholders.

50.    Long term prospects.  Despite the challenging operational and macro-economic conditions during 2014, the Group delivered full year 2014 gross and net production of approximately 47.6 thousand barrels of oil per day and 31.8 thousand barrels of oil per day, respectively.  Afren is confident that it can build on this output, and by executing its new business plan (aligned around core producing assets to operate in a lower oil price environment), it expects year-on-year growth in the underlying net production base through to 2017.

51.    Over the long-term, Afren is confident that, following the implementation of the Restructuring (or the Alternative Restructuring) and by responding to the lower oil price environment, the Group's financial position will be sustainable.

E.    **The Restructuring**

52.    The primary objectives of the Restructuring (and of the Alternative Restructuring, as applicable) are to (i) mitigate the risk of any member of the Group having to commence a formal insolvency process, which would result in materially lower recoveries for persons with a

beneficial interest in the Existing Notes (the "**Scheme Creditors**," and the claims based on such interests, the "**Scheme Claims**") than if the Restructuring or the Alternative Restructuring were successfully completed, (ii) implement a new capital structure so that the Group will have a strengthened balance sheet and a debt service and maturity profile more appropriately adapted to the ongoing difficult market conditions in the global oil and gas market, and (iii) ensure that the Group can service its general corporate and working capital obligations, thereby allowing the Group to continue trading.

53.    Under the Restructuring, the Scheme provides that:

a.    Scheme Creditors will release in full the existing financial indebtedness of Afren and other Group entities under the Existing Notes (including any guarantees and security granted in connection with the Existing Notes), and

b.    Scheme Creditors (or their nominated recipients) shall receive, in aggregate, in consideration for the compromises and arrangements under the Scheme:

i.    on a pro rata basis by reference to the Scheme Claims of Scheme Creditors:

(a)    new high yield notes due 2019 in principal amount of approximately $350 million (the "**New 2019 Notes**") and high yield notes due 2020 in principal amount of approximately $350 million (the "**New 2020 Notes**," and together with the New 2019 Notes, the "**Reinstated Notes**"), issued by Afren Finance plc (the "**Notes Issuer**"), a newly incorporated subsidiary sitting directly underneath Afren; and

(b)    new ordinary shares representing eighty percent (80%) of the existing issued ordinary share capital in Afren immediately following issuance of such shares (the "**Debt for Equity Swap**"); and

ii.    the ability to participate in the issuance by the Notes Issuer of new high yield notes due 2017 in principal amount of approximately $369 million (the "**New Senior Notes**");

iii.    the ability to participate in the issuance of new ordinary shares in Afren to the holders of the New Senior Notes in a total aggregate amount representing fifty percent (50%) of the share capital of Afren (the "**New Senior Notes Share Issue**") following the Debt for Equity Swap.

54.    Under the Restructuring, but outside of the terms of the Scheme, Afren will:

a.    undertake the Open Offer

b.    following the Open Offer, allocate the Early Subscriber Issue (as defined below);

c.    repay the Bridge Securities; and

d.    amend the terms of the Ebok Facility and the Okwok/OML 113 Facility.

55.    The effect of the Restructuring on share capital and ownership of Afren:

|  | **Equity Ownership*** |
|---|---|
| Existing Shareholders | 15% |
| Scheme Creditors | 31% |
| New Senior Noteholders (through the New Senior Notes Issue) | 39% |

| | |
|---|---|
| Recipients of the Early Subscriber Issue | 10% |
| Recipients of the Bridge Securities Share Issue | 5% |

*Assumes 100% take-up from the Existing Shareholders only under the Open Offer.  Amount held by Existing Shareholders, Scheme Creditors and Scheme Creditors participating in the issue of the New Senior Notes is capped at 85% in aggregate.

56.    Structure charts, illustrating the Group's position before the Restructuring and after the Restructuring are attached hereto as **Exhibit "C."**

57.    <u>Issue of the Reinstated Notes</u>.  As part of the Scheme, the Notes Issuer will issue the New 2019 Notes and the New 2020 Notes (each as further described in the Explanatory Statement (as hereinafter defined)) to each Scheme Creditor.  The New 2019 Notes and the New 2020 Notes will have an annual interest rate of 9.1%, payable in kind until the New Senior Notes are fully repaid and then payable in cash.

58.    <u>Debt for Equity Swap</u>.  As part of the Scheme, the Scheme Creditors collectively will be entitled to receive 80% of the share capital of Afren in consideration for the cancellation of the Existing Notes held by each Scheme Creditor.  This entitlement will be satisfied by the issue of new ordinary shares in Afren to the Scheme Creditors. The collective 80% shareholding of the Scheme Creditors will then be diluted in accordance with the steps described below.

