# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 15 |
| Afren plc, | ) Case No. 15-11452 (KG) |
| Debtor in a Foreign Proceeding. | ) |

## DECLARATION OF CHRISTIAN PILKINGTON
## PURSUANT TO 28 U.S.C. § 1746

I, Christian Pilkington, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am a partner in the law firm of White & Case LLP, located at 5 Old Broad Street, London, EC2N 1DW United Kingdom. I submit this declaration (the "Declaration") in support of the Verified Petition for Recognition of Foreign Main Proceeding Supplementing "Voluntary Petition" and Motion for Related Relief dated July 2, 2015 [ECF No. 2] (together with the Form of Voluntary Petition [ECF No. 1] filed contemporaneously therewith, the "Petition"),[1] which seeks entry of an order (i) recognizing the UK Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"),[2] (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a) and 1525(a) of the Bankruptcy Code in support of the financial restructuring of the Debtor and certain of its affiliates through, among other things, a scheme of

---

[1] Except as otherwise indicated, capitalized terms used herein carry the meanings ascribed to them in the Petition.
[2] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

arrangement (the "Scheme"), if such Scheme is duly approved by a requisite majority of affected creditors and sanctioned by the UK Court, all in accordance with applicable English law.

2. In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition.

3. In preparing this Declaration, I have reviewed (i) the Petition and (ii) relevant provisions of the Companies Act 2006, the Insolvency Act 1986 and other provisions of English and EU law, as they relate to chapter 15 and other aspects of U.S. bankruptcy law.

## BACKGROUND AND QUALIFICATIONS

1. Pertinent aspects of my legal background are as follows: I earned a Bachelor of Laws degree from the *University of Nottingham* in 1995 and a Master of Laws degree in Commercial and Corporate Law from the *London School of Economics* in 2003. I am a partner in the Financial Restructuring & Insolvency team in White & Case LLP's Banking & Capital Markets group in London. I have been a practicing attorney concentrating in all aspects of national and cross-border restructuring and insolvency work since 1999. I also have regularly advised directors of companies in financial difficulty, often with an international element, frequently working with overseas counsel and coordinating advice on cross-border restructuring and insolvency issues.

2. I regularly publish articles on English, EU and cross-border insolvency and restructuring law issues in legal journals and periodicals. I am moreover the author of a leading text on schemes of arrangement.

3.      Papers submitted by the Debtor in the UK Proceeding have been drafted by me or under my supervision.[3]

4.      I have been advising the Debtor on all legal aspects of the restructuring, administration of the Scheme, and the extraterritorial effects and recognition of the same since January 2015.

## STATEMENTS ON ENGLISH LAW AND PRACTICE

**Schemes of Arrangement**

5.      A scheme of arrangement is a proceeding under the laws of England and Wales[4] that allows companies to effect compromises or arrangements, including restructuring their liabilities, with their members and/or creditors (or any class of them).  As the Scheme proposed by the Debtor in the UK Proceedings is with certain classes of its creditors only, the remainder of this Declaration will refer only to schemes in that context.

6.      Schemes are available in the situation where a company is insolvent, but also where no grounds for insolvency exist.  They are particularly useful in cases in which hold out creditors seek unfair advantage as against similarly ranked creditors in work out negotiations, as they enable companies and their creditors in certain instances to obtain a court sanction to effect restructuring measures without having to obtain approval from 100% of affected creditors. Creditors in general benefit from the fact that a scheme can afford the certainty that they will receive at least certain consideration in partial satisfaction of their claims relatively quickly in accordance with the terms of the scheme, although they may lose some of their rights, including

---

[3] The information concerning the UK Proceeding provided here is drawn either from public documents or from my personal knowledge.  Furthermore, <u>I have not relied on any confidential attorney-client communications</u> or on confidential documents prepared in anticipation of litigation.

[4] The legal basis for schemes of arrangement is set out in Part 26 of the Companies Act 2006 of England and Wales.

the right to full satisfaction of their claims, pursuant to the "compromise" or "arrangement" proposed in the scheme.

7. The scheme process begins when a company proposes the scheme and then submits it to the UK Court, seeking its permission to convene a creditors' meeting (or meetings) to vote on the scheme proposal, i.e., the "compromise" or "arrangement" being put to the creditors and/or members. After a hearing, at which creditors are entitled to raise objections (primarily at this stage as to the composition of creditor classes and jurisdiction issues), the UK Court decides whether to order that a creditors' meeting (or meetings) be convened to consider and, if thought fit, approve the proposed scheme. Creditors will fall into separate classes where the UK Court deems that their legal interests are so dissimilar that they cannot consult together with a view to their common interest. Each class of creditors will be required to meet separately to consider and, if thought fit, vote in favor of, the scheme.

8. Any such convening order must rest on, amongst other things, a finding of requisite jurisdiction. To have jurisdiction under English law to sanction a scheme, the UK Court must have jurisdiction to wind up the company in question under the Insolvency Act 1986. The Insolvency Act 1986 grants such jurisdiction in respect of all companies registered in England and Wales or Scotland under the Companies Act 2006. This includes those companies incorporated under the Companies Act 1985 and the Companies (Northern Ireland) Order 1986. The UK Court will not act in vain, and so must also be reasonably assured that the scheme will be recognized and given effect in each relevant foreign jurisdiction where the scheme company (and any released guarantors) have material assets or could otherwise be sued.