59.    <u>Issue of the New Senior Notes and Repayment of the Bridge Securities</u>.  As part of the Scheme, each Scheme Creditor will be entitled to participate in the issuance of the New Senior Notes in a principal amount of approximately $369 million.  The New Senior Notes will carry an annual interest rate of 15% (7.5% payable in cash and 7.5% payable in kind).  An event of default under any of the Ebok Facility (as amended and restated as part of the Restructuring),

the OML 26 Facility and the Okwok/OML 113 Facility (as amended and restated as part of the Restructuring) is likely to give rise to a cross-default under the New Senior Notes and vice versa.

60.    The New Senior Notes will be used to refinance and repay substantially all of the Bridge Securities and provide an additional $148 million in net cash proceeds to the Group (as compared to the funding position under the Bridge Securities).  The issue of the New Senior Notes has been fully subscribed by certain Existing Noteholders pursuant a conditional subscription agreement dated April 30, 2015 (as amended, the "**Conditional Subscription Agreement**"), giving the Debtor certainty that the New Senior Notes issue will be fully subscribed. However, all Scheme Creditors will be entitled to participate in the issuance of the New Senior Notes.

61.    <u>New Senior Notes Share Issue</u>.  Afren shall issue new ordinary shares for cash at nominal value to those Existing Noteholders who subscribe for New Senior Notes.  Afren has agreed to issue a total aggregate amount of new ordinary shares (representing 50% of the share capital of Afren) following the completion of the Debt-for-Equity Swap.  The collective shareholding of those Scheme Creditors will then be diluted in accordance with the steps described below.

62.    <u>Open Offer</u>.  Outside of the terms of the Scheme, Afren will subsequently commence a pre-emptive open offer (the "**Open Offer**") of up to £49.2 million (approximately $75 million) of the ordinary shares in Afren to all shareholders, including those Existing Noteholders who acquire shares pursuant to the Debt-for-Equity Swap and the New Senior Notes Share Issue.  The Open Offer will not be underwritten.

63.    <u>Bridge Securities Share Issue</u>.  Under the terms of the Restructuring, $5 million of the Bridge Securities will not be repaid by the proceeds raised by the issue of the New Senior

Notes but instead will be released and converted into equity pursuant to the issue of new ordinary shares in Afren to holders of Bridge Securities (or their nominees) following the completion of the Debt for Equity Swap, the New Senior Notes Share Issue, the Open Offer, and the Early Subscriber Issue (and, if applicable, the Additional Commitment Issue (described below)).

64.    <u>Early Subscriber Issue</u>.  Under the terms of the Restructuring, the new financing will be raised by the issuance of the New Senior Notes.  Given the importance of this new financing to the Group's ability to continue to operate, Afren requires certainty that the new liquidity will be provided and that creditors will elect to participate in the issuance of the New Senior Notes.  It is normal practice in the debt markets to achieve this by having one or more persons underwrite or subscribe early for the new debt in return for which a fee is paid.

65.    With respect to the Restructuring, members of the Ad Hoc Committee were initially given the opportunity to subscribe early for the New Senior Notes (the "**Initial Providers**") pursuant to the terms of the Conditional Subscription Agreement.  This was to give Afren the required certainty that these new funds will be secured for the Group's operations. Following the initial commitment, the other Existing Noteholders were offered the opportunity to subscribe early for the New Senior Notes (the "**Consenting Noteholders**," and together with the Initial Providers, the "**Restructuring Backstop Providers**") by adhering to the Conditional Subscription Agreement.  The Debtor has agreed to issue, for cash at nominal value to the Restructuring Backstop Providers, additional new shares in the ordinary share capital of Afren representing 10% in aggregate of the fully diluted share capital of Afren (the "**Early Subscriber Issue**"), following the Debt-for-Equity Swap, the New Senior Notes Share Issue and the Open Offer and assuming the completion of the Bridge Securities Share Issue.  This is as an "early bird" incentive payment, in order of priority of the Restructuring Backstop Providers' agreement

to subscribe for New Senior Notes.  If the New Senior Notes are issued after August 7, 2015, the amount of the Early Subscriber Issue will increase by 0.1205% of the fully diluted share capital of Afren for each day after August 7, 2015 until the date of issue of the New Senior Notes (the "**Additional Commitment Issue**").

66.     Afren has agreed to issue ordinary shares in Afren in respect of the Early Subscriber Issue to the Initial Providers and Consenting Noteholders on the following basis:

    a.     20% of the Early Subscriber Issue shall be allocated to the Initial Providers *pro rata* to their subscriptions for Bridge Securities (the "**Initial Provider Fee**");

    b.     80% of the Early Subscriber Issue shall be allocated to the Consenting Noteholders *pro rata* to their subscriptions for New Senior Notes and adjusted for the date on which they agreed to subscribe for New Senior Notes and the amount of Existing Notes held at such time.

67.     Afren has agreed to pay the Early Subscriber Issue because it believes that the fee is a necessary part of the overall restructuring.  The Restructuring Backstop Providers have insisted, understandably, on payment of a commercial fee in return for their agreement to subscribe early, and Afren could not take the risk that they would not subscribe for the new debt instruments and support the Restructuring.  I believe that the payment of the Initial Provider Fee is merely reflective of the commercial fee payable in return for those members' commitment to subscribe early for the New Senior Notes before the other Existing Noteholders.  Although the Initial Provider Fee is not being made available to all Existing Noteholders, the Petitioner does not believe that this would cause an Initial Provider who considered any substantive aspect of the Scheme to be against its interest to vote in favor of the Scheme by reason of the Initial Provider Fee.