9. If the UK Court finds it has jurisdiction and decides to allow a creditors' meeting (or meetings) to be convened, notice of the meeting(s) must be delivered to creditors directly

affected by the scheme before the meeting. Such notice must set forth the time and place of the creditors' meeting, and an explanatory statement must be distributed to such creditors that contains sufficient information for a typical creditor whose claim is being affected by the terms of the scheme to make a reasonable decision about whether to support the scheme. The explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of an acceptance or rejection of a chapter 11 plan. Affected creditors are entitled to attend (in person or by proxy) and ask questions regarding the proposed scheme at the creditors' meeting(s).

10. The scheme is considered approved at a creditors' meeting only if it is supported by a simple majority (by number) of the creditors present and voting (in person or by proxy) and representing at least 75% by value (i.e., amount of the claims) of voters of the relevant class of creditors. All creditors whose claims would be affected by the scheme are entitled to vote at one or more of the creditors' meetings. The voting majorities will normally be scrutinized and confirmed by an independent third party (in this case, they will be scrutinized by the Information Agent). In those cases where the creditors have been divided into more than one class with different rights, a class of creditors must approve the scheme by at least the same majorities specified above in order for the rights of such class of creditors to be affected. In other words, non-consenting creditors can be bound by the terms of the scheme only if they are within an approving class. Thus, unlike a confirmed chapter 11 plan, a scheme cannot "cram down" entire classes of dissenting creditors.

11. In order for the scheme to become binding on the creditors following the creditors' meeting or meetings (assuming the requisite majority votes in favor have been obtained), it must also be approved by the UK Court at a fairness hearing, which is comparable

to a confirmation hearing under section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3020(b)(2). All affected creditors have an opportunity to raise questions and objections to the scheme and present evidence at the fairness hearing.

12. The UK Court has full discretion to grant or withhold its approval of the scheme at the fairness hearing, and will hear argument at this stage both from scheme creditors whose rights would be overtly affected by the scheme, and from persons whose rights were not overtly affected but who claim they would be prejudiced by the scheme if it were given the Court's sanction. In particular, it will examine whether the applicable statutory requirements are met; for example, whether the requisite majorities of voting creditors have approved the scheme (in this case, if such majorities have approved, the Information Agent will provide a sworn statement as evidence thereof), and whether the scheme overall is fair, taking into account the interests of the creditors and the nature of the scheme's impact upon dissenting creditors.

13. If the UK Court approves a scheme, it will take effect once a certified copy of the UK Court's order approving the scheme[5] has been delivered to the Registrar of Companies for England and Wales, and in accordance with the provisions of the scheme itself. It will then apply to, and be effective according to its terms upon, all creditors in the relevant class or classes, irrespective of whether or not they took part in the creditors' meeting or meetings and whether or not they voted in favor of the scheme.

14. It is now well established that a company through an English scheme may cause the release of its creditors' claims under guarantees provided by third parties where the guarantees are of the debt being compromised under the scheme. In accordance with the applicable case law, the UK Court will consider the release only of claims which:

---

[5] The order may be appealed to the Court of Appeal, and appeal may be had from the Court of Appeal to the Supreme Court.

(a) are closely connected with the scheme creditors' rights as creditors against the scheme company;

(b) are personal and not proprietary rights; and

(c) if exercised and leading to a payment by the third-party guarantor, would result in a reduction of the scheme creditors' claims against the company.

15. These stringent tests ensure that the ability to release third-party claims through a scheme is appropriately circumscribed, unlikely to be exploited or abused, and within the jurisdiction of the UK Court. In this case, these tests are met. Here, the Scheme contemplates certain non-consensual third party releases (the "<u>Releases</u>") of obligations and liabilities of guarantors (the "<u>Guarantors</u>") of the Existing Notes (as such term is defined in the Scheme). The Releases are essential, because without them, any amounts the Guarantors paid on the debt to the holders of Existing Notes would merely be transformed into contribution or subrogation claims of each Guarantor against the Debtor and/or the other Guarantor. For the same reason, the "close connection" and "reduction in claims against the company" requirements are met. The released rights are for satisfaction of a debt and are thus personal rather than proprietary in nature – any release of a proprietary security right being the direct result of a release of such debt. Without the Releases, demands for payment would mean that the Guarantors would have to undergo uncertain and expensive restructuring alternatives or liquidate, risks and expenses that the vast majority of holders of Existing Notes are unwilling to take on given the possibility of compromise under the Scheme. In the present circumstances, a requisite "give and take" between Guarantors and the holders of Existing Notes will be present to allow for a release of third-party guarantee claims given that they relate to such holders' claims against the Debtor, and the overall Scheme inures to the benefit of both the holders of Existing Notes and the Guarantors

as the financial position of the Debtor and its affiliates will be improved and value preserved in comparison to the alternatives. Furthermore, the Guarantors will guarantee the new notes issued to the Existing Noteholders, which will also be supported by pledges over the shares in the Guarantors' share capital.

16. Non-UK-domiciled creditors have the same rights to participate in and vote at the creditors' meetings, participate at and raise questions and issues at both UK Court hearings in relation to the scheme, and appeal the UK Court's orders, if any, as creditors from the UK.

[The remainder of this page is intentionally left blank.]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 2, 2015
      Reykjavik, Iceland

_____
Christian Pilkington

White & Case LLP
5 Old Broad Street
London, EC2N 1DW
United Kingdom

Counsel to Afren plc