68.      The Early Subscriber Issue, which is merely reflective of the commercial fee that
is payable in return for a commitment to subscribe early for the New Senior Notes, is unlikely to
cause a Restructuring Backstop Provider who considered any substantive aspect of the Scheme
to be against its interests to vote in favor of the Scheme by reason of the Early Subscriber Issue.
The Early Subscriber Issue is de minimis when compared with the aggregate claims of the
Scheme Creditors, and it is unlikely that a Scheme Creditor would be persuaded to vote in favor
of the Scheme by reason of the Early Subscriber Issue.

69.      <u>Conditionality of the Restructuring</u>.      Afren's ability to implement the
Restructuring is, in part, subject to its Existing Shareholders approving various matters in
connection with the steps outlined above.  It is intended that the Debtor will call an extraordinary
general meeting of shareholders (the "**EGM**") to try to obtain all of the necessary approvals.  It is
intended that the EGM will be held on July 24, 2015, but in any event before the Scheme
Meeting, so that prior to voting on the Scheme, it will be known if the Restructuring can be
implemented (subject to the requisite majorities of Scheme Creditors approving the terms of the
Scheme at the Scheme Meeting).  If the requisite shareholder approval is not obtained, Afren will
seek to implement the Alternative Restructuring (subject to the requisite majorities of Scheme
Creditors approving the terms of the Scheme at the Scheme Meeting).  Given the Group's urgent
need for relief, both alternatives are being simultaneously presented until it becomes clear
whether such conditions have been met, which will occur before the Scheme Creditors vote on
the Scheme at the Scheme Meeting and before this Court holds a hearing to consider the relief
requested in the Petition.

F.    **The Alternative Restructuring**

70.    Under the Alternative Restructuring, the Scheme provides:

a.    Scheme Creditors will release in full the existing financial indebtedness of Afren and other Group entities under the Existing Notes (including any guarantees and security granted in connection with the Existing Notes); and

b.    Scheme Creditors shall receive, in aggregate, in consideration for the compromises and arrangements under the Scheme, on a *pro rata* basis by reference to the Scheme Claims of the Scheme Creditors:

i.    from the Notes Issuer, new high yield notes due 2019 in principal amount of approximately $350 million (the "**Alternative New 2019 Notes**"), high yield notes due 2020 in principal amount of approximately $350 million (the "**Alternative New 2020 Notes**"), and $233 million new high yield notes which have an annual interest rate of 20.2%, payable in kind (the "**Alternative New 2021 Notes**," and together with the Alternative New 2019 Notes and the Alternative New 2020 Notes, the "**Alternative Reinstated Notes**"); and

ii.    the ability to participate in the issuance of approximately $401 million new high yield notes (the "**Alternative New Senior Notes**"),[5] which will mature in 2017 and have an annual interest

---

[5] The increase from $369 million, which would have been issued under the New Senior Notes had the Restructuring been effected, is due to (i) an increased discount of 5% to the issue price of the Alternative New Senior Notes (as opposed to a discount of 2% under the New Senior Notes), (ii) $14 million additional Alternative New Senior Notes being required to effect the Alternative Early Subscriber Issue (as described below) as opposed to shares being issued pursuant to the Early Subscriber Issue had the Restructuring been effected, and  (iii) $5 million of the Bridge Securities being payable by the issue of Alternative New Senior Notes (as opposed to the issue of shares had the Restructuring been effected).

rate of (a) 7.1% payable in cash on the principal amount of the Alternative New Senior Notes, (b) 2.5% payable in kind on the principal amount of the Alternative New Senior Notes being capitalized under new senior PIK notes (which will mature in 2017 and will be issued on the same terms as the Alternative New Senior Notes) and (c) interest of 26.9% per annum payable in kind on the principal amount of the Alternative New Senior Notes being capitalized under new junior PIK notes (which will mature 6 months after the date of maturity of the Ebok Facility (as amended and restated as part of the restructuring process)).

71.     It will be an event of default under the Alternative New Senior Notes if, among other things:

i.      Afren does not take certain steps to initiate a sale of all or substantially all of the Group's business by the end of 2015;

ii.     Afren has not entered into a binding agreement or agreements (each a "**sale agreement**") for the sale of all or substantially all of the Group's business by the end of December 2016;

iii.    Shareholders do not approve the terms of any sale agreement when put to them for approval;

iv.     any sale agreement is terminated as a result of a failure to satisfy conditions of such agreement (other than shareholder approval), provided that such termination shall not in any event be an event of default before March 31, 2017; and/or

> v.   Afren and/or the Notes Issuer breaches the terms of the Investor Rights Agreement (as described below).

72.   <u>Investor Rights Agreement</u>.  Pursuant to the terms of an investor rights agreement (the "**Investor Rights Agreement**"), attached as Appendix S to the Explanatory Statement (as defined below), the holders of 50% or more of the Alternative New Senior Notes will have the right to appoint a majority of Afren's board of directors and the board of directors of the Notes Issuer and Afren International Limited (each such member, a "**Director Nominee**"), with control over the process for the sale of the Group's business, under the terms of the Investor Rights Agreement.  Under the Investor Rights Agreement, the obligations of Afren and the Notes Issuer are to ensure that such Director Nominees are appointed to the relevant board of directors.  It will be an event of default under the Alternative New Senior Notes if Afren or the Notes Issuer breaches the terms of the Investor Rights Agreement.

73.   <u>Early Subscriber Issue</u>.  Under the terms of the Alternative Restructuring, the new financing will be raised by the issuance of the Alternative New Senior Notes.  As was the case under the Restructuring, given the importance of this new financing to the Group's ability to continue to operate, Afren requires certainty that the new liquidity will be provided and that creditors will elect to participate in the issuance of the Alternative New Senior Notes.  It is normal practice in the debt markets to achieve this by having one or more persons underwrite or subscribe early for the new debt in return for which a fee is paid.

74.   Similar to the position under the Restructuring, members of the Ad Hoc Committee were initially given the opportunity to subscribe early for the Alternative New Senior Notes as Initial Providers.  This was to give the Debtor the required certainty that these new funds will be secured for the Group's operations.  Following the initial commitment, the other

Existing Noteholders were offered the opportunity to subscribe early for the Alternative New Senior Notes (the "**Alternative New Senior Notes Backstop Providers**," and together with the Initial Providers, the "**Alternative Backstop Providers**") by adhering to the Conditional Subscription Agreement. The Debtor has agreed to issue the Alternative Backstop Providers approximately $14 million in aggregate of Alternative New Senior Notes (the "**Alternative Early Subscriber Issue**"). The Alternative Early Subscriber Issue will be satisfied in the form of the issue of additional Alternative New Senior Notes as the Debtor will not have the requisite shareholder approval to issue the ordinary shares representing the Early Subscriber Issue.

75.     Afren has agreed to the Alternative Early Subscriber Issue because it believes that it is a necessary part of the overall restructuring. The Alternative Backstop Providers have insisted, understandably, on commercially reasonable consideration in return for their agreement to subscribe early, and the Debtor could not take the risk that they would not subscribe for the new debt instruments and support the Alternative Restructuring.

76.     In relation to the Alternative Restructuring, as described above, a certain portion of the Alternative Early Subscriber Issue will be available only to those members of the Ad Hoc Committee that participated in the early subscription. This will be paid through the allocation of $2.8 million Alternative New Senior Notes (being 20% of the Alternative Early Subscriber Issue) to the Initial Providers (the "**Alternative Initial Provider Fee**"). I believe that the payment of the Alternative Initial Provider Fee is merely reflective of the commercial fee payable in return for those members' commitment to subscribe early for the Alternative New Senior Notes before the other Existing Noteholders. Although the Alternative Initial Provider Fee is not being made available to all Existing Noteholders, I do not believe that this would cause an Initial Provider

who considered any substantive aspect of the Scheme to be against its interest to vote in favor of the Scheme by reason of the Alternative Initial Provider Fee.

77.    The Alternative Early Subscriber Issue, which is merely reflective of the commercial fee that is payable in return for a commitment to subscribe early for the Alternative New Senior Notes would not cause an Alternative Backstop Provider who considered any substantive aspect of the Scheme to be against its interests to vote in favor of the Scheme by reason of the Alternative Early Subscriber Issue.  The Alternative Early Subscriber Issue is de minimis when compared with the aggregate claims of the Scheme Creditors, and it is unlikely that a Scheme Creditor would be persuaded to vote in favor of the Scheme by reason of the Alternative Early Subscriber Issue.

78.    If the Alternative Restructuring is implemented, the Scheme Creditors will not receive distributions of any ordinary shares in Afren as part of the Scheme.

G.    **Consequences of a Failure to Implement the Restructuring or the Alternative Restructuring**

79.    Afren has outstanding debt of $1,587 million, of which approximately $920 million constitutes the Existing Notes, including principal and accrued interest.  Following the Restructuring, the Group's total external debt will decrease to approximately $1,534 million. However, the Group's capital structure will have a more appropriate debt service and maturity profile, and Scheme Creditors will benefit from a substantially reduced risk of default and the potential to receive substantial returns if Afren performs well.

80.    In the event of the Alternative Restructuring, the Group's total external debt (excluding debt-like commitments) will be increased to approximately $1,799 million. Additionally, the Alternative New Senior Notes will contain a covenant requiring Afren to sell all or substantially all of the Group's assets by the end of 2016.  However, the Alternative

Restructuring will provide the Group with a more advantageous debt service profile (particularly given the current cash flow position of the Group) in the short term to allow it the opportunity to realize its assets in an orderly manner and return increased value to its creditors from such disposals.

81.    If neither the Restructuring nor the Alternative Restructuring can be consummated, the Directors believe that the Group would face an immediate risk of being unable to meet its contractual obligations when they fall due.  The Group has deferred or not paid a number of payments when they fell due, including:

    a.    the deferral, as part of the negotiation of the terms of the Restructuring (and the Alternative Restructuring), of two amortization payments of approximately $50 million each under the Ebok Facility, which were due on January 31, 2015 and April 30, 2015, and which, if the Restructuring (or the Alternative Restructuring) is not implemented, these will become immediately due and payable;

    b.    approximately $15 million of accrued and unpaid interest under the 2016 Notes, which was due on February 1, 2015; and

    c.    approximately $12.8 million of accrued and unpaid interest under the 2019 Notes, which was due on April 8, 2015.

82.    In the medium- to long-term, the Group will also be liable to pay:

    a.    approximately $11.9 million of accrued and unpaid interest under the 2020 Notes, which was due on June 9, 2015, but is subject to a 30-day grace period;

    b.    further amortization payments of approximately $50 million each under

the Ebok Facility, which are due on July 31, 2015, October 31, 2015 and January 31, 2016;

c.   the Okwok/OML 113 Facility in full (in the amount of approximately $50 million plus accrued interest) on September 30, 2015;

d.   a further interest payment of approximately $15 million under the 2016 Notes, which will become due and payable in August 2015;

e.   the 2016 Notes (in the amount of approximately $253 million plus accrued interest) in full on February 1, 2016;

f.   further interest payments of approximately $12 million under the 2019 Notes and 2020 Notes, which will be due twice yearly until maturity; and

g.   the Bridge Securities, which will be due and payable in full (in the amount of $211.6 million plus accrued interest) on April 25, 2016 (save that the non-approval of the Restructuring or the Alternative Restructuring shall be an event of default).

83.   Taking into account the interest payments that are or shortly will be outstanding under the Existing Notes, the amortization payments that are or shortly will be outstanding under the Existing Bank Facilities, and the medium- and long-term debt burden of Afren, the Board of Directors likely would have no alternative but to place Afren into some form of insolvency process if neither the Restructuring nor the Alternative Restructuring could be implemented. Additionally, the guarantee obligations of the Guarantors (as defined in the Existing Indentures) likely would be called, compelling the directors of each of those companies to commence insolvency proceedings in the relevant jurisdictions.

84.     As discussed above, the Group's key operating subsidiaries have entered into joint operating agreements with local strategic partners, and the key assets of the Group, the Ebok oil field, the Okwok oil field and the OML 26 oil field, are all jointly owned.  The joint operating agreements contain change of control and/or termination provisions that would be triggered upon an insolvency of the respective operating subsidiaries.  Assuming that the change of control and/or termination provisions were not waived, the Group would lose control of its key operating assets, a highly value destructive outcome that would lead to a Group insolvency and likely to liquidation proceedings with returns to Scheme Creditors likely be materially worse than those available under the Restructuring or the Alternative Restructuring.

85.     In addition, Afren's Directors believe that it is highly likely that if the lenders under the Existing Bank Facilities thought that the Restructuring (or the Alternative Restructuring) was not capable of implementation, they would be highly likely to accelerate the Group's borrowings given the existing events of default under the Group's facilities. In such circumstances:

> a.     the lenders under the Ebok Facility would be able to enforce their security interest in the shares in Afren Resources and thereby acquire the Group's interest in the Ebok field, which is one of the Group's key assets; and/or

> b.     the lender under the OML 26 Facility would be able to enforce its security interest in the shares in First Hydrocarbon Nigeria Company Limited and thereby acquire the Group's interest in the OML 26 field, which is one of the Group's key assets; and/or

      c.      the lender under the Okwok/OML 113 Facility would be able to enforce its security interest and thereby acquire the Group's interest in the Okwok field, which is one of the Group's key assets.

86.     If the lenders under the Existing Bank Facilities enforce, the Group will lose control over their key assets.  Given the Debtor is a holding company, the loss of the Group's key assets would be highly value destructive, and this, combined with the amounts due and payable under the Existing Bank Facilities and the Existing Notes, would result in the directors of Afren and of the other Group entities having to commence insolvency proceedings.  As discussed, returns to Scheme Creditors in such insolvency proceeding(s) would likely be materially worse than those available under the Restructuring or the Alternative Restructuring, in particular because of the loss of key assets which could not be realized upon such insolvency proceedings.

87.     Accordingly, the Board of Directors considers that the Restructuring or the Alternative Restructuring is in the best interest of the Group and its stakeholders.

H.     **The UK Proceeding**

88.     After negotiating the terms of the Scheme and other aspects of the Restructuring and the Alternative Restructuring, the Debtor applied to the UK Court on June 30, 2015 for an order directing it to convene a single meeting of the Scheme Creditors (the "**Scheme Meeting**") for them to consider and, if thought fit, approve the Scheme.  The Scheme has only one class, which consists of persons with a beneficial interest in the Existing Notes (the "**Scheme Creditors**").  The Existing Notes are each held in global form through the Depository Trust Company ("**DTC**"), Euroclear, and Clearstream.  A person is deemed to be a Scheme Creditor if

the person holds a beneficial interest in the Existing Notes as of July 27, 2015 at 10:00 p.m.

(London Time) (the "**Record Time**").[6]

89.     Notice of the Scheme and the Scheme Meeting was distributed to all Scheme

Creditors pursuant to a practice statement letter (the "**Practice Statement Letter**") dated June 8,

2015 and addressed to UMB Bank, N.A., in its capacities as trustee for the Existing Notes, and to

the Scheme Creditors.[7]

90.     Afren sent out an update notice (the "**Update Notice**") to the Practice Statement

Letter on June 19, 2015, informing the Scheme Creditors of a revised court date.

91.     The Practice Statement Letter notified the Scheme Creditors of, among other

things:

    a.     the fact that the Scheme was being promoted;

    b.     the purpose that the Scheme is designed to achieve;

    c.     the meeting of Scheme Creditors that Afren believes is required for the

    purposes of voting on the Scheme; and

    d.     the composition of the Scheme Meeting.

---

[6] In relation to the Existing Notes, the Debtor has considered who satisfies the legal definition of a "creditor" of Afren for purposes of the Scheme. While one might argue that the "formal" creditor may be the Existing Notes Trustee or DTC as Common Depositary for the Existing Notes, the parties recognize that such a narrow interpretation of the term "creditor" is inappropriate in this instance because those creditors with the actual economic interest in the Existing Notes, i.e., the "real" creditors, are the underlying Existing Noteholders, or Scheme Creditors. Moreover, the Existing Indentures each expressly prevents the Existing Notes Trustee from exercising any discretion to vote on a matter such as this. Indeed, the Existing Notes Trustee has undertaken not to vote at the Scheme Meeting.

    It also should be noted that, because the Existing Notes are held in global form through DTC, all of the beneficial interests in the Existing Notes are held by the Existing Noteholders through account holders (the "**Account Holders**"), who are registered as having a direct interest in the Existing Notes with DTC. The Existing Notes could be definitized (i.e., individual bond certificates could be issued to each beneficial holder) in certain circumstances so that each beneficial holder becomes a legal owner of the Existing Notes. Each of the Existing Indentures provide for the circumstances in which the interests of beneficial owners may be exchanged for definitive notes. However, this process would add administrative complexity and have a significant impact on the Debtor's resources. The more practical alternative, which is now relatively well established in England, is to treat ultimate beneficial holders of the Existing Notes as contingent creditors and permit them to vote on the Scheme on that basis. This process was adopted in bringing the Practice Statement Letter (as hereinafter defined) to the attention of the Existing Noteholders.

[7] A copy of the Practice Statement Letter is attached hereto as **Exhibit "E."**

92.     Further, the Practice Statement Letter (as updated by the Update Notice) gave notice to Scheme Creditors that Afren was intending to apply to the UK Court, at a hearing (the "**Scheme Directions Hearing**") to be held no earlier than June 30, 2015, for an order (i.e, the Convening Court Order) granting Afren certain directions in relation to the Scheme, including permission to convene the Scheme Meeting for the purpose of considering and, if thought fit, approving the Scheme.

93.     The Information Agent reports that the Practice Statement Letter was made available to the Scheme Creditors June 8, 2015 (and the Update Notice was made available to the Scheme Creditors June 19, 2015) by:

    a.      publication on the Information Agent's website[8];

    b.      notification through DTC, Euroclear, and Clearstream; and

    c.      the Luxembourg Stock Exchange.

They were also published on Afren's website.

94.     Formal notice of the Scheme was given to the Scheme Creditors by means of the Practice Statement Letter of June 8, 2015 (as updated June 19, 2015).  Given the Scheme Creditors' representation in the prior negotiations over the Restructuring, the liquidity position of the Group, and the impending expiry of the Restructuring Agreement, I believed that such notice would not prejudice the Scheme Creditors and was sufficient and justified by the urgency of the situation and the need to achieve a restructuring.

95.     On June 30, 2015, the UK Court held the Scheme Directions Hearing and issued the Convening Court Order.  The UK Court found that it could exercise jurisdiction and that the center of the Debtor's main interests is situated in England.  Among other things, the Convening

---

[8] The Information Agent has agreed to provide a website (www.lucid-is.com/afren) to make Scheme documentation available to Scheme Creditors and to transmit any relevant document to any Scheme Creditor who requests the same.

Court Order also (i) set the Scheme Meeting for July 29, 2015 at 8:30 a.m. (London Time) at the

offices of White & Case LLP, 5 Old Broad Street, London EC2N 1DW, UK, (ii) ordered that

Scheme Creditors be notified of the Scheme Meeting and the Scheme by having notices placed at

least twenty-one (21) days before the Scheme Meeting, on or with the Information Agent's

website, which notice will be accompanied by instructions on how to access the Explanatory

Statement (as hereinafter defined), (iii) ordered that, at least twenty-one (21) days before the

Scheme Meeting, a package of documents be published on the Information Agent's website and

be sent to the Existing Notes Trustee and the depositaries, and e-mailed to known Existing

Noteholders, which package should include, among other things (a) an explanatory statement

required to be provided under section 897 of the Companies Act 2006 (the "**Explanatory**

**Statement**"), describing, among other things, the Scheme, the effect and risks of the Scheme,

any material interests of the managing directors of Afren and the effect that the Scheme has on

such interests, the Scheme voting and approval process, the other steps of the Restructuring and

the Alternative Restructuring (including a summary of the order sought by this Petition) and

information about the Debtor, its business and that of the Group,[9] (b) the document incorporating

the Scheme,[10] (c) a form of notice of the Scheme Meeting (the "**Notice of the Scheme**

**Meeting**")[11] and (d) a form of letter (the "**Account Holder Letter**") to be sent to depositary

account holders, which allows the Existing Noteholders to register details of their holdings and

certain elections with respect to voting the Existing Notes in respect of the Scheme[12] (the

documents comprising (a)-(d) collectively, the "**Notification Documents**").  Notice of the

Scheme and Scheme Meeting was accompanied by instructions on how to access the

---

[9] The Explanatory Statement is attached to the hereto as **Exhibit** "**F**."
[10] The Scheme is set forth in Part G of the Explanatory Statement.
[11] The Notice of the Scheme Meeting is set forth in Appendix B of the Explanatory Statement.
[12] The Account Holder Letter is set forth in Appendix C of the Explanatory Statement.

Explanatory Statement.  A copy of the Explanatory Statement is available on request to each Scheme Creditor, free of charge.

96.     The Convening Court Order also declared that I am authorized to act, as foreign representative in respect of the UK Proceeding in any chapter 15 cases under the Bankruptcy Code.

97.     The Notification Documents, including a voting and proxy form, have been provided to the Existing Noteholders on the Information Agent's website.

98.     In addition, on June 30, 2015, the Notification Documents, including the notice of the Scheme Meeting, were sent to the depositories, which, according to their usual procedures, have forwarded or will forward a notice confirming their receipt of such materials directly to their participants and clients, being the Account Holders for whom they hold details, and informing the Account Holders of the means by which they can download or otherwise obtain copies of the materials.

99.     It is understood that the Account Holders have been liaising with the beneficial owners of the Existing Notes and/or any intermediaries who themselves hold an interest in the Existing Notes on behalf of Scheme Creditors, and will collate, through the procedures established by DTC, Euroclear, and Clearstream for purposes of the Scheme, individual voting instructions on behalf of the Scheme Creditors.  The votes can then be lodged by the Account Holder with the relevant depositary, together with certification of the individual Scheme Creditor's holding (as of the Record Time), and, in turn, lodged with Afren via the Information Agent.

100.    On July 1, 2015, Afren also notified Scheme Creditors of the Scheme and Scheme

Meeting by advertising in the press, including the <u>Luxemburger Wort</u> in Luxembourg.[13]

101.    It is anticipated that a hearing to consider sanctioning the Scheme, if it obtains

requisite approval at the Scheme Meeting, will occur on or after July 30, 2015 (the "**Fairness**

**Hearing**").  After the Fairness Hearing, the Debtor anticipates that the UK Court will enter an

order sanctioning the Scheme (the "**Sanction Order**").

I.    **The Scheme**

102.    The Scheme has been promulgated as part of the process to implement the

Restructuring of the Group (or if the Restructuring does not obtain the necessary consent of

Existing Shareholders of Afren, the Alternative Restructuring).  Afren proposes to implement the

Restructuring in part through the Scheme to provide a solution to the immediate and long-term

liquidity and debt problems that the Group faces, which I believe is in the interests of all of the

Group's stakeholders.  The Restructuring will allow all of the Scheme Creditors to benefit from

any recovery in the performance of the Group.  If Afren is not able to implement the

Restructuring, given its liquidity position it will not be possible for it to return to creditors a

second time with a different restructuring proposal, and therefore, Afren would seek to

implement the Alternative Restructuring.  Obtaining an order from this Court giving full force

and effect to the Scheme in the United States is a condition to implementing the Scheme.

103.    A detailed description of the Scheme is set forth in Part C of the Explanatory

Statement.  In short, the Scheme seeks

a.    to bind all of the Scheme Creditors to certain aspects of the Restructuring,

which will affect their rights (including in respect of the release and then

cancellation of the Existing Notes), and to grant Afren the authority, for itself and

---

[13] Copies of these press advertisements are attached hereto as **Exhibit** "**G**."

on behalf of the Scheme Creditors, to enter into certain documents required to

effect the Restructuring (as set forth in Part D of the Explanatory Statement, the

"**Restructuring Documents**") and any other documents necessary to effect the

Restructuring, but only if the Scheme receives the support of the requisite

majority of the Scheme Creditors and the other applicable conditions to the

effectiveness of the Scheme are satisfied; or

b.       to bind the Scheme Creditors to certain aspects of the Alternative

Restructuring, which will affect their rights, and to grant Afren the authority, for

itself and on behalf of the Scheme Creditors, to enter into certain documents

required to effect the Alternative Restructuring (as set forth in Part E of the

Explanatory Statement, the "**Alternative Restructuring Documents**") and any

other documents necessary to effect the Alternative Restructuring, but only if the

Restructuring cannot be implemented because the necessary shareholder

approvals are not obtained.

104.     Pursuant to the Scheme, Afren will be authorized to execute the Restructuring

Documents or the Alternative Restructuring Documents, as applicable, to which the Scheme

Creditors are party, or under which they assume their rights, on behalf of the Scheme Creditors,

together with other documents necessary to give effect to the Restructuring or the Alternative

Restructuring, as applicable, subject to the conditions set out therein.  The Guarantors will not be

bound directly by the Scheme, which relates solely to Afren.  However, each of these entities,

together with Afren and the Scheme Creditors, intends to enter into the Restructuring Documents

or the Alternative Restructuring Documents, as applicable, where necessary to implement the

Restructuring or the Alternative Restructuring, respectively, which will take effect if the Scheme is sanctioned.

J.    **The Debtor's Connections to the United States**

105.    Afren's assets in the United States include Afren's wholly owned subsidiary, Afren USA Inc. ("**Afren USA**"), a corporation organized, existing and registered under the laws of Delaware, that provides technical staff and support and is based in Texas.

106.    Afren also holds a reversionary interest in a $25,000 retainer advanced to the my Delaware counsel, Fox Rothschild LLP, in Wilmington, Delaware.

107.    Other connections to the United States include that the Existing Indentures,[14] under which Afren issued the Existing Notes, are governed by New York law.  However, the Existing Notes are not qualified or required to be qualified under the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa-77bbbb, because the offer and sale of the Existing Notes was not registered or required to be registered under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, as the Existing Notes were not sold in a public offering in the United States. Rather, the Existing Notes are listed on the Official List of the Luxembourg Stock Exchange and are traded on the Euro MTF Market.  Pursuant to Section 14.9 of the Existing Indentures, Afren has expressly consented to the jurisdiction of any federal or state court located in the borough of Manhattan, New York, New York and any appellate court from any thereof.

108.    Afren has appointed Corporation Service Company, a privately held corporation, incorporated in Delaware and with its registered office in Wilmington, Delaware, as its agent for service of process for any such court for actions arising out of the Existing Indentures or transactions contemplated thereby.

---

[14] Excerpts of Offering Memoranda in respect of the Existing Notes discussing information relevant to the center of Afren's main interests are attached hereto as **Exhibit** "**H**."

109.    Finally, some of the Existing Noteholders and other financial creditors of Afren may be based in the United States.

110.    Afren is not involved in any litigation in the United States.

## STATEMENT PURSUANT TO
## SECTION 1515(c) OF THE BANKRUPTCY CODE

111.    I am informed that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

112.    In compliance with section 1515(c), I hereby declare that the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to the Debtor that is known to me is the UK Proceeding.

## LIST PURSUANT TO
## BANKRUPTCY RULE 1007(a)(4)

113.    I am informed that Federal Rule of Bankruptcy Procedure 1007(a)(4) provides as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

114.    In compliance with Interim Bankruptcy Rule 1007(a)(4), I hereby provide the following lists:

Corporate Ownership Statement

115.    Pursuant to Federal Rule of Bankruptcy Procedure 7007.1, the following corporations directly or indirectly own 10 percent or more of the Debtor's equity interests:

None.

Administrators in the UK Proceeding

116.    In a scheme proceeding, Afren remains in possession of its assets and attends to

its own affairs.  As noted, I, Anne Vallely, Kinnaird House, 1 Pall Mall East, London SW1Y

5AU, United Kingdom, was appointed by the Resolution of Appointment and declared

authorized by the UK Court to act as foreign representative for the purposes of chapter

15 proceedings in the United States pursuant to the Convening Court Order.  I am unaware of

any other persons or bodies authorized to administer foreign proceedings in respect of the debtor.

Parties to Litigation in the United States

117.    As of the date of this Declaration, the Debtor is not a party to any litigation

pending in the United States of which I am aware.

Entities Against Whom Provisional Relief is Sought under Section 1519

118.    Neither the Debtor nor I am currently seeking any provisional relief, but each of

us reserves the right to do so should the need arise.

[The remainder of this page is left intentionally blank.]

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: July 2, 2015
        London, England

Anne Vallely

1 Pall Mall East
London  SW1Y 5AU
United Kingdom

Americas 90648543 (2K)